## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENZOR SHEM VIDAL,<br><br>*Plaintiff*,<br><br>*v.*<br><br>ADVANCED CARE STAFFING, LLC,<br><br>*Defendant.* | **COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**<br><br>Civ. Action No.: 22-cv-5535 |

Plaintiff Benzor Shem Vidal, by his undersigned attorneys for his Complaint, alleges as follows:

### INTRODUCTION

1.       Plaintiff Benzor Shem Vidal ("Mr. Vidal" or "Plaintiff") is an immigrant nurse who came to the United States from the Philippines on a visa sponsored by his former employer Advanced Care Staffing, LLC ("Advanced Care Staffing" or "Defendant"). After entering the United States in 2022, he confronted grueling and unsafe working conditions that threatened his nursing license—including unmanageable patient loads of more than forty patients at a time. Mr. Vidal believed it was impossible for him to provide adequate care to patients but was also terrified to resign. He knew that his contract with Advanced Care Staffing purported to allow the company to pursue legal action against him, with potentially ruinous financial consequences, if he decided to terminate his employment.

2.       After months working for Advanced Care Staffing, he decided that he could no longer work under these dangerous conditions. He decided to quit his job. Advanced Care Staffing characterized his termination as a "breach of contract," and—after sending him a letter threatening legal action in which it would seek to recover tens of thousands of dollars and all of

its attorney's fees and arbitration costs if he did not return to his employment—Advanced Care Staffing filed a demand for arbitration before the American Arbitration Association, pursuing its purported damages ( including its supposed "lost profits"), its attorney's fees, and the costs of arbitration.

3.      With this case, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the arbitration provision Advanced Care Staffing seeks to enforce against him (the "Arbitration Provision") is illegal and unenforceable.

4.      First, the Arbitration Provision is a contract for illegal purposes. The Arbitration Provision and its "loser pays" term—which would require Mr. Vidal to pay all Advanced Care Staffing's attorney's fees and arbitration costs if the arbitrator awarded Advanced Care Staffing even a dollar in purported damages—are a threat of serious harm designed to coerce Mr. Vidal to stay in his job. That threat violates federal and state trafficking laws. Additionally, Advanced Care Staffing seeks to recoup costs, including lost profits, that federal and state minimum wage laws prevent it from forcing Mr. Vidal to bear. Advanced Care Staffing's recovery of attorney's fees and costs accrued would be an illegal kickback under federal and state wage and hour laws. Because it is black letter law that contracts for illegal purposes cannot be enforced, the Arbitration Provision is unenforceable.

5.      The Arbitration Provision is also unenforceable on its face. Its substantively unconscionable and illegal "loser pays" provision threatens to bury Mr. Vidal in tens of thousands of dollars of attorney's fees and arbitration costs and conflicts with the one-way fee shifting mechanism set out in the trafficking and minimum wage laws.

6.      As the United States Supreme Court has recently reaffirmed, the Federal Arbitration Act's policy "is to make 'arbitration agreements as enforceable as other contracts, but

not more so.'" *Morgan v. Sundance, Inc.*, No. 21-328, __ U.S. __, slip op. at 6 (2022) (citation omitted). "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* (citation omitted).

7.  For all these reasons, this Court should declare the Arbitration Provision unenforceable under federal and state law and enjoin the currently pending arbitration against Mr. Vidal.

## THE PARTIES

8.  Plaintiff Benzor Shem Vidal is a Registered Nurse who was formerly employed by Defendant. He is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. He lives in New York.

9.  Defendant Advanced Care Staffing, LLC is a limited liability company with its principal place of business in New York.

10.  At all times relevant to this action, Defendant has been an enterprise engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r)–(s).

11.  Upon information and belief, Defendant had gross sales made or business done in excess of $500,000 annually for each of the years from 2018 through 2021.

12.  Throughout his employment, Defendant was an "employer" of Plaintiff as defined by the FLSA and NYLL.

13.  Throughout his employment, Plaintiff was a non-exempt "employee" of Defendant as defined by the FLSA and NYLL.

14.  Throughout his employment, Defendant "employed" Plaintiff within the meaning of the FLSA and NYLL.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331. Plaintiff seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201, that

Defendant's Arbitration Provision is a contract for illegal purposes in violation of the Trafficking

Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, and the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq*., and that the enforcement of the Arbitration Provision would

violate Plaintiff's rights under the TVPA and the FLSA.

