**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

BENZOR SHEM VIDAL,

     Plaintiff,

     v.

ADVANCED CARE STAFFING, LLC,

     Defendant.

Civ. Action No.: 22-cv-5535
(NM)(MMH)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**


**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ............................................................................................................1

FACTUAL AND PROCEDURAL HISTORY .....................................................................1

I.      ACS's Business Model ....................................................................................... 1
II.     Plaintiff Vidal's Recruitment from the Philippines and ACS'S Contracts...................3
III.    Mr. Vidal's Intolerable Working Conditions........................................................5
IV.     ACS's Weaponized Arbitration ..........................................................................6

        A. ACS's Arbitration Demand...........................................................................6
        B. Mr. Vidal's Repeated Pleas to AAA to Pause the Arbitration
           Pending Litigation Due to the Extraordinary Costs of Arbitration..............................7
        C. The New York Attorney General Urges AAA to Stop the Arbitration ......................10

ARGUMENT ................................................................................................................10

I.      The Court Should Preliminarily Enjoin the Arbitration until this Court Rules on the
        Enforceability of the Purported Delegation Clause ....................................................10

        A. This Court Has Authority to Enjoin an Arbitration That is Not Authorized by an
           Enforceable Agreement to Arbitrate............................................................................11
        B. Mr. Vidal Only Seeks a Preliminary Injunction against the Arbitration Pending
           Judicial Resolution on the Delegation Issue ..............................................................12
        C. Mr. Vidal Is Likely to Succeed on the Merits.............................................................14

                1. There is No Clear and Unmistakable Delegation Clause.......................................14
                2. Mr. Vidal signed the arbitration requirement, including its delegation provision,
                   under economic duress................................................................................................16
                3. The delegation provision is illegal and unconscionable ......................................17

                        a.  The arbitration provision and delegation clause violate trafficking laws ........18
                        b.  The arbitration requirement and delegation provision violate wage and hour
                            laws ...............................................................................................................21
                        c.  The delegation clause is unconscionable as a matter of New York law..........22
                        d.  The loser pays term cannot be severed from the arbitration requirement and
                            delegation clause..........................................................................................25

        D. Even if the Court Cannot Resolve Whether Mr. Vidal Is Likely to Succeed on the
        Merits, Mr. Vidal Raises a Serious Question Regarding the Arbitrator's Authority, Which
        Warrants Injunctive Relief..................................................................................................26

        E. Mr. Vidal Will Suffer Irreparable Harm Absent Immediate Relief ..............................27

        F. The Balance of Harms Tips Decidedly in Mr. Vidal's Favor.......................................28

        G. A Preliminary Injunction Is in the Public Interest .......................................................29

II.    The Court Can Enjoin the Arbitration Pursuant to the All Writs Act...........................29

CONCLUSION....................................................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Anthony Int'l, L.P.,*
341 F.3d 256 (3d Cir. 2003) ............................................................................................ 22, 25

*Allstate Ins. Co. v. Elzanaty,*
929 F. Supp. 2d 199 (E.D.N.Y. 2013) ..................................................................................... 12

*Andersen v. InePros Federal, Inc.,*
240 F.Supp.3d 143 (D.D.C. 2017) .......................................................................................... 18

*Arriaga v. Florida Pacific Farms, L.L.C.,*
305 F.3d 1228 (11th Cir. 2002) .............................................................................................. 22

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
475 U.S. 643 (1986) ................................................................................................................. 14

*Austin Instrument, Inc. v. Loral Corp.,*
29 N.Y.2d 124 (1971) .............................................................................................................. 16

*Castedo v. Permanent Mission of Thailand to the U.N.,*
 114 N.Y.S.3d 70 (2019) .......................................................................................................... 15

*Chen-Oster v. Goldman, Sachs & Co.,*
785 F. Supp. 2d 394 (S.D.N.Y. 2011) ............................................................................... 12, 14

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010)
aff'd, 598 F.3d 30 (2d Cir. 2010) ................................................................................. 11-12, 30

*Citigroup, Inc. v. Abu Dhabi Inv. Auth.,*
776 F.3d 126 (2d Cir. 2015) .................................................................................................... 30

*DDK Hotels, LLC v. Williams-Sonoma, Inc.,*
6 F.4th 308 (2d Cir. 2021) ...................................................................................................... 14

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,*
191 F.3d 198 (2d Cir. 1999) .................................................................................................... 23

*Fedor v. United Healthcare, Inc.,*
976 F.3d 1100 (10th Cir. 2020) .............................................................................................. 16

*First Options of Chi., Inc. v. Kaplan,*
514 U.S. 938 (1995) ................................................................................................................. 15

*Gingras v. Think Fin., Inc.,*
922 F.3d 112 (2d Cir. 2019) ............................................................................................. 11, 13

*Gov't Emps. Ins. Co. v. Wellmart RX, Inc.,*
No. 19-cv-04414 (KAM), 2020 WL 249020 (E.D.N.Y. Jan. 16, 2020) ................................. 26

*Hayes v. Delbert Services Corp.*,
811 F.3d 666 (4th Cir. 2016) ............................................................26

*He v. Home on 8th Corp.*,
No. 09 CV 5630, 2014 WL 3974670 (S.D.N.Y. Aug. 13, 2014) ...........................................21

*In re Am. Exp. Fin. Advisors Secs. Litig.*,
672 F.3d 113 (2d Cir. 2011).............................................................12

*In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*,
315 F.3d 417 (4th Cir. 2003) ............................................................30

*Int'l Dairy Foods Ass'n v. Amestoy*,
 92 F.3d 67 (2d Cir. 1996)................................................................28

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ............................................................14

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) ..........................................................18, 26

*Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n, Inc.*,
965 F.2d 1224 (2d Cir. 1992)............................................................30

*Lowden v. T-Mobile, USA, Inc.*,
No. 05 Civ. 1482, 2006 WL 1009279 (W.D. Wash. Apr. 13, 2006) ......................................26

*MacDonald v. CashCall, Inc.*,
883 F.3d 220 (3d Cir. 2018)............................................................25

*Magtoles v. United Staffing Registry, Inc.*,
No. 21 Civ. 1850, 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) .........................................20

*Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations*,
107 F.3d 979 (2d Cir. 1997)............................................................28

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)............................................................16

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022)................................................................15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)..................................................................11-12

*Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union*,
975 F. Supp. 445 (E.D.N.Y. 1997) ......................................................27

*New York v. Nuclear Regulatory Comm'n*,
550 F.2d 745 (2d Cir. 1977)............................................................14

*Paguirigan v. Prompt Nursing Emp't Agency*,
286 F. Supp 3d 430 (E.D.N.Y. 2017) ..............................................2-3, 18

*Port Drivers Fed'n 18, Inc. v. All Saints Express*,
757 F. Supp. 2d 443 (D.N.J. 2010) ...................................................................27-28

*Ragone v. Atl. Video at Manhattan Ctr.*,
595 F.3d 115 (2d Cir. 2010)................................................................................22

*Rent-A-Center, W., Inc. v. Jackson*,
560 U.S. 63 (2010)..............................................................................................12

*Santich v. VCG Holding Corp.*,
2018 WL 3968879 (D. Colo. Aug. 20, 2018) ......................................................22

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)............................................................................11-12

*Smith v. AHS Okla. Heart, L.L.C.*,
No. 11 Civ. 691, 2012 WL 3156877 (N.D. Okla. Aug. 3, 2012)...........................22

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019)................................................................................11

*State v. Wolowitz*,
96 A.D.2d 47 (N.Y. App. Div. 1983) ...................................................................23

*Tellium, Inc. v. Corning Inc.*,
No. 03 Civ. 8487, 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004) ............................27

*Trump v. Vance*,
941 F.3d 631 (2d Cir. 2019)................................................................................11

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) .............................................................................