16.     The Court has subject matter jurisdiction over Mr. Vidal's request for a

declaration that Defendant's Arbitration Provision is a contract for illegal purposes and

unconscionable in violation of state law, and that the enforcement of the Arbitration Provision

would violate Plaintiff's rights under state laws, pursuant to 28 U.S.C. § 1367, as they form part

of the same case or controversy.

17.     This Court has personal jurisdiction over Defendant because Defendant initiated

the AAA proceeding in New York, is based in New York, and employed Plaintiff in New York.

18.     Venue is proper in this district pursuant to and 28 U.S.C. § 1391 because this

action seeks a declaration affecting the rights of Plaintiff who was employed in Brooklyn, New

York with respect to an arbitration initiated in New York.

19.     A declaratory judgment is appropriate because the facts alleged show that there is

a substantial controversy between parties having adverse legal interests—Mr. Vidal and

Advanced Care Staffing—of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.

## BACKGROUND

### I.    DEFENDANT'S BUSINESS

20.    Defendant recruits trained nurses from the Philippines and elsewhere, bringing them to the United States, and selling their labor to healthcare facilities, including nursing homes.

21.    Defendant profits by charging healthcare facilities more for healthcare workers' labor than it pays the workers in wages. Therefore, the longer healthcare workers work, the more Defendant can profit from their labor. Defendant's clients (the healthcare facilities) benefit from the arrangement through, among other things, obtaining the labor of expert healthcare workers at a time when providers across the country face increasingly serious challenges attracting qualified healthcare workers. Defendant and similar companies that recruit foreign healthcare workers can provide labor that is less expensive than domestic travel nurse companies, a common source of healthcare workers.

### II.    PLAINTIFF'S RECRUITMENT

22.    Mr. Vidal is an experienced Registered Nurse. He worked in a hospital setting for four years in the Philippines and the United Kingdom prior to immigrating to the United States.

23.    Like many healthcare workers in the Philippines, Mr. Vidal had dreamed about becoming a nurse in the United States. Mr. Vidal thought it would allow him to advance his career because he could work for top-notch healthcare providers. He also thought it would allow him to save a little money to send home to his family in the Philippines. Mr. Vidal's father is the sole caretaker for his nonverbal autistic brother, who cannot care for himself. Mr. Vidal's father must feed, bathe, and attend to all of his brother's needs, which means that Mr. Vidal's father cannot work to support himself. Mr. Vidal is thus a crucial source of support for his family back home.

24.     Lured by the possibility of a more prosperous future, Mr. Vidal contacted
Advanced Care Staffing, which recruited nurses from the Philippines with promises of achieving
the "American Dream." Eventually, Defendant offered to help him obtain an EB-3, legal
permanent resident visa to take up work for Advanced Care Staffing in the United States.

25.     In May 2019, Advanced Care Staffing required Mr. Vidal to sign a nonnegotiable
form contract (the "2019 Contract") for nurses that included several pages of fine print, legalese
in English that he could barely understand. Advanced Care Staffing presented the contract to Mr.
Vidal on a take-it-or-leave-it basis.

26.     Mr. Vidal had to sign the 2019 Contract if he wanted to come to the United States.
Mr. Vidal did not understand the 2019 Contract at the time he signed it, but the contract included
several unfair terms. For example, the 2019 Contract included a promissory note that required
Mr. Vidal to work for Advanced Care Staffing for three years, and, if he left the company before
his three-year term ended, to pay a $20,000 fee, in addition to all costs and expenses (including
legal costs and attorney's fees) to enforce the promissory note. That was far more money than he
had ever had in savings.

27.     The 2019 Contract also said that Mr. Vidal would not be able to sue Advanced
Care Staffing in court but had to bring any claim in arbitration. And even though arbitration can
cost tens of thousands of dollars in fees and costs, not including the fees Mr. Vidal might have to
pay his own lawyer, the contract said that he would have to split those arbitration costs with
Advanced Care Staffing. Mr. Vidal did not have the money to pay those costs.