*United States v. Int'l Bhd. of Teamsters, Chauffeurs,*
*Warehousemen & Helpers of Am., AFL-CIO*,
907 F.2d 277, 281 (2d Cir. 1990)....................................................................29-30

*Valle v. ATM Nat., LLC*,
No. 14-CV-7993 KBF, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015)......................24

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................................11

**RULES**

Rule 65(a)......................................................................................................13-14

**STATUTES AND REGULATIONS**

29 C.F.R. § 53.13(b) ...........................................................................................21

9 U.S.C. § 10.......................................................................................................28

18 U.S.C. § 1589(a)(2)........................................................................................19

18 U.S.C. § 1589(c)(1)............................................................................18, 20

18 U.S.C. § 1594(a) ...............................................................................20

29 U.S.C. § 201 .....................................................................................21

29 U.S.C. § 216(b) .................................................................................22

**OTHER**

N.Y. Lab. Law § 198-b ...........................................................................22

Wright & Miller,
11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.).................................................13-14, 29

AAA, Employment Fee Schedule,
https://www.adr.org/sites/default/files/Employment_Fee_Schedule.pdf ...............................21

## INTRODUCTION

Plaintiff Benzor Vidal seeks preliminary relief to pause an arbitration brought against him by Advanced Care Staffing ("ACS") to punish him for leaving his job. ACS has weaponized the arbitration requirement in its employment contract, which requires Mr. Vidal to pay all ACS's alleged "lost profits," arbitration costs, and attorney's fees if the company succeeds in arbitration.

The New York State Attorney General's office has taken action, urging that the arbitration proceedings be paused because ACS's employment contract implicates forced labor concerns. Mr. Vidal has objected strenuously to the arbitrator's jurisdiction, raising threshold challenges about the circumstances under which he signed the contract, as well as challenges about the enforceability of the contract. These are questions that have not been delegated to the arbitrator and which are for this Court to resolve in the course of this declaratory judgment action. Nonetheless, the American Arbitration Association and the arbitrator have declined to even pause the arbitration, and ACS has refused to agree to a pause in the proceeding through the pendency of this action.

Accordingly, Mr. Vidal seeks a narrow injunction to stay the ongoing arbitration proceedings pending judicial resolution of his threshold challenges. Such relief would protect Plaintiff from the irreparable harm of being subject to the unauthorized acts of the arbitrator, would not harm Defendant, and would broadly serve the public interest by putting a halt to a proceeding that is perpetuating forced labor in the Court's backyard.

## FACTUAL AND PROCEDURAL HISTORY

### I.    ACS's Business Model

ACS is a healthcare staffing company based in New York that recruits trained nurses from the Philippines and sends them to work for healthcare facilities, including nursing homes around New York City. ECF No. 1 ("Compl.") ¶¶ 9, 20. ACS profits off the difference

1

between the payments it receives from its clients and the wages it pays its nurses. *Id.* ¶ 21.

The wages ACS pays nurses are substantially less than market wages for similar nurses. Compl. ¶ 53. ACS requires nurses like Mr. Vidal to work with challenging staffing ratios under difficult conditions. *Id.* ¶¶ 47-51; Ex. 1 (Vidal Decl.) ¶¶ 27-32.[1] In theory, nurses like Mr. Vidal would pressure ACS to pay decent wages and treat nurses fairly by seeking work with other employers that would pay more and treat them better. And because ACS's nurses are recruited on Legal Permanent Resident visas, not guest worker visas that bind an employee to their employer, *see id.* ¶ 24, as an immigration law matter, these nurses should be able to leave ACS if they were dissatisfied with their wages or treatment.

So that it can continue to subject them to low wages and deplorable staffing ratios without fear that they will seek out work elsewhere, however, ACS's contracts with immigrant nurses include harsh and abusive financial penalties if nurses leave their jobs before the end of a purported commitment period. *See, e.g.*, Compl. ¶¶ 32-37. Exacerbating the coercive force of these penalties, the contract includes a forced arbitration provision, which ACS uses to threaten nurses with being respondents in arbitrations and facing ACS's legal bills and thousands of dollars in arbitration costs in the event they decide to leave their jobs. *See, e.g.*, Compl. ¶¶ 54-58, 63-64; Ex. 1 (Vidal Decl.) ¶¶34-41.

Similar business models have already been the subject of public enforcement and litigation in New York state. At least one court in the Eastern District, as well as the New York Attorney General's Office, have concluded that luring nurses into the United States and then coercing them to continue working under threat of financial penalties *less* substantial than those at issue in this case violates federal and state anti-trafficking laws. *See Paguirigan v. Prompt Nursing Emp't Agency*, 286 F. Supp 3d 430, 535 (E.D.N.Y. 2017) (granting

---

[1] All exhibits are attached to the Declaration of David H. Seligman in Support of Plaintiff's Motion for Preliminary Injunction.

2

summary judgment to plaintiff and holding that a $25,000 contract termination fee was an unenforceable penalty designed to compel performance, in violation of the TVPA); *see also* Assurance of Discontinuance, *In re: Albany Med Health System f/k/a Albany Medical Center* (settlement between N.Y. Attorney General and Albany Med Health System for unlawfully including a $20,000 repayment fee in contracts for nurses recruited from foreign nations).[2]

## II.    Plaintiff Vidal's Recruitment from the Philippines and ACS's Contracts

Benzor Vidal grew up in the Philippines. When he was a child, his parents frequently had to borrow money to feed their family. Ex. 1 (Vidal Decl.) ¶ 1. To this day, Mr. Vidal's father cannot work because he needs to provide constant care to Mr. Vidal's autistic and nonverbal brother. Compl. ¶ 23. It has always fallen on Mr. Vidal to support his family, but it was hard for Mr. Vidal to make enough money in the Philippines. *Id.*; Ex. 1 (Vidal Decl.) ¶ 9.

Hoping to find more lucrative opportunities in the United States, Mr. Vidal contacted ACS in 2019. Compl. ¶ 24; Ex. 1 (Vidal Decl.) ¶¶ 11-12. ACS offered to help Mr. Vidal obtain an EB-3 legal permanent resident visa to work in the United States and required Mr. Vidal to sign a nonnegotiable form contract in May 2019 ("2019 Contract"). Compl. ¶ 25; Ex. 1 (Vidal Decl.) ¶¶12-13; Ex. 2 (2019 Contract). The 2019 Contract included pages of fine print legalese with several unfair terms, including a so-called "promissory note" that required Mr. Vidal to work for ACS for three years and, if he left before his term ended, pay a $20,000 fee in addition to all costs and expenses. Compl. ¶ 26; *see also* Ex. 2 (2019 Contract) at 6.

After Mr. Vidal signed the 2019 Contract, it took years to fulfill the administrative requirements for placement, including licensure, English proficiency exams, birth certificates, transcripts, visa screening certificates, and medical examination. Compl. ¶¶ 28-31; Ex. 1 (Vidal Decl.) ¶¶ 14-16. During that time, ACS forbade Mr. Vidal from working any other job

---

[2] *Available at* https://ag.ny.gov/aod/matter-investigation-letitia-james-attorney-general-state-new-york-albany-med-health-system-fka (last visited January 20, 2023).

in the United States. Compl. ¶ 29; Ex. 2 (2019 Contract) at 2. Instead, Mr. Vidal worked at a London hospital for two years, making barely enough to afford basic living expenses and to send a little money home to his family. Compl. ¶¶ 29-31; Ex. 1 (Vidal Decl.) ¶ 18.

In 2021, ACS informed Mr. Vidal that his visa had been approved and he should plan to move to the United States in 2022. Compl. ¶ 32; Ex. 1 (Vidal Decl.) ¶ 20. Mr. Vidal resigned from his UK job, and ACS then informed him that he had to sign a new contract (the "2022 Contract") to move to the United States. Compl. ¶ 33; Ex. 1 (Vidal Decl.) ¶ 21. The 2022 Contract superseded the 2019 Contract but was similarly presented on a take-it-or-leave-it basis and contained terms written in legalese Mr. Vidal did not understand. Compl. ¶ 35; Ex. 1 (Vidal Decl.) ¶ 21. Although ACS stated that 2022 Contract removed the $20,000 promissory note, it repackaged that penalty by broadening its scope: if Mr. Vidal left his employment before the contract term ended, the 2022 Contract required him to pay "all damages and other relief to redress the harm" allegedly resulting from his early departure, including "lost profits" ACS would have recouped through Mr. Vidal's work for ACS's clients. Compl. ¶¶ 34, 37-38; Ex. 3 (Jan. 4, 2022 let.); *see also* Ex. 4 (2022 Contract) at 6.

ACS's 2022 Contract also stated that any dispute between Mr. Vidal and the company had to be resolved in arbitration. Ex. 4 (2022 Contract) at 7 & Sched. B. Forced arbitration was designed to further coerce Mr. Vidal's labor. It includes a "loser pays" provision, which entitles the prevailing party in the arbitration to reimbursement of its attorney's fees and costs and fees charged by the American Arbitration Association ("AAA") and arbitrator. *Id.* at Sched. B. In short, any arbitration would bury Mr. Vidal in further debt to ACS.