28.     After he signed the 2019 Contract, Advanced Care Staffing required Mr. Vidal to
spend several months fulfilling administrative requirements for placement, including licensure,

English proficiency exams, birth certificates, transcripts, visa screening certificates, and medical examination.

29.     While waiting for Advanced Care Staffing to help him with his visa, Mr. Vidal could not look for any other jobs working in the United States because had promised Advanced Care Staffing that he would not seek other employment there. Instead, Mr. Vidal located a healthcare staffing company that placed nurses in the United Kingdom and worked at a London hospital for two years.

30.     While in the U.K., Mr. Vidal earned approximately $3,000 a month, but about half of his earnings went directly to housing. If he worked overtime shifts, he was able to send a few hundred dollars a month to his family in the Philippines to help support his father and brother.

31.     Despite paying a $1200 out-of-pocket fee for expedited visa processing—almost half of what he earned in a month—Mr. Vidal waited well over two years before Advanced Care Staffing assigned him to work at a rehabilitation facility in New York.

### III.     ADVANCED CARE STAFFING IMPOSES A NEW CONTRACT

32.     In late 2021, Mr. Vidal discovered that his visa paperwork had come through and that he would be moving in the United States to begin work for Defendant.

33.     In January 2022, when he was still in the United Kingdom but on the verge of flying to the United States to begin work, Advanced Care Staffing told Mr. Vidal that he had to sign a new contract to work for the company. This contract is the "Amended and Restated Employment Agreement" (the "2022 Contract"), and it states that it supersedes all prior contracts.

34.     In correspondence accompanying the 2022 Contract, Advanced Care Staffing told Mr. Vidal the new contract contained two key updates: (1) greater clarity; and (2) the elimination

of the promissory note because Defendant had received feedback that it could be viewed as a "buy out" which would allow him to leave his employment if he just paid the note amount.

35.     As with the 2019 Contract, Defendant presented Mr. Vidal the 2022 Contract on a take-it-or-leave-it basis. At the time Mr. Vidal signed the 2022 Contract, he believed he would not be able to come to the United States if he did not sign, because Advanced Care Staffing presented the contract as a condition of sponsoring his visa application. Mr. Vidal had also already given notice to his UK employer and arranged his travel to the United States.

36.     Mr. Vidal also feared that if he did not sign the 2022 Contract, Defendant would seek the $20,000 in liquidated damages outlined in the original contract, which would not be revoked unless he signed the 2022 Contract. Mr. Vidal had no way of paying such a sum. In addition, Advanced Care Staffing had not reimbursed him for the expenses he had already incurred in anticipation of his travel to the United States, so that money would be lost as well.

37.     While Mr. Vidal did not understand the 2022 Contract at the time he signed it, it includes even more unfair and aggressive provisions than the 2019 Contract with Advanced Care Staffing. First, although it no longer includes a specifically-labeled "breach fee," it nevertheless states that if Mr. Vidal were to leave his employment with Defendant early "without good reason," he would owe Advanced Care Staffing "all damages and other relief to redress the harm," meaning that there remains a significant breach fee, except under the 2022 Contract this fee is of an unknown magnitude.

38.     Advanced Care Staffing told Mr. Vidal that if he left his job, he would be responsible for purported damages that far exceed the hard costs it expended in bringing Plaintiff to the United States.

39.     The 2022 Contract states that Defendant's purported damages in the event of a breach by Mr. Vidal would include "significant loss of profits (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact on [Advanced Care Staffing's] relationship with its Clients)."

40.     That is not the only financial harm that Defendant suggested it could inflict on Mr. Vidal if he left his job early. In addition to its purported damages, the 2022 Contract suggests in two different places that Mr. Vidal could be on the hook for all Advanced Care Staffing's attorney's fees and costs.

41.     First, Section 14 of the 2022 Contract specifies that Mr. Vidal is responsible for reimbursing Defendant for all "reasonable costs, including all attorney's fees" that it "incurs in enforcing its rights and remedies under the Agreement."

42.     Second, the 2022 Contract's Schedule B, the Dispute Resolution Provision—described in this action as the Arbitration Provision—specifies that the prevailing party in arbitration, including Advanced Care Staffing if it prevailed in any arbitration against Mr. Vidal for leaving his employment before the end of the contract term, would be "reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator."