When ACS presented Mr. Vidal with the 2022 Contract, it did not disclaim potential liability for Mr. Vidal under the 2019 Contract for failing to sign the 2022 Contract. Compl. ¶ 36; *see* Ex. 3 (Jan. 4, 2022 let.). As a result, Mr. Vidal believed that, if he did not sign the new contract, ACS would attempt to collect the $20,000 promissory note contained in the

then-applicable 2019 Contract. Compl. ¶ 36; Ex. 1 (Vidal Decl.) ¶ 25. Mr. Vidal had no way

of paying ACS $20,000. *Id.* With no other viable options, Mr. Vidal signed the 2022 Contract

and came to the United States in early 2022. Compl. ¶¶ 35-36; Ex. 1 (Vidal Decl.) ¶ 26.

### III.    Mr. Vidal's Intolerable Working Conditions

On March 8, 2022, Mr. Vidal began working at ACS's client facility, Downtown

Brooklyn Nursing & Rehabilitation Center, located at 727 Classon Avenue in Crown Heights.

Compl. ¶ 44. But Mr. Vidal's working conditions were nothing like ACS had led him to

believe. Compl. ¶ 45; Ex. 1 (Vidal Decl.) ¶¶ 26-27. Most notably, prior to entering the United

States, ACS told Mr. Vidal he would have a manageable patient load of 20-30 patients.

Compl. ¶ 46; Ex. 1 (Vidal Decl.) ¶ 26. Instead, Mr. Vidal juggled up to forty patients at a

time. Compl ¶ 47; Ex. 1 (Vidal Decl.) ¶ 27. Mr. Vidal often heard his patients moaning in

agony as they waited for him, or anyone else, to care for them. Ex. 1 (Vidal Decl.) ¶¶ 27-29,

32-33; *see also* Compl. ¶ 51. Patients frantically rang their call buttons repeatedly to alert

staff of their medical needs, including with feeding tubes, oxygen lines, and painful bed

sores. Compl ¶ 51; Ex. 1 (Vidal Decl.) ¶ 28. Due to the dangerous staffing practices, Mr.

Vidal feared he would lose the nursing license he had worked so hard for. Compl ¶ 52; Ex. 1

(Vidal Decl.) ¶¶ 32-35. Without it, he feared he would no longer be able to send money to his

family. Ex. 1 (Vidal Decl.) ¶ 33.

After months of exhausting work and persistent fears of losing his license, Mr. Vidal

resigned on June 15, 2022. Compl ¶ 54; Ex. 1 (Vidal Decl.) ¶ 35. Mr. Vidal was terrified to

leave his job. Ex. 1 (Vidal Decl.) ¶ 35. He knew that his contract included harsh penalties for

leaving, and he knew that he did not have the money to pay those penalties, especially if he

wanted to have any money to support his family. *See id.* ¶¶ 37-42. But Mr. Vidal felt that he

had no choice because of how horrible his working conditions were. *Id.* ¶¶ 34-35.

Shortly after he resigned, ACS commenced a campaign of threatening and aggressive

communications and demanded that Mr. Vidal return to work. Ex. 1 (Vidal Decl.) ¶¶ 36-37, 40-41; Ex. 5 (June 22, 2022 let.). In a June 2022 letter from its lawyers, ACS claimed it had suffered "significant damages" and threatened it would "seek to be made whole" through arbitration, which would include ACS's "attorney's fees and costs incurred in the arbitration." Ex. 5 (June 22, 2022 let.). ACS also warned Mr. Vidal that he would be responsible for "at least $20,000 [in damages] (not counting attorney's fees and costs that would be incurred in the arbitration)." *Id.* (emphasis original). ACS also told Mr. Vidal that he would be responsible for the cost of recruiting and hiring a replacement nurse, which it estimated would be "over $9,000 per year over the remainder" of his contract. *Id.* (emphasis in original). Finally, ACS stated that Mr. Vidal would also be on the hook for ACS's costs, "including all attorney's fees." *Id.* ACS asked Mr. Vidal to "reconsider" his resignation in response to its threats made under loser pays term in the arbitration requirement. *Id.*

Mr. Vidal did not know how to respond. Compl. ¶ 61. He was terrified by the threatened crippling financial burdens, including ACS's purported damages and fees. *Id.*; Ex. 1 (Vidal Decl.) ¶¶ 41-43. Mr. Vidal feared the ramifications of quitting his job, but felt that his working conditions were too dangerous and presented a genuine risk to his nursing license. Compl. ¶ 62; Ex. 1 (Vidal Decl.) ¶¶ 34-35, 42. If Mr. Vidal lost his license, he would end up even more helpless. Compl. ¶ 62; Ex. 1 (Vidal Decl.) ¶ 64. So, despite the substantial risks, he declined to return to work for ACS. Compl. ¶ 62; Ex. 1 (Vidal Decl.) ¶ 56.

IV.     **ACS's Weaponized Arbitration**

    A.     **ACS's Arbitration Demand**

    On July 8, 2022—just weeks after Mr. Vidal left his employment—ACS initiated an arbitration against Mr. Vidal before AAA. Compl. ¶ 63; *see* Ex. 6 (Arb. Demand). In its demand, ACS sought expansive relief, including "all available damages, including, without limitation, [ACS's] [c]osts and lost profits," "reasonable attorney's fees," and the "cost of

arbitration." *Id.* ¶ 64; Ex. 6 (Arb. Demand). Mr. Vidal would owe these amounts, apparently, based on the contract's loser pays provision.

Mr. Vidal knew little about how arbitration worked, though based on ACS's lawyer-drafted threatening letter, he was terrified that arbitration costs and attorney's fees would bury him in more debt, devastating him financially and endangering his family. Ex. 1 (Vidal Decl.) ¶¶ 38-42. Throughout July and August 2022, Mr. Vidal attempted to alert AAA that he needed additional time to respond to the arbitration demand and attempt to find legal counsel who would represent him in arbitration. Compl. ¶¶ 70-72; Ex. 1 (Vidal Decl.) ¶¶ 55-56; Ex. 7 (Aug. 1, 2022 email); Ex. 8 (Aug. 10, 2022 email). Mr. Vidal expressed concern about his inability to pay for the arbitration. *See, e.g.*, Ex. 9 (Sept. 8, 2022 email). Nonetheless, AAA barreled ahead and notified Mr. Vidal that it had selected an arbitrator on September 7, even after Mr. Vidal informed AAA he needed additional time to evaluate the list of arbitrators. Compl. ¶ 74; Ex. 10 (Sept. 2, 2022 email); Ex. 11 (Sept. 7, 2022 let.).

**B.  Mr. Vidal's Repeated Pleas to AAA to Pause the Arbitration Pending Litigation Due to the Extraordinary Costs of Arbitration**

After AAA assigned an arbitrator, Mr. Vidal again informed AAA that he could not afford arbitration and any of the costs of ACS's attorney's fees. *Id.* ¶ 80; Ex. 1 (Vidal Decl.) 44-45. The arbitrator's hourly rate is $450 per hour. Compl. ¶ 75; Ex. 11 (Sept. 7, 2022 let.). Mr. Vidal was unable to afford even one hour of her time, let alone the entire proceeding. Ex. 1 (Vidal Decl.) ¶¶ 44-45. In addition, the costs of arbitration owed to the AAA include a filing fee of $1,900, and a case management fee of $750, all of which ACS could potentially recover from Mr. Vidal if it were to prevail. Compl. ¶ 76. Given this, even a preliminary hearing on delegation—i.e., whether a court or arbitrator can decide whether the arbitration provision is valid—would likely cost thousands. And, as ACS repeatedly emphasized, Mr. Vidal would also be required to pay its attorney's fees and costs. *Id.* ¶ 77; Ex. 5 (June 22, 2022 let.). Those fees could easily be tens of thousands of dollars or more. Compl. ¶ 77.

On September 16, 2022, Mr. Vidal, through the undersigned counsel, filed the instant lawsuit against ACS, seeking a declaration that the arbitration provision in his contract is invalid because it penalizes him with costs and fees that violate his rights under trafficking laws and minimum wage laws, and because it is unconscionable. *See generally* Compl.