## IV.     WORKING CONDITIONS IN THE UNITED STATES

43.     In February 2022, Mr. Vidal entered the United States.

44.     Defendant assigned Plaintiff to work at Downtown Brooklyn Nursing & Rehabilitation Center, and he began working there on March 8, 2022.

45.     Mr. Vidal's life in the United States working for Advanced Care Staffing was nothing like what he had envisioned or been promised.

46.     Prior to Mr. Vidal signing the 2022 Contract, Advanced Care Staffing told Mr. Vidal that, once placed in a facility, he would be assigned manageable patient loads of twenty to thirty patients at a time.

47.     But in the United States, he was required to work under brutal and dangerous conditions, caring for as many as forty patients at a time. This patient load meant that Mr. Vidal rarely took a break and ran constantly from one patient to the next, unable to take the time he believed was necessary to provide them with adequate care.

48.     The facility where Defendant placed Mr. Vidal also failed to adequately staff Certified Nursing Assistants, which meant Mr. Vidal was not only doing the work of two nurses but was also performing duties that would typically be the responsibility of assistants, such as sanitary cleaning, hygiene care, and feeding assistance for residents unable to feed themselves.

49.     As a result of his working conditions, Mr. Vidal suffered repeated bouts of illness, including COVID-19, which he contracted while working at the facility.

50.     On the rare occasion Mr. Vidal was able to take a break, they rarely lasted longer than 10-15 minutes due to the severe staffing shortages and excessive number of patients in his care.

51.     Mr. Vidal's breakneck work pace was not only dangerous and exhausting for him—it also endangered his patients. Despite his best efforts, he often could not physically get to patients fast enough to give them their medications or protect them against falls. Mr. Vidal commonly heard his patients moaning in agony as they waited for him or anyone else to provide them with care. Patients being fed often had to wait hours to eat because Mr. Vidal did not have the capacity to assist them. Patients frantically used their call buttons, ringing them repeatedly, to

alert staff of their medical needs, including issues with feeding tubes, oxygen lines, and bed sores.

52.     As a result of the dangerous staffing practices, Mr. Vidal was terrified he would lose the license he had worked so hard to train for and obtain.

53.     Although Mr. Vidal's pay of around $36 per hour was more than he had ever made, it was far below market wages for nurses in the region, and he could barely make ends meet in New York City after sending a little money home to support his father and his brother with severe disabilities.

## V.     PLAINTIFF'S RESIGNATION, THREATS FROM ADVANCED CARE STAFFING, AND THE RESULTING ARBITRATION DEMAND AGAINST PLAINTIFF

54.     After months of exhausting work and persistent fears of losing his license, on June 15, 2022, Mr. Vidal informed Defendant that he felt compelled to resign from his role.

55.     On June 22, 2022, Defendant, through its attorneys, commenced a campaign of threatening and aggressive communications demanding that Mr. Vidal return to work for Advanced Care Staffing.

56.     Those communications claimed that Defendant had suffered "significant damages." If Mr. Vidal "proceeded with [his] resignation," Defendant's lawyers said, Advanced Care Staffing would "seek to be made whole" through an "arbitration." They explained that Defendant would provide evidence that its purported damages were "at least $20,000" (emphasis in original).

57.      Defendant's lawyers suggested that those costs would include the costs Advanced Care Staffing would incur in trying to find a new nurse to replace Mr. Vidal, which they said would be $9,000 for each year remaining in his contract.

58.     But that was not the extent of the financial harm confronting Mr. Vidal. Defendant's letter also claimed that Mr. Vidal would be on the hook for "attorney's fees and costs incurred in the arbitration" unless he returned to work. Mr. Vidal did not know how much those fees and costs could be but, based on what little he knew about the American legal system, he feared they would far exceed the wages he could earn in many months working as a nurse.