In the fall of 2022, Mr. Vidal, through his counsel in this case, repeatedly informed AAA that he had filed this case, requested that AAA stay the arbitration pending this case's resolution, and made clear that the arbitration requirement was illegal and unenforceable. Ex. 12 (Sept. 19, 2022 email); Ex. 13 (Oct. 6, 2022 email). In response, ACS argued that this Court does not have authority to decide whether ACS's arbitration provision is illegal because, in ACS's view, the provision includes a "delegation clause" delegating questions of the arbitration provision's validity to the arbitrator. Ex. 14 (Oct. 20, 2022 let.).

In truth, the arbitration provision failed to "clearly and unmistakably" delegate such questions to the arbitrator. Mr. Vidal asserted this and further asserted that any purported delegation clause was illegal and unenforceable under state and federal trafficking laws, federal and state wage and hour laws, and is unconscionable, including because Mr. Vidal signed under economic duress. *See* Ex. 15 (Oct. 28, 2022 let.); Ex. 16 (Nov. 10, 2022 let.).

In several letters filed with the arbitrator and the AAA in late 2022, Mr. Vidal explained that the arbitrator lacks authority to maintain the arbitration pending judicial resolution of this action because challenges to the delegation provision—the sole purported contractual basis to decide the validity of the arbitration provision—are necessarily for this Court to decide.[3] Ex. 16 (Nov. 10, 2022 let.); Ex. 17 (Dec. 2, 2022 let.). Mr. Vidal urged that, at the very least, the arbitrator should stay the arbitration pending judicial resolution of the

---

[3] These letters were filed with the aid of pro bono counsel Towards Justice, which appeared in the arbitration for the limited purpose of challenging the authority of the arbitrator. Towards Justice does not represent Mr. Vidal for any other purpose in the arbitration, and Mr. Vidal has no other counsel there.

delegation question. Ex. 17 (Dec. 2, 2022 let.).

Again, however, AAA barreled ahead. In an October 24, 2022 order, the arbitrator concluded—without engaging with the substance of whether there was a delegation clause— that "I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim." Ex. 18 (Oct. 24, 2022 email). On December 9, the arbitrator denied Mr. Vidal's request to stay the arbitration. Ex. 19 (Dec. 9, 2022 order). The arbitrator held that Mr. Vidal's submissions did not provide "sufficient factual or legal support for the argument that the arbitration agreement is unconscionable under New York law" and that Mr. Vidal's "other arguments can be addressed during the proceedings in this matter." *Id.* That is, the arbitrator decided to defer concerns over the validity of the purported delegation clause to the end of the arbitration process, thus ensuring that the cost of resolving that question will be virtually the same as the cost of the entire arbitration, thus compounding the harm to Mr. Vidal effected by ACS's loser pays provision.

To avoid burdening the judicial resources of this Court with a motion for preliminary relief pending resolution of this declaratory judgment action, Mr. Vidal has repeatedly sought relief from the AAA. He has continued to reinforce to the arbitrator that the arbitration requirement is unenforceable and illegal, that she may not proceed until those arguments are resolved, and that she has no authority to rule on the enforceability of the arbitration requirement because challenges to the delegation clause are necessarily for the Court. *See, e.g.*, Ex. 15 (Oct. 28, 2022 let.); Ex. 16 (Nov. 10, 2022 let.); Ex. 17 (Dec. 2, 2022 let.). The arbitrator ignored substantive engagement with most of these arguments. She has instead set an aggressive schedule, including a deadline for service of discovery requests in December 2022, responses to which are due January 20, and completion of all discovery by mid-March. Ex. 19 (Dec. 9, 2022 order). Meanwhile, the arbitrator's work on this case—mounting at a cost of $450 per hour—and ACS's likely spiraling attorney's fees related to the arbitration,

continue to impose even greater costs on Mr. Vidal.

### C.  <u>The New York Attorney General Urges AAA to Stop the Arbitration</u>

On January 4, 2023, the New York State Office of Attorney General, Labor Bureau (the "OAG") sent AAA a letter expressing "grave concerns" regarding the use of arbitration proceedings to enforce oppressive contract provisions that "compel forced labor" in violation of the Trafficking Victims Protection Act ("TVPA"). Ex. 20 (OAG let.) at 1. Specifically, the OAG reviewed the provisions in the ACS 2022 Contract and determined that the provisions "appear invalid and unlawful under the TVPA." *Id.* at 2.

The OAG expressed specific concerns about AAA administering arbitrations like this one, brought by employers like ACS. AAA should "exercise caution" before administering arbitrations "concer[ning] unlawful contract provisions that violate the TVPA," lest the AAA's arbitration program be "used as a tool by employers to further labor trafficking violations." *Id.* at 3. The OAG also asked the AAA to stay the Vidal arbitration in particular "because it is an undue burden on the worker to defend this matter, especially while the legality of the contract provision at issues is pending" before the Court. *Id.*

Following this letter, Mr. Vidal renewed his request that AAA stay the arbitration pending the resolution of the declaratory judgment action in federal court. Ex. 21 (Jan. 4, 2023 email). Mr. Vidal also informed AAA that if it refused to stay the proceeding, it would necessitate him filing a motion for preliminary injunction in the federal court case. *Id.*

In response to the OAG, AAA explained it had "no authority to vacate or overturn an arbitrator's order." Ex. 22 (Jan. 9, 2023 let.). For that reason, AAA informed the OAG that it would not stay the arbitration absent a court order. *Id.* AAA told Mr. Vidal the same. Ex. 23 (Jan. 9, 2023 let. to D. Seligman).

### ARGUMENT

**I.     The Court Should Preliminarily Enjoin the Arbitration until this Court Rules on the Enforceability of the Purported Delegation Clause.**

Mr. Vidal requests that the Court preliminarily enjoin the arbitration so the Court can decide the threshold issue of whether the arbitration provision contains a clear and unmistakable delegation clause, and if it does, whether that clause is valid and enforceable. Absent a valid delegation clause, the arbitrator does not have the authority to arbitrate the underlying dispute because Mr. Vidal has raised threshold questions regarding the enforceability of the arbitration requirement.

Mr. Vidal satisfies the Rule 65 criteria for a preliminary injunction: (1) he is likely to succeed in his challenges to the delegation clause; (2) he faces the irreparable harm of being forced to endure lengthy legal proceedings in arbitration when he has not assented to those proceedings; (3) the balance of equities between ACS's interests and Plaintiff's interests tips in favor of Plaintiff; and (4) an injunction is in the public interest to help restrain ACS from launching other arbitrations that will keep workers laboring for ACS against their will. *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Regardless, a preliminary injunction is appropriate because "serious questions" about the arbitrator's lack of authority are sufficient to justify issuing an injunction. *See Trump v. Vance*, 941 F.3d 631, 639 (2d Cir. 2019); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("That specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court.").

### A.  This Court Has Authority to Enjoin an Arbitration That is Not Authorized by an Enforceable Agreement to Arbitrate.

Arbitration is a creature of contract. *Starke v. SquareTrade, Inc*., 913 F.3d 279, 288 (2d Cir. 2019). Thus, while the Federal Arbitration Act may embody a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983), the mere invocation of arbitration does not strip this Court of its authority. An arbitrator has "no authority of any kind with respect to a matter at issue absent an

11

agreement to arbitrate," and "the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

The Second Circuit has been clear that federal courts may enjoin pending arbitrations that are not authorized pursuant to a binding and enforceable agreement to arbitrate. *See In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 139 (2d Cir.2011); *see also Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 219 (E.D.N.Y. 2013). "[A]t least where the court determines . . . that the parties have not entered into a valid and binding arbitration agreement, the court has the authority to enjoin the arbitration proceedings." *In re Am. Exp.*, 672 F.3d at 140. For these same reasons, the Second Circuit has also concluded that a district court may issue a preliminary injunction to "freeze [an] arbitration without destroying" the responding party's "ability to continue that arbitration in the event that the district court" determines that the dispute is arbitrable. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010).

### B. Mr. Vidal Only Seeks a Preliminary Injunction against the Arbitration Pending Judicial Resolution on the Delegation Issue.

Because an arbitrator does not have authority to decide a dispute absent an enforceable agreement to arbitrate, *Schnabel*, 697 F.3d at 119, questions regarding the enforceability of an arbitration provision are generally for a court to decide. *See Rent-A-Center, W., Inc. v. Jackson*, 560 U.S. 63 (2010). There is a narrow exception, however, where the parties have "clearly and unmistakably" agreed to arbitrate questions regarding the validity of an arbitration provision—in other words, where they have contractually delegated to the arbitrator the authority to decide disputes regarding the enforceability of an arbitration provision. *Id.* Where such a delegation is "clear and unmistakable," questions regarding the enforceability of an arbitration provision are for the arbitrator. *See, e.g., Chen-Oster v. Goldman, Sachs & Co.*, 785 F. Supp. 2d 394 (S.D.N.Y. 2011).