59.     At least one court in New York and the New York Attorney General's Office have concluded that luring nurses into the United States and then coercing them to continue working under threat of financial penalties less substantial than those at issue in this case violates federal and state anti-trafficking laws. *See Paguirigan v. Prompt Nursing Emp't Agency*, 286 F. Supp 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee unenforceable penalty designed to compel performance); *see also* Assurance of Discontinuance, *In re: Albany Med Health System f/k/a Albany Medical Center* (settlement agreement between New York Attorney General and Albany Med Health System for unlawfully including a $20,000 repayment fee in employment contracts for nurses recruited from foreign nations).[1]

60.     Defendant has already threatened Mr. Vidal with "at least" $20,000 in purported damages and has indicated he could be responsible for tens of thousands more after factoring in attorney's fees and arbitration costs, including arbitrator compensation.

61.     Mr. Vidal did not know what to do in response to Defendant's threats. He was terrified by the crippling financial burdens threatened by Advanced Care Staffing, including its purported damages. These purported damages seemingly included not just the amounts Defendant paid for his travel to the United States, but also tens of thousands in dollars in "lost profits" and the costs of hiring a replacement.

---

[1] https://ag.ny.gov/sites/default/files/albany_med_aod_21-040_fully_executed_6.11.21.pdf

62.     Mr. Vidal was terrified to quit his job, but he felt that his working conditions were too dangerous and presented a genuine risk to his nursing license. If Mr. Vidal lost his license, he would end up even more helpless. Notwithstanding the substantial risks, he declined to return to work for Defendant.

63.     On July 8, 2022—just weeks after Mr. Vidal left his employment—Advanced Care Staffing initiated an arbitration against Mr. Vidal before the American Arbitration Association ("AAA"). The arbitration is titled *Advanced Care Staffing, LLC v. Benzor Vidal*, AAA Case Number: 01-22-0002-9008.

64.     In its demand for arbitration, Advanced Care Staffing seeks expansive relief that includes aggressive and harsh financial penalties from Mr. Vidal, including "all available damages, including, without limitation, [Advanced Care Staffing's] [c]osts and lost profits," "reasonable attorney's fees," and the "cost of arbitration."

## VI.     PLAINTIFF'S INABILITY TO PAY ATTORNEY'S FEES AND THE COSTS OF THE PENDING ARBITRATION PROCEEDING

65.     Plaintiff cannot afford to pay Defendant's attorney's fees and the costs of the pending arbitration.

66.     When he was working for Advanced Care Staffing, Plaintiff earned around $3,600 a month. Nearly all of his salary went to paying rent and basic living expenses. He could barely provide his family in the Philippines with any additional support.

67.     Plaintiff currently takes home approximately $5,000 per month. Half of his earnings go directly to rent. The remainder goes to basic living expenses such as household bills, food, and transportation costs.

68.     Most of what is left, Plaintiff uses to support his family in the Philippines, including his father and brother.

69.     Mr. Vidal cannot afford to pay the arbitration costs of the pending arbitration proceeding, let alone Advanced Care Staffing's attorney's fees.

70.     In July, the AAA sent a list of potential arbitrators to Advanced Care Staffing and Mr. Vidal, and said that the parties had until August 4, 2022, to strike potential arbitrators.

71.     On August 10, 2022, Mr. Vidal, who was unrepresented in the arbitration and seeking counsel, sought an extension of time to respond to the arbitration demand.

72.     On August 25, 2022, Mr. Vidal, who was still unrepresented in the arbitration, sought an additional two weeks to respond to the arbitration demand. The AAA denied this request, granting him only a one-week extension.

73.     On September 2, 2022, Mr. Vidal informed the AAA that he did not believe he should be in arbitration because he did not believe the arbitration provision was legal, and also requested an additional two weeks to evaluate the potential arbitrators, given that he lacked the assistance of counsel in doing so.

74.     But the AAA denied his request for additional time to evaluate the arbitrators, without informing Mr. Vidal that it was doing so. Instead, the AAA barreled ahead and on September 7, 2022, unilaterally (though presumably with Advanced Care Staffing's input) informed the parties that it had appointed an arbitrator, Sara Kula.

75.     Arbitrator Kula's rate is $450 per hour, for both time in a hearing and for "study" time reviewing the parties' briefs and evidentiary submissions prior to a hearing.

76.     In addition, the costs of arbitration due to the AAA also include a filing fee of $1,900, and a case management fee of $750, all of which Advanced Care Staffing could recover from Mr. Vidal if it were to prevail in the arbitration.