12

ACS has argued that such a delegation clause exists here in two places: first in the incorporation by reference of AAA's "Commercial Rules," and second in language of the arbitration provision purportedly mandating that disputes regarding the "validity" of the arbitration provision are themselves subject to arbitration. Ex. 14 (Oct. 20, 2022 let.). The arbitrator has continually declined to pause the arbitration proceedings—which continue to impose substantial costs on Mr. Vidal—and presumed that she has the authority to decide his challenges to the validity of the arbitration provision. Indeed, she has explained that such challenges shall be addressed through the development of evidence in the arbitration, along with the merits of ACS's action. Ex. 19 (Dec. 9, 2022 order).

But the mere invocation of arbitration does not divest a court of jurisdiction absent an enforceable agreement to arbitrate. And mere invocation of a delegation requirement does not divest this Court of the authority to decide whether the arbitration requirement is enforceable. Again, to delegate questions of validity to an arbitrator, there must be "clear and unmistakable" delegation. Whether there is a "clear and unmistakable" delegation clause, and the enforceability of any such clause, is necessarily for the Court to decide. *See, e.g.*, *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("[An] attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court.").

At this stage, all Mr. Vidal seeks is a preliminary injunction against the arbitration pending judicial resolution of the preliminary question of the enforceability of any delegation clause in ACS's arbitration requirement. So, although this case challenges the validity of ACS's arbitration requirement as a whole, the instant motion is narrower. It simply requests a preliminary injunction against the arbitration pending judicial resolution of the preliminary question of the enforceability of any delegation clause in ACS's arbitration requirement. This is consistent with the purpose of Rule 65(a), which allows for an injunction to issue "to protect plaintiff from irreparable injury and to preserve the court's power to render a

meaningful decision after a trial on the merits." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.); *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) ("The 'purpose' of a preliminary injunction 'is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur.'") (quoting *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 754 (2d Cir. 1977).[4]

### C.  **Mr. Vidal Is Likely to Succeed on the Merits.**

Mr. Vidal's contract does not include a clear and unmistakable delegation clause. And even if it did, that clause would not be valid and enforceable because: (1) Mr. Vidal signed it and the arbitration provision in which it is situated under economic duress; and (2) the clause is unenforceable and illegal because it violates labor trafficking laws, state and federal wage and hour laws, and because it is unconscionable.

### 1)  *There is No Clear and Unmistakable Delegation Clause.*

Questions regarding the validity of an arbitration provision ("arbitrability") are referrable to an arbitrator only if there is a clear and unmistakable delegation clause. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Chen-Oster*, 785 F. Supp. 2d 394. There is a presumption that the court should decide issues of arbitrability, and that presumption can be overcome only by clear contractual language to the contrary. *See DDK Hotels, LLC v. Williams-Sonoma, Inc*., 6 F.4th 308, 317 (2d Cir. 2021).

Here, there has been no clear and unmistakable delegation of issues of arbitrability to the arbitrator. ACS points to two clauses in the 2022 Contract that it claims amount to such a delegation: A statement that the arbitration "shall proceed in accordance with Rule E-6 of the AAA's Commercial Arbitration rules," Ex. 4 (2022 Contract), Schedule B at 2, and a clause

---

[4] *See also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.) ("the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act").

purporting to require arbitration of all claims, including those about the "validity" of the arbitration provision. *Id.* Schedule B, at 1.

The contractual reference to the AAA Commercial Rules is insufficient to constitute a "clear and unmistakable" delegation. Although Commercial Rule 7(a) provides that an arbitrator has the power to rule on her own jurisdiction, the Commercial Rules themselves indicate that they do *not* apply to this dispute because it is a dispute arising out of an "employment plan." *See* Ex. 24 (AAA Commercial Rules), at 10, n*. Because the Commercial Rules by definition do not apply to a AAA arbitration under this agreement, which indisputably arises out of Mr. Vidal's employment, the Commercial Rules have not been clearly and unmistakably been incorporated by reference.

While incorporation of AAA's Commercial Rules may in some cases amount to a clear and unmistakable delegation to the arbitrator of the authority to rule on matters of arbitrability, Mr. Vidal is not a sophisticated commercial party who can be assumed to have knowledge of the detailed AAA Commercial Rules and the extent to which those rules might apply in an employment context. *Cf. First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995) (unwise to "interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power" in cases involving employees or consumers).

Furthermore, under New York law, the arbitration requirement does not incorporate AAA's Commercial Rules by reference. *See Castedo v. Permanent Mission of Thailand to the U.N.*, 114 N.Y.S.3d 70, 71 (2019) (incorporation by reference ineffective where contract did not "clearly reflect an intention to incorporate"). And concluding that a reference to the Commercial Rules, which themselves disclaim applicability to this dispute, amounts to an incorporation by reference in an arbitration subject to the Employment Rules—solely because the reference occurs in an arbitration provision—would violate the FAA's equal footing principle. *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713-14 (2022).

15

Finally, the language ACS points to stating that disputes regarding the "validity" of the contract should be compelled into arbitration is also far from clear and unmistakable. The arbitration provision at issue also contains a clause that specifically contemplates judicial review of enforceability matters. Specifically, it states that "in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion so as to render it enforceable . . . ." Ex. 4 (2022 Contract), Sched. B, at 2. This provision creates further ambiguity about the intent of the agreement by suggesting that a *court* can rule on the enforceability of the arbitration provision.

### 2) Mr. Vidal signed the arbitration requirement, including its delegation provision, under economic duress.

The delegation provision is also unenforceable because Mr. Vidal signed it, and the arbitration provision in which it is situated, under economic duress. Whether a party voluntarily entered into an agreement to arbitrate is always for the court to decide. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) ("[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists[.]"); *Fedor v. United Healthcare, Inc*., 976 F.3d 1100, 1106–07 (10th Cir. 2020) (questions of formation "cannot be delegated to the arbitrator"). If no valid agreement to arbitrate was ever formed, then no delegation provision exists, and it would be improper to send any part of the dispute to arbitration. *See Schnabel*, 697 F.3d at 118.

Under New York law, a contract is unenforceable on grounds of economic duress when a party "was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Austin Instrument, Inc. v. Loral Corp*., 29 N.Y.2d 124, 130 (1971). Here, Mr. Vidal alleges that he was under substantial economic duress at the time the contract containing the arbitration provision was presented to him. Pursuant to the harsh liquidated damages clause in ACS's first contract with him, if Mr. Vidal did not sign the 2022 contract

16

containing the arbitration provision and its purported delegation clause, he would have been contractually required to pay $20,000 in liquidated damages. Ex. 1 (Vidal Decl.) ¶ 25; *see also* Ex. 2 (2019 Contract) at 4, 6. He also feared that he would be left jobless in London. Ex. 1 (Vidal Decl.) ¶ 25. Especially in light of his circumstances at the time, he could not voluntarily enter into the agreement in the face of this extraordinary financial pressure. *Id.* ¶¶ 20-26. This formation challenge—which goes to both the enforceability of the arbitration provision as a whole and to the delegation clause in particular—must be adjudicated by this Court with the benefit of further factual development.

### 3) The delegation provision is illegal and unconscionable.

Even if the delegation clause were clear and unmistakable and even if Mr. Vidal had voluntarily entered into the arbitration requirement and its delegation provision, he would still be likely to succeed on the merits because the delegation clause is illegal and unenforceable for the same reasons that the arbitration requirement in which it is situated is unenforceable: It violates state and federal trafficking laws, state and federal wage and hour laws, and is unconscionable as a matter of law.

Again, delegating questions of arbitrability to the arbitrator would require Mr. Vidal to submit to an arbitration regarding matters that, by virtue of the "loser pays" provision, could bury him in extraordinary costs and legal fees. Although the precise fees and costs associated with ACS's collection activities are not known at this time, they already likely exceed $3,000, including the attorney's fees and arbitration costs, and the only issues raised by the parties to date concern the arbitrability of ACS's claims. *See* Vidal Decl. ¶¶ 43-47. At the arbitrator's rate of $450 per hour, even litigating the question of arbitrability could cost tens of thousands of dollars, particularly given that the arbitrator has apparently decided to defer ruling on arbitrability until resolution of the merits of the case. *See supra* § IV.B. Those costs could be ruinous to Mr. Vidal should the loser pays provision be invoked against him.