77.     Under the Arbitration Provision, Mr. Vidal would also be required to pay Advanced Care Staffing's attorney's fees and costs. Those fees could easily run into the tens of thousands of dollars or more.

78.     Mr. Vidal lacks the means to pay an attorney to represent him in the arbitration— let alone the potentially enormous attorney's fees and costs incurred by Defendant.

79.     In its letter appointing the arbitrator, the AAA informed Mr. Vidal that he had to provide his availability within several time slots for a "case management conference call." All the time slots AAA suggested were during Mr. Vidal's working hours.

80.     On September 8, 2022, Mr. Vidal wrote the AAA to inform them he was not available at any of the times indicated. He also asked, among other things, how many other arbitrations the AAA was administering for Advanced Care Staffing because it seemed that Defendant understood the process much better than him.

81.     On September 9, the AAA informed Mr. Vidal that it could not tell him "any information regarding any case you are not a party/representative to." The AAA thus refused to disclose whether it had a potential financial conflict of interest in its administration of the arbitration because of Defendant's potential repeat player role in filing arbitrations.

### COUNT I: THE ARBITRATION PROVISION IS INVALID UNDER THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1589
(Declaratory Relief Under 28 U.S.C. § 2201)

82.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

83.     The Arbitration Provision is intended to achieve purposes that are illegal under the TVPA, as it aims to procure the labor of services of Mr. Vidal by threatening Mr. Vidal that he will have to pay Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation, if he leaves his job.

84.     These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm," in violation of 18 U.S.C. § 1589(a)(2)–(3).

85.     Defendant knowingly used such threats to exert pressure on Plaintiff to continue working for Advanced Care Staffing and to prevent him from seeking employment elsewhere, telling him that he would be on the hook for "attorney's fees and costs incurred in the arbitration" unless he returned to work. This was done with the purpose of obtaining Plaintiff's continued labor for Advanced Care Staffing.

86.     Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails is inconsistent with the one-way fee shifting provision in the TVPA, which allows the victims of trafficking to recover their attorney's fees in civil actions brought under the TVPA.

87.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

## COUNT II: THE ARBITRATION PROVISION IS INVALID UNDER NEW YORK'S PROHIBITION ON LABOR TRAFFICKING, N.Y. PENAL LAW § 135.35
(Declaratory Relief Under 28 U.S.C. § 2201)

88.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

89.     The Arbitration Provision is intended to achieve purposes that are illegal under N.Y. Penal Law § 135.35, as it was intended to force Mr. Vidal into continued labor for Advanced Care Staffing through threats of serious harm and abuse of legal process.

90.     The Arbitration Provision violates N.Y. Penal Law § 135.35's prohibitions against forced labor and attempted forced labor.

91.     Through the Arbitration Provision, Defendant compelled or induced Plaintiff's labor by requiring him to work in order to retire, repay, or service a purported debt, in the form

of Defendant's attorney's fees and arbitration costs, including arbitrator compensation, that could run into the tens of thousands of dollars.

92.     Defendant engaged in an ongoing course of conduct with intent to defraud Plaintiff by recruiting Plaintiff from the Philippines and intentionally deceiving him as to the nature of his work in the United States. Specifically, Defendant represented that Plaintiff could achieve his "American Dream" and would have a manageable patient caseload, when in fact Defendant knew that Plaintiff would be assigned 40 or more patients—a caseload that placed Plaintiff's nursing license and the health of those patients at risk.

93.     Furthermore, Defendant fraudulently induced Plaintiff to come to the United States and work in unbearable conditions by inducing Plaintiff to enter into an unenforceable and unlawful contract, as set forth in detail above.

94.     Defendant knew or should have known that its Arbitration Provision is illegal and unenforceable, but nonetheless used the Arbitration Provision to intimidate Plaintiff and coerce him to continue working for Defendant. Representing that the contract is enforceable is also fraudulent conduct.

95.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

**COUNT III: THE ARBITRATION PROVISION IS INVALID UNDER THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 201, *ET SEQ.* BECAUSE IT WOULD REDUCE PLAINTIFF'S WAGES BELOW THE FEDERAL MINIMUM WAGE**
(Declaratory Relief Under 28 U.S.C. § 2201)

96.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

97.     When he worked for Defendant, Plaintiff was an employee pursuant to the FLSA.

98.     Defendant was Plaintiff's employer under the FLSA.

99.     The Arbitration Provision is intended to achieve purposes that are illegal under the FLSA, as it is aims to force Mr. Vidal to pay Advanced Care Staffing's attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit—and thus reduce Mr. Vidal's wages in his last workweek below the federal minimum wage.