17

*See* Vidal Decl. ¶¶ 2, 3, 46; *see also Andersen v. InePros Federal, Inc.*, 240 F.Supp.3d 143

(D.D.C. 2017) ("$7,500 filing fee, standing alone, is more than sufficient to demonstrate cost-

prohibitiveness when measured against [plaintiff's] modest financial circumstances").

The Court should not require Mr. Vidal to submit to an illegal arbitral process for the

purpose of establishing that that same process is illegal and unconscionable. *See, e.g., Lim v.*

*TForce Logistics*, LLC, 8 F.4th 992, 1003 (9th Cir. 2021).

a)  The arbitration provision and delegation clause violate trafficking
laws.

ACS's conduct—using threats of financial penalties obtained through a weaponized

arbitration—violates federal prohibitions on forced labor. The TVPA prohibits labor obtained

through threats of "serious harm," including "psychological, financial, or reputational harm" that is

sufficiently serious under the circumstances to compel a reasonable person "to perform or to continue

performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(1). The

TVPA also prohibits extracting labor through the "abuse or threatened abuse of legal process." 18

U.S.C. § 1589(c)(1). Under these circumstances, the extraordinary costs that could be imposed

on Mr. Vidal as a consequence of an arbitration even over threshold issues of arbitrability,

fall squarely within these prohibitions.

Federal courts in New York have concluded that it is a violation of federal labor

trafficking laws to require immigrant nurses like Mr. Vidal to pay steep financial penalties if

they leave their employment before the end of a contractual commitment period. *See, e.g.*,

*Paguirigan v. Prompt Nursing Emp't Agency,* 286 F. Supp. 3d 430, 535 (E.D.N.Y. 2017)

($25,000 contract termination fee an unenforceable penalty designed to compel performance).

The OAG has come to a similar conclusion. *See* Assurance of Discontinuance, *In re: Albany*

*Med Health System* (settlement agreement between NY Attorney General & Albany Med

Health System for unlawfully including $20,000 repayment fee in employment contracts for

nurses from foreign nations); *see also* Ex. 20 (OAG let.) at 1 & n.2.

As made clear by the OAG in its letter to AAA, this case involves similar, but even more troubling, facts. *See* Ex. 20 (OAG let.) at 2 (facts and circumstances here "strikingly similar" to cited cases). In all three cases, an employer threatened an immigrant nurse from the Philippines with tens of thousands of dollars in debt for leaving their job. But in *Pagurigan* and *In re: Albany Med Health System*, the employers defended their conduct based on a "liquidated damages" provision which they argued was enforceable. ACS has no such defense here (and in fact has specifically disclaimed any right to pursue liquidated damages), Ex. 25 (Jan. 4, 2023 let.). Instead, ACS seeks unspecified damages (including $9,000 per year for the remainder of Mr. Vidal's contract), costs, and fees of "at least" $20,000, but likely much more. *See* Ex. 5 (June 22, 2022 let.).

Worse still, unlike *Paguarigan* and *In re: Albany Med Health System*, ACS has weaponized the financial burdens of its arbitration requirement to further coerce Mr. Vidal to continue working for ACS. That is the issue before the Court now. In this case, it is not just the costs of the penalty, but the costs of arbitration fees, the arbitrator's hourly rates, attorney's fees, and other related costs that ACS has used to coerce Mr. Vidal into staying in his job. These costs—even just those costs flowing from an arbitration over matters of arbitrability—amount to a threat of "serious harm" that ACS used to coerce Mr. Vidal to continue working for the company. 18 U.S.C. § 1589(a)(2).

ACS clearly intended for the costs of arbitration and related attorney's fees to coerce Mr. Vidal into staying in his job. In its letter to Mr. Vidal on June 22, 2022, shortly after Mr. Vidal indicated his intent to quit, ACS specifically told Mr. Vidal that, if he did not return to work, the company would sue him in arbitration. It also highlighted that, if he left before his contract term, Mr. Vidal would owe "attorney's fees and costs incurred in the arbitration" and that he would, pursuant to the loser pays provision, need to "reimburse" ACS "for all reasonable costs, including all attorneys' fees" that it "incur[red] in enforcing its rights and

19

remedies" under the contract. Immediately after asserting those threats, ACS invited Mr. Vidal to "reconsider" his "course of action." Ex. 5 (June 22, 2022 let.). ACS thus explicitly threatened Mr. Vidal with the potentially devastating costs of its collection activities and the costs of the arbitration itself to coerce him into returning to work.[5] A contract, in this case the delegation provision, intended to be used, and in fact used, for such illegal purposes is illegal and unenforceable under the TVPA.

Furthermore, the unenforceable arbitration provision and its purported delegation clause amount to a "threatened abuse of legal process" to keep Mr. Vidal trapped in his job. New York courts have concluded that the threat of suing workers for leaving a job, even without forcing them to bear the costs of attorney's fees and private dispute resolution, amounts to the threatened abuse of legal process. *See, e.g., Magtoles v. United Staffing Registry, Inc.*, No. 21 Civ. 1850, 2021 WL 6197063, at *8 (E.D.N.Y. Dec. 30, 2021).[6]

By threatening arbitration—even over the threshold matter of arbitrability—against Mr. Vidal and using the threat of that arbitration and its related costs to coerce Mr. Vidal's continued work, ACS unlawfully coerced Mr. Vidal's work, using the arbitration scheme in a manner for which it was surely "not designed." *See* 18 U.S.C. § 1589(c)(1). ACS's arbitration provision also contravenes the stated purposes and protections of the AAA's Employment Due Process Protocols and employment fee schedules, which purport to prohibit abusive contract terms like ACS's loser pays provision.[7]

---

[5] That Mr. Vidal ultimately stopped working for Advanced Care Staffing does not make the coercive arbitration requirement permissible under the TVPA. Mr. Vidal was terrified to quit his job, but felt he had no choice because of the risks to him and his patients created by Advanced Care Staffing's conduct. Vidal Decl. ¶¶ 32-37. Moreover, *attempted* forced labor also violates the TVPA, 18 U.S.C. § 1594(a), and Advanced Care Staffing clearly used the arbitration requirement to *attempt* to coerce Mr. Vidal to continue working.

[6] For similar reasons, ACS's conduct violates New York's anti-trafficking statute, Penal Law § 135.35. *See* ECF No. 1 (Complaint) ¶¶ 88-95.

[7] For example, the Employment/Workplace Fee Schedule provides that "the company shall pay the arbitrator's compensation unless the individual, *post* dispute, voluntarily elects to pay a portion of the arbitrator's compensation" and that "arbitrator compensation, expenses, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's

20

      b)  <u>The arbitration requirement and delegation provision violate wage and hour laws.</u>

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, an employer like ACS may not require an employee like Mr. Vidal to pay costs or damages that are "primarily for the benefit of the employer" when those costs take the employee's wages below applicable federal minimum wage or required overtime in the relevant workweek. *He v. Home on 8th Corp.*, No. 09 Civ. 5630, 2014 WL 3974670, at *9 (S.D.N.Y. Aug. 13, 2014).

In the underlying arbitration here, ACS seeks such an illegal kickback:  ACS seeks to recover its purported "lost profits" and the costs of hiring a replacement employee. Those costs are not primarily for the employee's benefit. The profit from an employee's work is inherently for the employer's benefit. *See, e.g.*, 29 C.F.R. § 53.13(b) (where an employer does seek to recoup costs paid for the employee's benefit, such costs may not include a "profit" for the employer). In a fair and competitive marketplace, employers recoup that value (and avoid the costs of hiring a replacement) through competitive wages and benefits. Allowing employers like ACS to recover these types of costs would eviscerate the minimum wage laws. Because the costs ACS seeks are an illegal kickback, the costs of attempting to collect that illegal kickback are an illegal kickback too.

Because ACS seeks to recover an illegal kickback through arbitration, the loser pays term requiring Mr. Vidal to bear the costs of the arbitration, even merely over the threshold issue of arbitrability, also effects an illegal kickback. And because those costs must be measured against Mr. Vidal's last week of wages—for which he earned less than $1,500 for 35-40 hours of work—they result in a minimum wage violation. Vidal Decl. ¶ 53; *see Arriaga*, 305 F.3d at 1236.[8] The delegation provision is thus unenforceable because it

---

determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous." AAA, Employment Fee Sched., <u>https://www.adr.org/sites/default/files/Employment_Fee_Sched..pdf</u> (emphasis added).