100.    The Arbitration Provision is thus illegal and unenforceable, under the FLSA because it would, if enforced, permit Defendant to pay its workers wages that are below the federal minimum wage.

101.    In his last workweek of work, Plaintiff worked approximately 40 hours and was paid approximately $1,440. His hourly wage for that week was approximately $36 per hour.

102.    In satisfying its federal minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other purported damages, Defendant's purported "lost profits" and the costs of hiring a replacement employee, costs that Defendant has suggested will amount to $9,000 per year over each of the years remaining on Plaintiff's contract, plus Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation.

103.    Defendant's attempt to recoup costs that are for the benefit of Advanced Care Staffing violates the FLSA because Defendant did not pay Mr. Vidal's wages "free and clear."

104.    Because the recovery of damages such as "lost profits," attorney's fees, or costs of arbitration would reduce Mr. Vidal's wages in the last week of his employment below the federal minimum wage, the enforcement of the Arbitration Provision would violate the FLSA.

105.    Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration, is

inconsistent with the one-way fee shifting provision in the FLSA, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the FLSA.

106.   Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

## COUNT IV: THE ARBITRATION PROVISION IS INVALID UNDER NYLL § 650 *ET SEQ.* BECAUSE IT WOULD REDUCE PLAINTIFF'S WAGES BELOW THE STATE MINIMUM WAGE
(Declaratory Relief Under 28 U.S.C. § 2201)

107.   Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

108.   When Mr. Vidal worked for Advanced Care Staffing, he was employed within the meaning of NYLL §§ 2 and 651.

109.   At all relevant times, Advanced Care Staffing was an employer within the meaning of the NYLL.

110.   The Arbitration Provision is intended to achieve purposes that are illegal under the NYLL, as it is aims to force Mr. Vidal to pay Advanced Care Staffing's attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit—and thus reduce Mr. Vidal's wages in his last workweek below the state minimum wage.

111.   The Arbitration Provision is thus illegal and unenforceable, under the NYLL because it would, if enforced, permit Defendant to pay its workers wages that are below the state minimum wage.

112.   In his last workweek of work, Plaintiff worked approximately 40 hours and was paid approximately $1,440. His hourly wage for that week was approximately $36 per hour.

113.     In satisfying its state minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other purported damages, Defendant's purported "lost profits" and the costs of hiring a replacement employee, costs that Defendant has suggested will amount to $9,000 per year over each of the years remaining on Plaintiff's contract, plus Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation.

114.     Accordingly, because the recovery of damages such as "lost profits," attorney's fees, or costs of arbitration would reduce Mr. Vidal's wages in the last week of his employment below the state minimum wage, the enforcement of the Arbitration Provision would violate the NYLL.

115.     Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration, is inconsistent with the one-way fee shifting provision in the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

116.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

**COUNT V: THE ARBITRATION PROVISION IS INVALID UNDER NYLL § 198-b BECAUSE IT WOULD FORCE PLAINTIFF TO PROVIDE AN ILLEGAL KICKBACK**
(Declaratory Relief Under 28 U.S.C. § 2201)

117.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

118.     When Mr. Vidal worked for Advanced Care Staffing, he was employed within the meaning of NYLL §§ 2 and 651.

119.    At all relevant times, Advanced Care Staffing was an employer within the meaning of the NYLL.

120.    The Arbitration Provision is illegal under the NYLL, as it was intended to force Mr. Vidal to provide a kickback against his wages to his employer if he left his employment before the end of the contract term, thus resulting in him being paid below the legally-required wage for his hours worked.

121.    The Arbitration Provision's terms are illegal and unenforceable, under the NYLL because they permit Defendant to force workers to make kickbacks from their wages that are illegal under the NYLL.

122.    In his last workweek of work, Plaintiff worked approximately 40 hours and was paid approximately $1,440. His hourly wage for that week was approximately $36 per hour.