     [8] It makes no difference to the analysis that Advanced Care Staffing did not directly deduct the alleged damages from Mr. Vidal's wages. There is no difference between deducting a cost from a

requires a violation of Mr. Vidal's federal minimum wage rights.

Finally, the loser pays term in the arbitration provision and delegation clause is also inconsistent with the one-way fee shifting provisions in state and federal wage and hour law. *See, e.g.*, 29 U.S.C. § 216(b). In enacting a one-way fee shifting statute, Congress did not intend to permit employers to contract for the recovery of their own fees and costs when they prevail in disputes under the FLSA. *See, e.g.*, *Alexander v. Anthony Int'l, L.P.,* 341 F.3d 256, 268–269 (3d Cir. 2003) (provision requiring losing party in employment discrimination case to pay all arbitrator fees and costs unenforceable); *Santich v. VCG Holding Corp.*, 2018 WL 3968879, at *7 (D. Colo. Aug. 20, 2018); *Smith v. AHS Okla. Heart, L.L.C.*, No. 11 Civ. 691, 2012 WL 3156877, at *4-5 (N.D. Okla. Aug. 3, 2012) (invalidating loser pays provision in arbitration clause covering employee's Title VII and Equal Pay Act claims, but severing provision and enforcing remainder of arbitration clause).[9]

c) The delegation clause is unconscionable as a matter of New York law.

The delegation clause is also unconscionable as a matter of New York law. Under New York law, unconscionability involves both procedural and substantive components. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010). Procedural unconscionability concerns the circumstances of contract formation and the degree of choice provided to the non-drafting party. Substantive unconscionability concerns the substantive fairness of the terms of a contract.

A contract or clause is unconscionable when there is an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably

---

worker's wages and shifting a cost to an employee to bear directly. *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) (citations omitted).

[9] For all these same reasons, the arbitration requirement violates state minimum wage and anti-kickback laws. *See* N.Y. Lab. Law § 198-b. New York prohibits an employer from conditioning employment on the employee agreeing to kick back "any part or all of said employee's wages." *Id.* That is precisely what the Advanced Care Staffing's contract and arbitration requirement do here.

favorable to the other party." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999). And while procedural unconscionability always bears on the unconscionability analysis, substantive unconscionability alone may be enough to establish a contract as unconscionable if the terms of the contract are sufficiently unfair. *Ragone*, 595 F.3d at 122. "In general, it can be said that procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *State v. Wolowitz*, 96 A.D.2d 47, 68 (N.Y. App. Div. 1983). In this case, the arbitration provision and the delegation clause are strongly procedurally and substantively unconscionable.

The arbitration provision, including the purported delegation clause, has a strong degree of procedural unconscionability. ACS forced Mr. Vidal to sign the arbitration requirement as a condition of his employment, without any meaningful opportunity to negotiate, and Mr. Vidal had an imperfect understanding of the contents of the contract he was signing. Vidal Decl. ¶¶ 20-26.

But this case also includes exceptionally coercive contracting circumstances that are unlike those typically arising in the employment context. *Ragone*, 595 F.3d at 122. Most importantly, ACS required Mr. Vidal to sign the arbitration provision when he was in a foreign country, had already quit his job, and had no way of supporting himself or paying rent unless he signed the contract and began his employment with ACS. *Id.* Even more significantly, because Mr. Vidal had already signed a prior agreement with the company that required him to pay $20,000 if he did not work for ACS, he reasonably believed that if he did not sign the new contract, which included the delegation clause, he would have to pay ACS thousands of dollars he did not have. *Id.* This amounted to an extraordinary "inequality of bargaining power" resulting in "lack of meaningful choice." *Wolowitz*, 96 A.D.2d at 66.

The degree of procedural unconscionability evident in this case is so substantial that

23

under the "sliding scale" framework Mr. Vidal should face a lower burden for establishing substantive unconscionability. Nonetheless, there is also a high degree of substantive unconscionability present in the delegation clause. Most importantly, the requirement includes a loser pays term that provides that the prevailing party "shall be entitled" to its attorney's fees and the costs of the arbitration, including the arbitrator's fees, even over an arbitration regarding preliminary matters of arbitrability.

Although there is minimal New York case law on the enforceability of loser pays provisions in employment contracts, some courts around the country find such terms to be *per se* unconscionable. *See, e.g.*, *Tompkins v. 23andMe, Inc*., 840 F.3d 1016, 1025 (9th Cir. 2016) (as a matter of California law, "when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court" (internal quotation marks omitted)). However, even under an analysis that looks to the circumstances of the party challenging the contract, this contract is substantively unconscionable under New York law because it prevents Mr. Vidal from vindicating his rights or defending himself in arbitration. *See, e.g.*, *Valle v. ATM Nat., LLC*, No. 14 Civ. 7993, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (loser pays provision in arbitration agreement covering low-wage workers is substantively unconscionable where the costs of arbitration could amount to tens of thousands of dollars).

The loser pays term effectively prevents Mr. Vidal from even being able to challenge the arbitrator's authority to administer this case. Mr. Vidal came to the United States from the Philippines, where he grew up in poverty. Ex. 1 (Vidal Decl.) ¶¶ 1-4. He is a critical source of support for his family back home, including his brother who has a severe disability, is non-verbal, and requires the constant care and attention of Mr. Vidal's father, who cannot work outside of the house. *See id.* ¶¶ 2, 10, 13, 33, 48-49. Mr. Vidal cannot afford to pay the over

24

$2,000 in filing fees already at issue here, let alone the arbitrator's time, which costs $450 per hour. *Id.* ¶¶ 44-45. He certainly cannot afford to pay tens of thousands of dollars in attorney's fees for the several attorneys that ACS has retained to pursue this purported debt. Paying even some of those costs would prevent him from sending any money home to his father and brother who rely on him to put food on the table and pay rent. *Id.* ¶ 45.

d) <u>The loser pays term cannot be severed from the arbitration requirement and delegation clause.</u>

ACS cannot avoid the conclusion that the delegation provision is unenforceable by urging the court to sever the loser pays term and enforce the purported delegation provision in its absence. First, the loser pays term is integral to the arbitration requirement here, and the arbitrator cannot re-write the provision without fundamentally altering the nature of the agreement. *See, e.g.*, *MacDonald v. CashCall, Inc*, 883 F.3d 220, 230 (3d Cir. 2018). The purpose of the contract to shift the costs of arbitration and collection onto Mr. Vidal is evident in several provisions of the contract, including in the "loser pays" term in Schedule B of the requirement's "Dispute Resolution Provision," and in Section 14 of the contract, which purports to require Mr. Vidal to bear all the costs and attorney's fees associated with ACS's collection activities. *See, e.g.*, *Alexander v. Anthony Int'l*, L.P., 341 F.3d 256, 271 (3d Cir. 2003) ("The cumulative effect of such illegality prevents us from enforcing the arbitration agreement. Because the sickness has infected the trunk, we must cut down the entire tree.")

Second, ACS's own conduct has revealed that the fee-shifting aspects of the requirement are integral to the agreement. In its communications with Mr. Vidal, it repeatedly emphasized that he would bear the costs of collection and arbitration and all ACS's attorney's fees. Ex. 5 (June 22, 2022 let.). The loser pays term was clearly critical to ACS.

Third, particularly in light of ACS's conduct and threats, severing the loser pays provision would create incentives for contract drafters like ACS to overreach and pack their contracts with unfair and unenforceable terms. *See, e.g.*, *Lim v. TForce Logistics, LLC*, 8

25

F.4th 992, 1006 (9th Cir. 2021); *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016); *Lowden v. T-Mobile, USA, Inc.*, No. 05 Civ. 1482, 2006 WL 1009279, at *9 (W.D. Wash. Apr. 13, 2006). If such terms were routinely severed in cases like this one, then drafting parties like ACS would have every incentive to pack their arbitration requirements with fee-shifting provisions and loser pays terms, then use those terms to threaten workers while attempting to coerce their labor, knowing that—at worst—the arbitrator will sever or blue pencil the aspects of the requirement that she finds most concerning.