123.    In satisfying its minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other costs and purported damages, Defendant's purported "lost profits" and the costs of hiring a replacement employee, costs that Defendant has suggested will amount to $9,000 per year over each of the years remaining on Plaintiff's contract.

124.    Any attorney's fees or arbitration costs incurred in seeking to collect an illegal kickback under the NYLL are themselves illegal kickbacks under the NYLL. Thus, the provision allowing Defendant to recover its attorney's fees and arbitration costs is invalid under the NYLL.

125.    Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration, is inconsistent with the one-way fee shifting provision in the NYLL, which allows prevailing

employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

126. Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

### COUNT VI: THE ARBITRATION PROVISION IS INVALID UNDER NYLL § 193 BECAUSE IF ENFORCED IT WOULD RESULT IN AN ILLEGAL DEDUCTION FROM PLAINTIFF'S WAGES
(Declaratory Relief Under 28 U.S.C. § 2201)

127. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

128. When Mr. Vidal worked for Advanced Care Staffing, he was employed within the meaning of NYLL §§ 2 and 651.

129. At all relevant times, Advanced Care Staffing was an employer within the meaning of the NYLL.

130. The Arbitration Provision is illegal and unenforceable under the NYLL, as it was intended to allow Defendant to make illegal deductions from the pay of Mr. Vidal if he left his employment before the end of the contract term.

131. The arbitration purports to permit Defendant to recover attorney's fees and arbitration costs in conjunction with the recovery of an illegal deduction that is not authorized in writing under the NYLL.

132. In the course of satisfying its obligations under the NYLL, Defendant may only deduct from Plaintiff's wages those deductions that are expressly authorized in writing by Plaintiff, as required by statute, and that are for the benefit of Plaintiff.

133. Defendant seeks to deduct from Plaintiff's wages its lost profits as well as arbitration costs and attorney's fees. Such deductions are unlawful under NYLL § 193.

134.     Any attorney's fees or arbitration costs incurred in seeking to collect an illegal deduction under the NYLL are themselves illegal deductions under the NYLL. Thus, the Arbitration Provision is invalid under the NYLL.

135.     Additionally, the Arbitration Provision requires that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration. This provision is invalid under the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

136.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is illegal and unenforceable.

**COUNT VII: THE ARBITRATION PROVISION IS UNCONSCIONABLE AND UNENFORCEABLE UNDER NEW YORK COMMON LAW**
(Declaratory Relief Under 28 U.S.C. § 2201)

137.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

138.     The Arbitration Provision is unconscionable as a matter of New York law.

139.     Mr. Vidal was forced to enter into the Arbitration Provision on a take-it-or-leave-it basis and faced substantial economic harm if he did not sign the contract, including potentially $20,000 in penalties, an amount that far exceeded his savings and that would be financially ruinous. Mr. Vidal lacked meaningful choice about whether to enter into the contract.

140.     The Arbitration Provision is also unreasonably favorable to Defendant. Among other things, it requires Mr. Vidal, who is of limited financial means to bear costs that could run into the tens of thousands or hundreds of thousands of dollars if he does not prevail in the arbitration.

141.     The Arbitration Provision unreasonably prevents Mr. Vidal from vindicating his own contractual and statutory rights under federal and New York law in the arbitration forum, as

they would require him to spend tens of thousands or hundreds of thousands of dollars if he does not prevail in arbitration. This risk effectively chills Mr. Vidal from raising his own claims against Defendant, and thus precludes him from vindicating his rights in arbitration.

142.    Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

(a) A declaration that the Arbitration Provision is unenforceable;

(b) An order enjoining the arbitration brought by Defendant against Plaintiff before the American Arbitration Association.

DATED:      September 16, 2022
            Brooklyn, New York

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
Kakalec Law PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**TOWARDS JUSTICE**

Juno Turner
David H. Seligman (*pro hac vice* motion forthcoming)
Valerie Collins (*pro hac vice* motion forthcoming)
Towards Justice
P.O. Box 371689, PMB 44465

Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362 (*pro hac vice* motion forthcoming)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

**NICHOLS KASTER, LLP**

Matthew C. Helland, CA Bar No. 250451
(*pro hac vice* motion forthcoming)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*