### D. **Even if the Court Cannot Resolve Whether Mr. Vidal Is Likely to Succeed on the Merits, Mr. Vidal Raises a Serious Question Regarding the Arbitrator's Authority, Which Warrants Injunctive Relief.**

The Court need not definitively resolve whether or not Mr. Vidal is likely to succeed on the merits of the enforceability of the delegation clause. Because "[p]reliminary injunctions should not be mechanically confined to cases that are simple or easy," a preliminary injunction is appropriate even when a plaintiff's chance of success is uncertain so long as the balance of hardships tilts strongly enough in her favor. *See Citigroup*, 598 F.3d at 35 (affirming district court order preliminarily enjoining arbitration). This flexibility "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* Disputes over the merits of a plaintiff's claim that "simply raise a question of fact," for example, do not prevent a court from entering an injunction while those serious questions are resolved. *See Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, No. 19 Civ. 04414, 2020 WL 249020, at *9 (E.D.N.Y. Jan. 16, 2020).

The Second Circuit has specifically invoked the "serious question" standard in upholding a preliminary injunction against a potentially unauthorized arbitration. *Citigroup* 598 F.3d at 35. The *Citigroup* court explained that even where "uncertainty" about the

arbitrability of a dispute "poses a serious question," a district court may preliminarily enjoin the arbitration. *Id.* at 39. After all, doing so does not strip the party seeking arbitration of the right to arbitrate. All it does is "freeze" the arbitration pending judicial resolution of the arbitrability of the dispute. *Id.* at 32. For the same reasons that Plaintiff meets the higher threshold of establishing a likelihood of success on the merits, Plaintiff also presents "serious questions" about the arbitrator's authority to proceed with this arbitration. And, as explained below, the balance of hardships overwhelmingly favors Plaintiff.

### E.  Mr. Vidal Will Suffer Irreparable Harm Absent Immediate Relief.

Absent a preliminary injunction, Mr. Vidal faces the irreparable harm of being subjected to an arbitration before an arbitrator without any authority to rule even on threshold questions of arbitrability. Courts in this Circuit recognize that being subjected to an unauthorized arbitration constitutes an irreparable harm sufficient to support preliminary injunctive relief. *See Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Fund Ltd.*, No. 08 Civ. 5520, 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008) ("Compelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.') (citation omitted), *aff'd*, 598 F.3d 30, 41 (2d Cir. 2010); *Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union*, 975 F. Supp. 445, 447 (E.D.N.Y. 1997).

Absent a preliminary injunction staying the arbitration—at least until the Court decides whether the parties delegated arbitrability to the arbitrator—Mr. Vidal will be forced to expend time and substantial resources seeking to protect his rights in arbitration. *See Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004); *see also Port Drivers Fed'n 18, Inc. v. All Saints Express*, 757 F. Supp. 2d 443, 460–61 (D.N.J. 2010). And as the Second Circuit has acknowledged, "the time and resources [a party] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages . . .." *Maryland Casualty Co. v. Realty Advisory Bd. on Labor*

*Relations,* 107 F.3d 979, 985 (2d Cir. 1997) (citing *Int'l Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 71 (2d Cir. 1996)).

This harm is not speculative—it is already occurring as the arbitrator has commenced, and refused to halt, proceedings, despite Mr. Vidal's attempts to persuade her that she was not delegated the authority to decide questions of arbitrability, and despite the Attorney General's office urging AAA to consider staying the arbitration. The threatened harm is thus more than a mere possibility. *See Winter*, 555 U.S. at 22.

Moreover, this harm cannot be redressed by challenging an arbitration award following the proceeding. To get to that point, Mr. Vidal would have to go through the entire arbitration, expending considerable time and resources in doing so. *See Maryland Casualty Co.*, 107 F.3d at 985. And he could only challenge the outcome of the arbitration through a separate proceeding seeking vacatur of the arbitral order, an exceptionally high standard to meet. *See* 9 U.S.C. § 10.

### F.   The Balance of Harms Tips Decidedly in Mr. Vidal's Favor.

The harm to ACS from granting a preliminary injunction is only a small delay in a potential monetary recovery through arbitration. That harm is minimal, particularly given that ACS is a large company that likely earns millions of dollars every year. And any harm that may result from the delay could be compensated by the arbitrator if the Court determines that the arbitration here may lawfully proceed. By contrast, the harm to Mr. Vidal of having to expend further time and resources on the unauthorized arbitration before the Court has ruled on whether issues of arbitrability were validly delegated to the arbitrator would be, as the Second Circuit has recognized, "not compensable by any monetary award of attorneys' fees or damages." *Maryland Casualty Co.*, 107 F.3d at 985 (cleaned up).

### G.   A Preliminary Injunction Is in the Public Interest.

That a preliminary injunction is squarely in the public interest is evident from the

New York Attorney General's interest in this case. *See supra* section IV.C. The Attorney

General expressed "grave concerns" that circumstances like those experienced by Mr. Vidal

"compel forced labor" in violation of the TVPA. Ex. 20 (OAG Let.) at 1. The OAG also

noted that the legal and financial harms threatened against vulnerable immigrant workers like

Mr. Vidal are likely to result in coerced work. *Id.* The public has a strong interest in

preventing forced labor, as reflected in the adoption of the TVPA. *See* Wright & Miller, 11A

Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.) (federal statute prohibiting threatened acts that are

subject of litigation "strong factor in favor of granting a preliminary injunction.").

In addition, the incentives created by allowing ACS's conduct to proceed unchecked

militate in favor of a preliminary injunction to protect the public interest in a fair dispute

resolution process. Allowing ACS to weaponize the arbitration process and aggressively seek

judgment against Mr. Vidal while his allegations go unexamined would undermine that

interest. *See* Ex. 20 (OAG Let.) at 2.

## II.     The Court Can Enjoin the Arbitration Pursuant to the All Writs Act.

The Court also has the authority to preliminarily enjoin this arbitration pursuant to the

All Writs Act. The All Writs Act provides federal courts with the authority to issue all writs

"necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The

Act specifically allows courts to issue orders directed toward non-parties. *United States v.

Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 907 F.2d

277, 281 (2d Cir. 1990). In this case, that would include an order directed toward the AAA

and the arbitrator requiring that the underlying arbitration be stayed, at least preliminarily,

until this Court can rule on the arbitrator's authority to decide issues of arbitrability.

The continued administration of ACS's arbitration against Mr. Vidal constitutes a

direct threat to this Court's jurisdiction. As explained above, whether the arbitrator has the

authority under the purported delegation requirement to decide the enforceability of the

29

arbitration provision is necessarily for the Court to decide in the first instance. The Second Circuit and courts around the country have reasoned that the All Writs Act gives federal courts authority to enjoin arbitrations that threaten their jurisdiction. *See, e.g.*, *In re Am. Exp.*, 672 F.3d at 141 n.20; *In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*, 315 F.3d 417, 438-40 (4th Cir. 2003); *Allstate Ins.*, 929 F. Supp. 2d at 220. The administration of an arbitration regarding issues that are not arbitrable and that fall within a court's jurisdiction presents a sufficiently serious threat to that court's jurisdiction to justify application of the All Writs Act. *In re Am. Honda Motor Co.*, 315 F.3d at 438.[10]

The Court need not decide now whether a clear and unmistakable delegation clause exists or whether the arbitration requirement or the putative delegation clause is enforceable. All Plaintiff requests here is a preliminary injunction staying arbitration until the Court can address those issues. The Court should preliminarily enjoin the arbitration if it concludes that there are serious questions whether the administration of the arbitration, before the Court has had a chance to decide the applicability and enforceability of the delegation provision, presents a threat to this Court's jurisdiction. *Citigroup Glob. Markets, Inc.*, 598 F.3d at 33. There should be no question that such questions are present here.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's requested injunction and enjoin further proceedings in arbitration until this Court can determine whether the arbitration provision contains a clear and unmistakable delegation clause, and whether that clause is valid and enforceable.

---

[10] Although some courts have refused to enjoin arbitrations under the All Writs Act and permitted arbitrators to rule on their own authority to decide the dispute before them, in those cases there was no dispute that the underlying substantive question was covered by an enforceable arbitration agreement. *See, e.g., Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 128 (2d Cir. 2015); *Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224,1233 (2d Cir. 1992). Here, Plaintiff challenges the purported delegation clause, a challenge that the Court must decide. *See supra* § I.B.

Dated: January 20, 2023

Respectfully submitted,

/s/               
David H. Seligman

**TOWARDS JUSTICE**

David H. Seligman (*pro hac vice*)
Juno Turner
Valerie Collins (*pro hac vice*)
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362 (*pro hac vice*)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

Matthew C. Helland, CA Bar No. 250451 (*pro hac vice*)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*