# EXHIBIT 16



**towardsjustice.org** | 720-441-2236
303 E. 17th Street, Suite 400 Denver, CO 80203
PO Box 371680, PMB 44465 Denver, CO 80237-5680

November 10, 2022

**By Email**

Sara Kula
Arbitrator

Re: *Advanced Care Staffing, LLC v. Benzor Vidal* (Case No. 01-22-0002-9008)

Dear Ms. Kula:

Pursuant to the arbitrator's order of October 24, 2022, Respondent Benzor Vidal submits further evidence and argument that the arbitration requirement at issue here is unconscionable and unenforceable as a matter of state and federal law. For the reasons discussed below, the arbitration requirement and its "loser pays" provision: (1) violate prohibitions against forced labor and trafficking, (2) violate federal and state wage and hour laws, and (3) are unconscionable and unenforceable as a matter of state law.

In response to the arbitrator's October 24, 2022 order, this briefing begins with those arguments. However, the arbitrator does not have the authority to resolve these issues of arbitrability at this stage. That is because the purported delegation provision—the sole contractual basis for the arbitrator's jurisdiction to decide issues of arbitrability—is also infirm. Like the arbitration requirement as a whole, the delegation provision violates trafficking and wage and hour laws and is unconscionable as a matter of New York law. Mr. Vidal has already raised that argument for the federal district court in *Vidal v. Advanced Care Staffing*, LLC, 22-cv-5535 (E.D.N.Y.), ECF Doc 13. He has also argued that the arbitration requirement does not "clearly and unmistakably" delegate questions of arbitrability to the arbitrator and that he signed the requirement and its purported delegation provision under duress. *Id.* The arbitrator does not have the authority to address any of those questions. For that reason, the arbitrator should—at the very least—stay this matter until the federal district court resolves the arbitrator's authority in *Vidal.*

## A.  The Arbitration Requirement Violates Federal and State Trafficking Laws

Federal courts in New York have concluded that it is a violation of federal labor trafficking laws to require immigrant nurses like Mr. Vidal to pay steep financial penalties if they leave their employment before the end of a contractual commitment period. *See, e.g., Paguirigan v. Prompt Nursing Emp't Agency,* 286 F. Supp. 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee an unenforceable penalty designed to compel performance). The New York Attorney General has come to a similar conclusion. *See also* Assurance of Discontinuance, *In re: Albany Med Health System* (settlement agreement between NY Attorney General & Albany Med Health System for unlawfully including $20,000 repayment fee in employment contracts for nurses from foreign nations).

Mr. Vidal's case involves similar, but even more troubling, facts to those considered by the court in *Paguirigan* and the Attorney General in *In re: Albany Med Health System*. In all three cases, an employer threatened an immigrant nurse from the Philippines with tens of thousands of dollars in

debt for leaving their job. Here, however, Advanced Care Staffing cannot even avail itself of the other employers' asserted defense. In *Paguirigan* and *In re: Albany Med Health System*, the employers attempted to justify their conduct based on a "liquidated damages" provision, which they argued was enforceable. Advanced Care Staffing has no such defense. Instead, Advanced Care Staffing is seeking uncertain damages, costs, and fees of "at least" $20,000, but likely much more. *See* June 22, 2022 Letter from Advanced Care Staffing, Vidal Decl., Ex. A.

Worse still, unlike *Paguarigan* and *In re: Albany Med Health System*, Advanced Care Staffing has weaponized its arbitration requirement and the financial burdens of arbitration to further coerce Mr. Vidal to continue working for Advanced Care Staffing. The arbitration requirement is therefore illegal and unenforceable pursuant to federal prohibitions against forced labor and trafficking.

*First*, the arbitration requirement amounts to a threat of "serious harm" that Advanced Care Staffing exploited to coerce Mr. Vidal to continue working for the company. 18 U.S.C. § 1589(a)(2). Under the statute, "serious harm" is harm "whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(1).

While the precise fees and costs associated with Advanced Care Staffing's collection activities are not clear, those fees and costs are already likely to be several thousand dollars, increasing to several tens of thousands depending on Advanced Care Staffing's attorney's fees and the hours expended by the arbitrator resolving this dispute. Those fees include over $2,000 in filing fees and hourly rates of over $400 for the arbitrator's services. Vidal Decl. ¶¶ 43-47.

Those costs could be ruinous to Mr. Vidal. Mr. Vidal is an immigrant who came to the United States to work as a nurse and make money to send home to his father and brother, who has a serious disability and needs constant care. Vidal Decl. ¶¶ 2, 3, 46. While he worked at Advanced Care Staffing, Mr. Vidal barely had any money left over after paying for rent, expenses, and sending money home to his family, let alone thousands of dollars. *Id.* ¶¶ 42-56. Any reasonable person in his circumstances would feel compelled to work to avoid incurring the serious financial harm threatened by Advanced Care Staffing through its arbitration requirement.

The arbitration requirement did not become enforceable under the TVPA because Mr. Vidal stopped working for Advanced Care Staffing. Mr. Vidal was terrified to quit his job, but he felt like he had no choice because of the risks to him and his patients. Vidal Decl. ¶¶ 32-37. Moreover, *attempted* forced labor also violates the TVPA, 18 U.S.C. § 1594(a), and Advanced Care Staffing clearly used the arbitration requirement in an *attempt* to coerce Mr. Vidal to continue working. In its letter communicating about the threatened arbitration to Mr. Vidal on June 22, 2022, Advanced Care Staffing specifically cited to the arbitration requirement and the fact that he would owe "attorney's fees and costs incurred in the arbitration" and that he would need to "reimburse" Advanced Care Staffing "for all reasonable costs, including all attorneys' fees" that it "incur[red] in enforcing its rights and remedies" under the contract. Immediately after asserting those threats, it invited Mr. Vidal to "reconsider" his "course of action." Vidal Decl., Ex. A. Advanced Care Staffing thus explicitly tied the costs of its collection activities and the costs of arbitration to Mr. Vidal's return to work. A contract intended to be used, and in fact used, for such illegal purposes is illegal and unenforceable under the TVPA.

*Second*, the unenforceable arbitration requirement amounts to a "threatened abuse of legal process" to keep Mr. Vidal trapped in his job. Under the statute, the "abuse or threatened abuse of legal process means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

Courts in New York have concluded that the threat of filing lawsuits in court against workers who leave their jobs could amount to the threatened abuse of legal process under the TVPA. *See, e.g.*, *Magtoles v. United Staffing Registry, Inc.*, No. 21CV1850KAMPK, 2021 WL 6197063, at *8 (E.D.N.Y. Dec. 30, 2021). Advanced Care Staffing engaged in substantially more concerning conduct here. Advanced Care Staffing threatened arbitration against Mr. Vidal and specifically used the threat of that arbitration and its related costs to coerce Mr. Vidal's continued work.

The arbitration scheme was "not designed" for this purpose. 18 U.S.C. § 1589(c)(1). Advanced Care Staffing used its arbitration requirement not to facilitate efficient and fair dispute resolution, but rather to increase the potential costs and risks to Mr. Vidal for leaving Advanced Care Staffing's employment. Furthermore, Advanced Care Staffing's arbitration requirement contravenes the stated purposes and protections of the AAA's Employment Due Process Protocols and employment fee schedules, which purport to protect the due process rights of employees like Mr. Vidal. For example, the Employment/Workplace Fee Schedule provides that "the company shall pay the arbitrator's compensation unless the individual, *post* dispute, voluntarily elects to pay a portion of the arbitrator's compensation" and that "arbitrator compensation, expenses, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous." AAA, Employment Fee Schedule, https://www.adr.org/sites/default/files/Employment_Fee_Schedule.pdf (emphasis added). Contrary to these protections, Advanced Care Staffing's contract and arbitration requirement purport to shift onto employees like Mr. Vidal the costs of Advanced Care Staffing's collections efforts and, if the employee loses an action in arbitration, all costs, attorney's fees, and arbitrator's costs and compensation. This is not the stated purposes of AAA's arbitration scheme.

**B. The Arbitration Requirement Violates Federal and State Wage and Hour Laws**

The arbitration requirement and its "loser pays" provision also violate state and federal wage and hour laws. Through this arbitration, Advanced Care Staffing is seeking to recoup a kickback against Mr. Vidal's wages. Therefore, the costs and attorney's fees that Advanced Care Staffing seeks as part of its efforts to recoup those costs also constitute an illegal kickback against his wages.

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, an employer like Advanced Care Staffing may not require an employee like Mr. Vidal to pay costs or damages that are "primarily for the benefit of the employer" when those costs or damages take the employee's wages below applicable federal minimum wage or required overtime in the relevant workweek. *He v. Home on 8th Corp.*, No. 09 CV 5630, 2014 WL 3974670, at *9 (S.D.N.Y. Aug. 13, 2014). This makes sense. Fundamental to our labor laws is the notion that employers must pay employees for their work, not the other way around.

Advanced Care Staffing points to case law suggesting that damages related to leaving a job before the end of a contractual commitment period cannot be a kickback against wages. This is not the law. There are cases suggesting that where employers seek to recoup costs that are primarily for the *employee*'s benefit—for example, transferable training, licensing, or accreditation that is for the employee's benefit—those costs are not a kickback. *See, e.g.*, *Park v. FDM Grp. (Holdings) PLC*, No. 16 CV 1520-LTS, 2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017). But that is not what Advanced Care Staffing is doing here. Among other costs that it seeks to recoup, Advanced Care Staffing is attempting to recover its purported "lost profits" and the costs of hiring a replacement employee because of Mr. Vidal's termination of his employment relationship. *See* Vidal Decl., Ex. A; Amended and Restated Contract, Section 10, Vidal Decl., Ex B.

Those costs are not primarily for the employee's benefit. The surplus value of an employee's work is inherently for the employer's benefit. *See, e.g.*, 29 C.F.R. § 53.13(b) (where an employer does seek to recoup costs paid for the employee's benefit, such costs may not include a "profit" for the employer). In a fair and competitive marketplace, employers recoup that value (and avoid the costs of hiring a replacement) through competitive wages and benefits. Allowing employers like Advanced Care Staffing to recover these types of costs would eviscerate the minimum wage laws.

It makes no difference to the analysis that Advanced Care Staffing did not directly deduct the alleged damages from Mr. Vidal's wages. There is no difference between deducting a cost from a worker's wages and shifting a cost to an employee to bear directly. *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) (citations omitted). It also makes no difference that Mr. Vidal was not required to pay these costs until he terminated his contract. The minimum wage laws require payment of wages unconditionally and "free and clear." 29 C.F.R. § 53.35. It is not permissible for an employer to condition payment of minimum wages on an employee maintaining an employment relationship. An employment contract under which an employee is not paid for their last week of work if they leave the employment relationship before the end of three years would not be enforceable. The contract at issue here is no different.

The arbitration requirement also violates the FLSA. Because Advanced Care Staffing seeks to recover an illegal kickback through arbitration, the costs of the arbitration are an illegal kickback too. Those costs likely already exceed $3,000. And because those costs must be measured against Mr. Vidal's last week of wages—for which he earned less than $1,500 for 35-40 hours of work—they result in an illegal kickback. Vidal Decl. ¶ 53; *see Arriaga*, 305 F.3d at 1236.

For all these same reasons, the arbitration requirement violates state minimum wage and anti-kickback laws. *See* N.Y. Lab. Law § 198-b. It is not permissible under New York law to condition employment on the employee agreeing to kickback to the employer "any part or all of said employee's wages." *Id.* That is precisely what the Advanced Care Staffing's contract and arbitration requirement do here.

Finally, the loser pays term is inconsistent with the one-way fee shifting provision of the FLSA. *See, e.g.*, 29 U.S.C. § 216(b). In enacting a one-way fee shifting statute, Congress did not intend to permit employers to contract for the recovery of their own fees and costs when they prevail in disputes under the FLSA. *See, e.g.*, *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 268–269 (3d Cir. 2003) (provision requiring losing party in employment discrimination case to pay all arbitrator fees and costs unenforceable); *Santich v. VCG Holding Corp.*, 2018 WL 3968879, at *7 (D. Colo. Aug. 20, 2018); *Smith v. AHS Okla. Heart, L.L.C.*, 2012 WL 3156877, at *4–5 (N.D. Okla. Aug.

3, 2012) (invalidating loser pays provision in arbitration clause covering employee's Title VII and Equal Pay Act claims, but severing provision and enforcing remainder of arbitration clause).

### C.  The Arbitration Requirement Is Unconscionable as a Matter of New York Law

The arbitration requirement and its "loser pays" provision are also unconscionable as a matter of New York law. Under New York law, unconscionability involves both procedural and substantive components. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010). Procedural unconscionability concerns the circumstances of contract formation and the degree of choice provided to the non-drafting party. Substantive unconscionability concerns the substantive fairness of the terms of a contract.

A contract or clause is unconscionable when there is an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999). And while procedural unconscionability always bears on the unconscionability analysis, substantive unconscionability alone may be enough to establish a contract as unconscionable if the terms of the contract are sufficiently unfair. *Ragone*, 595 F.3d at 122. "In general, it can be said that procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa *State v. Wolowitz*, 96 A.D.2d 47, 68 (N.Y. App. Div. 1983). In this case, the arbitration requirement is strongly procedurally and substantively unconscionable.

The arbitration requirement has a strong degree of procedural unconscionability. In this case, as in many other cases involving employment contracts of adhesion, Advanced Care Staffing forced Mr. Vidal to sign the arbitration requirement as a condition of his employment, without any meaningful opportunity to negotiate, and Mr. Vidal had an imperfect understanding of the contents of the contract he was signing. Vidal Decl. ¶¶ 20-26.

But this case also includes exceptionally coercive contracting circumstances that are unlike those typically arising in the employment context. *Ragone*, 595 F.3d at 122. Most importantly, Advanced Care Staffing required Mr. Vidal to sign the arbitration requirement when he was in a foreign country, had already quit his job, and had no way of supporting himself or paying rent unless he signed the contract and began his employment with Advanced Care Staffing. *Id.* Even more significantly, because Mr. Vidal had already signed a prior agreement with the company that required him to pay $20,000 if he did not work for Advanced Care Staffing, he was under the reasonable impression, that if he did not sign the new contract, including the arbitration requirement, he would have to pay Advanced Care Staffing tens of thousands of dollars he did not have. *Id.* This amounted to an extraordinary "inequality of bargaining power" that resulted in the "lack of meaningful choice." *Wolowitz*, 96 A.D.2d at 66.

The degree of procedural unconscionability evident in this case is so substantial that under the "sliding scale" framework Mr. Vidal should face a lower burden for establishing substantive unconscionability. Nonetheless, there is also high degree of substantive unconscionability present in the arbitration requirement. Most importantly, the requirement includes a "loser pays" term that provides that at the conclusion of arbitration the prevailing party "shall be entitled" to its attorney's fees and the costs of the arbitration, including the arbitrator's fees. There is minimal New York case law on the enforceability of loser pays provisions in employment contracts. Some courts around the

country find such terms to be per se unconscionable. *See, e.g., Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1025 (9th Cir. 2016) (as a matter of California law, "when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court" (internal quotation marks omitted)). However, even assuming that New York applies a case-by-case analysis to determining the substantive fairness of loser pays terms in employment disputes, this contract is substantively unconscionable under New York law because it prevents Mr. Vidal from vindicating his rights or defending himself in arbitration. *See, e.g., Valle v. ATM Nat., LLC*, No. 14-CV-7993 KBF, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (loser pays provision in arbitration agreement covering low-wage workers is substantively unconscionable where the costs of arbitration could amount to tens of thousands of dollars).

Mr. Vidal came to the United States from the Philippines. Growing up, his family sometimes had challenges affording food. His family took out loans so he could go to nursing school and could make money to send back to his family in the Philippines, including his brother who has a severe disability, is non-verbal, and requires the constant care and attention of Mr. Vidal's father, who cannot work outside of the house. In the Philippines, Mr. Vidal made only a few hundred dollars a month. And while he took home around $3,500 per month while working for Advanced Care Staffing, he had to spend the majority of that on rent in an apartment with a roommate in New York City and on living expenses. Vidal Decl. ¶¶ 48-53. Meanwhile, his family in the Philippines needs about $1,000 per month to survive. He is a critical source of support for them. *Id.* ¶¶ 18, 49.

Mr. Vidal cannot afford to pay the over $2,000 in filing fees already at issue here, let alone even one hour of the arbitrator's time, which costs $400. He certainly cannot afford to pay tens of thousands of dollars in attorney's fees for all the several attorneys that Advanced Care Staffing has retained to pursue this purported debt. Paying even some of those costs would prevent him from sending any money home to his father and brother who rely on him to put food on the table and pay rent. *Id.*

These costs and fees also chill Mr. Vidal from being able to assert counterclaims against Advanced Care Staffing in this case. If Mr. Vidal increases the complexity of this proceeding, he increases the costs and fees that may later be imposed on him—perhaps by orders of magnitude. *Id.* ¶ 46. Advanced Care Staffing has thus not only weaponized its arbitration requirement to coerce Mr. Vidal's labor and extract more money from him, it has also effectively insulated itself from liability under state and federal law. That too renders the provision unconscionable as a matter of New York law.

### D. The Loser Pays Term Should Not Be "Severed" from the Arbitration Requirement

The arbitrator should not sever the loser pays term and enforce the rest of the arbitration requirement in its absence, notwithstanding the "blue pencil" provision highlighted by Advanced Care Staffing.

First, the loser pays term is integral to the arbitration requirement here, and the arbitrator cannot re-write the provision without fundamentally altering the nature of the agreement. *See, e.g., MacDonald v. CashCall, Inc*, 883 F.3d 220, 230 (3d Cir. 2018). The purpose of the contract to shift the costs of arbitration and collection onto Mr. Vidal is evident in several provisions of the contract,

including in the "loser pays" term in Schedule B of the requirement's "Dispute Resolution Provision," and in Section 14 of the contract, which purports to require Mr. Vidal to bear all the costs and attorney's fees associated with Advanced Care Staffing's collection activities. *See, e.g.*, *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 271 (3d Cir. 2003) ("The cumulative effect of such illegality prevents us from enforcing the arbitration agreement. Because the sickness has infected the trunk, we must cut down the entire tree.")

Second, Advanced Care Staffing's own conduct has revealed that the fee-shifting aspects of the requirement are integral to the agreement. In its communications with Mr. Vidal, it repeatedly emphasized that he would bear the costs of collection and arbitration and all Advanced Care Staffing's attorney's fees. Vidal Decl., Ex. A. The loser pays term was clearly of critical importance to Advanced Care Staffing.

Third, particularly in light of Advanced Care Staffing's conduct and threats, severing the loser pays provision would create incentives for contract drafters like Advanced Care Staffing to overreach and pack their contracts with unfair and unenforceable terms. *See, e.g.*, *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016); *Lowden v. T-Mobile, USA, Inc.*, 2006 WL 1009279, at *9 (W.D. Wash. Apr. 13, 2006). If such terms were routinely severed in cases like this one, then drafting parties like Advanced Care Staffing would have every incentive to pack their arbitration requirements with fee-shifting provisions and loser pays terms, then use those terms to threaten workers while attempting to coerce their labor, knowing that at worst, the arbitrator will sever or blue pencil the aspects of the requirement that she finds most concerning.

### E.   The Arbitrator May Not Proceed with this Arbitration, Including on the Threshold Issue of Arbitrability, Before the Court Rules

The arbitrator may not, however, proceed to these questions until the federal court in *Vidal v. Advanced Care Staffing*, LLC, 22-cv-5535 (E.D.N.Y.) has resolved threshold issues of arbitrability. While the arbitrator's order of October 24 concludes that the arbitration requirement delegates disputes regarding arbitrability to the arbitrator, the enforceability of that purported delegation provision is a question for the court to address in the first instance. For the following three reasons, all of which have already been raised for the court, the delegation provision is unenforceable. *See Benzor Shem Vidal v. Advanced Care Staffing, LLC*, 22-cv-5535 (CBA)(MMH), ECF Doc. 13.

First, the delegation provision itself violates federal and state trafficking laws, wage and hour laws, and is unconscionable as a matter of New York law. *See, e.g., Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1003 (9th Cir. 2021). Even a preliminary hearing on arbitrability risks saddling Mr. Vidal with extraordinary costs and fees that were designed to coerce him to work and are a kickback against his wages, and the delegation clause is both procedurally and substantively unconscionable.

Second, the delegation provision does not "clearly and unmistakably" delegate issues of arbitrability to the arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

Third, Mr. Vidal entered into the arbitration requirement and its delegation provision under economic duress—an issue of contract formation regarding the contract as a whole and the delegation clause in particular that is for the court to address in the first instance. *See, e.g.*, *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1106–07 (10th Cir. 2020) ("issue[s] of formation . . . cannot be delegated to an arbitrator").

7

These arguments, which go to the enforceability of the delegation clause, will all be adjudicated by the federal district court. The arbitrator may not rule on matters of arbitrability unless the arbitration requirement includes a valid delegation provision, but the arbitrator does not have the authority to rule on the validity of the delegation provision. For this reason, the arbitrator does not have jurisdiction to preside over this dispute, including over the threshold question of arbitrability, until the federal court enforces a valid delegation provision.

The arbitrator should dismiss this arbitration or stay it pending resolution of the federal court action.

CC
Sara Kula
Arbitrator

Ann Lesser
Vice President
American Arbitration
Association

**TOWARDS JUSTICE**

/s/ ***David H. Seligman***

David H. Seligman
Juno Turner
Valerie Collins
Towards Justice
(720) 441-2236
david@towardsjustice.org
juno@towardsjustice.org
valerie@towardsjustice.org

# EXHIBIT A

---

**Declaration of Benzor Shem Vidal**

---

I, Benzor Shem Vidal, declare that the following is true and correct based on my personal knowledge:

      1.     I was born and grew up in the Philippines with very little money. There were even times when I was a kid when my family didn't have enough money to pay for food, and my parents would have to borrow money from friends just to get by.

      2.     Growing up, my life was also hard because my brother has a serious disability. He is non-verbal and has always needed full-time care from my parents. But my mother passed away in 2020, so now it's just my dad. My brother needs my father to feed and bathe him.

      3.     This has made it difficult for my father to work outside the home. Instead, he has to constantly work at home to support my brother.

      4.     This has made it hard for my family to meet our most basic needs like food, housing, and medicine, and it has caused me stress for almost my entire life, especially now that it's just my father around.

      5.     I knew since I was a kid that I had to find a way to make a decent living, and for many years, I thought that meant that I had to come to the United States. That would really be the only way I could support my family.

      6.     I also wanted to dedicate my life to caring for people—that's always what I'd been good at, even when I was a kid, so I thought I would work as hard as I possibly could to go to nursing school.

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6FA

7.      I started nursing school in 2012 in the Philippines. It cost us about $1,000 per semester to go to nursing school, and this was more money than my family had. But my parents used loans to help me pay because we all thought I'd be able to make more money for my family in the future if I became a nurse.

8.      I finally graduated from nursing school in 2016.

9.       I then worked at a hospital in the Philippines from 2016-2018. I made a little money working in the Philippines, but it wasn't enough to support my parents and my brother. I made about $200 every month. Also, the quality of the care I was providing wasn't what I wanted to give.

10.     I was desperate to find a way to come to the United States. It was the only way I felt like my family could really survive.

11.     I learned about Advanced Care Staffing around 2018 or 2019. I didn't really know a lot about them, but they were promising a way to come to the United States.

12.     I started talking to them in 2019, and I signed a contract with them in May 2019.

13.     I didn't have any chance to negotiate the contract with them. The contract said that if I didn't work for them for at least two years, I would have to pay them $20,000. It was more money than I could make in five years in the Philippines. That was more money than I'd ever had, but I didn't know what else to do. I had to find a way to make a little more money, and the company was telling me I'd have a good life and a good job in the U.S.

14.     After I signed the contract to come to the United States, it still took a very long time for my immigration paperwork to go through. I was waiting for years, doing the best I could to try and make things go faster.

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6EA

15.     I even paid more money to make my paperwork go faster. I think it was just over $1,000. This was about three-quarters of my savings, but again, I didn't know what else to do. If I didn't come to the United States quickly, my family wouldn't have enough to survive, especially because they were buried in the debt they took on to help me go to school and the loans they have had to take out to get by.

16.     Even with the money I paid, it took about four years for my visa paperwork to go through.

17.     While I was waiting for the paperwork to go through, I had an opportunity to go and work in the U.K. as a nurse.

18.     In the U.K. things were a little better. I earned about $3,000 per month, so about $36,000 per year. My living expenses were about $2,200 or $2,300 per month to live in a two-bedroom apartment with a roommate in the Limehouse neighborhood in London.

19.     Most of the remainder went to my father and brother—about $500 or $600 per month. My father told me that without this money, they would have struggled to pay their rent, for food, and to give my brother and my dad healthcare.

20.     In late 2021, I learned that my immigration paperwork had been approved to come to the United States. While I was making more money in the U.K. than I'd been making in the Philippines, it really wasn't enough to get by, and I thought I could make a little more in the United States. I quit my job in the U.K. and told my boss I was moving.

21.     But after I quit my job, Advanced Care Staffing emailed me and told me I had to sign a new contract before I would be allowed to come to the U.S. They sent me the contract in an email. It was many pages long and included lots of different terms. I didn't understand it, but they also made me feel like I had to sign it if I wanted the job.

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6FA

22.     It had already taken about four and half years, and I couldn't imagine waiting longer. I also didn't know what to do because I had already quit my job in the U.K., and I couldn't stay there much longer.

23.     At the time, I had no idea what an arbitration agreement was. I certainly had no idea what arbitration could cost. I was really desperate to get to the U.S. for my job and to support my family.

24.     I also didn't think much about arbitration because I thought it wouldn't affect my life. I thought that my job for Advanced Care Staffing was going to be safe and fair and with safe staffing ratios. That's what they promised me.

25.     I also was also really worried about the original contract that said that I would have to pay $20,000 if I left the job. Not signing the new contract would mean leaving the job, but I didn't have $20,000 to pay. I didn't even have the money to pay the next month's rent in the U.K. I had quit my job in the U.K., and I'd have to leave the country soon.

26.     I had no choice but to sign the new contract. I signed it in January 2022, and I finally came to the United States in March.  Before I came to the United States, Advanced Care Staffing told me that I would be responsible for 20-30 patients in the U.S. But after I came to the United States, Advanced Care staffing told me I had to work for a nursing home in Brooklyn where I had to treat about 40-50 patients at a time.

27.     Almost immediately after I started to work in the United States, I saw that my work was exhausting and did not allow me to provide safe care to my patients. My working conditions were horrible, unsafe, and often scary.

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6EA

28.     I frequently heard my patients buzzing their call buttons for me because they needed urgent help, but I couldn't get to them in time. I had patients screaming out because they were in pain.

29.     I did not have enough breaks, including lunch breaks, because the nursing home never had enough people, which made it nearly impossible to take breaks more than just a few minutes at a time.

30.     I also routinely got sick and worried I did not have enough time to recover.

31.     When I told my supervisor about my grueling workload, the supervisor told me that there was nothing they could do.

32.     I was also deeply concerned about my ethical and professional responsibilities because it was impossible to give patients adequate care with the number of patients I had. I grew very concerned that because of how hard everything was that a patient of mine would become injured or even die and that I would lose my license.

33.     That made me terrified for my patients but also terrified for myself. My license is the most important thing I have. It allows me to practice my job and make a little money for my family.

34.     After months of being terrified, I asked Advanced Care Staffing what my options were because I felt like I was putting my personal health, health of my patients, and professional license at risk.

35.     I was so terrified to quit my job, but I also felt like I didn't have any choice. I didn't know what to do. I felt as depressed as I'd ever felt in my life. I told Advanced Care that I had to find somewhere else to work.

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6EA

36.     In response, I received a letter from a law firm that told me I would be responsible for damages of *at least* $20,000 and that I could be responsible for the cost of recruiting and hiring my replacement, which would cost more than $9,000 a year over three years. That letter is attached here as Exhibit A.

37.     They also told me that if I didn't go back to work, they would bring a case against me in arbitration. They said that I would be responsible for paying all the "attorney's fees and costs" in the arbitration, and they said that the contract made me pay them all the costs and fees that they had to spend going after me for leaving my job.

38.     I don't know how much money arbitration costs exactly, and I don't know how much lawyers cost because I don't know much about the American legal system.

39.     But based on what I've heard, arbitration and attorney's charges for Advanced Care Staffing could cost many thousands of dollars. I knew that much right away.

40.     They told me they wanted me to think about these costs and "reconsider" my "course of action" and "honor [my] promise."

41.     I knew they were trying to threaten me with these costs and fees related to the arbitration. They wanted me to "reconsider" based on those threats.

42.     I felt so bad and scared because they were the ones who hadn't honored their promises to me. My job was scary and hard, and I was worried about my license. I was also terrified of arbitration, and I knew I couldn't pay. But I just felt like I had no choice.

43.     I don't have the money to pay for this arbitration, and the longer the arbitration goes, the more scared I am that I will be buried in costs.

44.     I heard that Advanced Care Staffing paid over $2,000 to AAA to file this case against me, and that they're trying to get that amount back from me. I don't even have the money

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6FA

to pay their filing fee. I couldn't afford on top of that even one hour of the arbitrator's time, which AAA told me was going to be more than $400 per hour.

45.     Even one hour of time on this case is something I can't afford if I still want to get by and do what I need to do for my father and brother.

46.     I also know that I could bring my own claims against Advanced Care Staffing in this arbitration, but I don't know if I can risk that. That will just make the case longer and harder, and if I lose, I'll owe even more money. Even one more hour of the arbitrator's time would be hundreds of dollars that I could send to my father and brother.

47.     I can't afford what Advanced Care Staffing says I owe now, but it will destroy me financially if this arbitration takes more time.

48.     Every month, after I pay for my living expenses and send money to my family, I have only a couple hundred dollars left over, which won't even begin to cover the costs of arbitration and Advanced Care Staffing's attorney's fees.

49.     My family in the Philippines needs about $1,000 per month now just to get by. I'm so scared for them.

50.     I'm also paying about $1,850 in rent every month to live with a roommate in Morningside Heights in Manhattan.

51.     I also have to pay for food, transportation, and other living expenses, which come to more than $1,000 per month usually.

52.     For Advanced Care Staffing, I made around $3,500 per month after taxes. Now, I earn about $4,500 per month or a little more after taxes.

53.     It also feels like Advanced Care Staffing is trying to steal from me. I only made between $1,000 and $1,500 in my last week of work for Advanced Care Staffing (before taxes),

DocuSign Envelope ID: 939FE0FC-E8CA-4082-A680-34EEE1ACD6FA

but now they're saying that I owe them thousands and thousands of dollars in their "lost profits"—even the filing fee in this case is more than they paid me for a whole week of work.

54.     This arbitration brought against me has been a nightmare. When Advanced Care Staffing first came to threaten me with the arbitration after I had left my job, I felt like I had to go back to work—like they were punishing me with this horrible arbitration. But I kept thinking about how hard, scary, and dangerous it was to work for Advanced Care Staffing, and I felt like I couldn't do it. I needed money for my father and brother, but if I lost my license, I'd be no use to them.

55.     Then the arbitration started, and everything was happening so fast. I didn't know what to do. I kept asking for some time to find a lawyer, but I couldn't afford to pay anyone. Finally, I found lawyers to at least try and help me get out of this arbitration and because they are from a non-profit they aren't charging me.

56.     But the arbitration keeps happening so fast. They assigned an arbitrator even though I asked for more time for that. At the end of this arbitration, I could owe Advanced Care Staffing even more money. Each day in arbitration is more money that they're punishing me with. But I can't go back to work for Advanced Care Staffing. I know I couldn't do that.


Executed on November 10, 2022.


_____

Benzor Shem Vidal

# EXHIBIT A



Ius Laboris USA Global HR Lawyers

CityPlace II, 185 Asylum Street | Suite 610
Hartford, Connecticut  06103
Tel 860-740-1355 | Fax 860-740-1394

SAMI ASAAD
860-740-1357
sasaad@fordharrison.com

June 22, 2022

VIA EMAIL (shem15418@gmail.com)

Benzor Shem Vidal
1353 Saint Marks Ave
Brooklyn, NY 11233

**Re:     Your Employment Agreement with Advanced Care Staffing**

Dear Mr. Vidal:

        We are attorneys for Advanced Care Staffing, Inc. ("Advanced Care"), and we write to you in regard to your resignation letter dated June 15, 2022.

        As you know, you entered into an Employment Agreement with Advanced Care on May 8, 2019, which was amended and restated in an Amended and Restated Employment Agreement dated January 4, 2022 (the "Agreement"). Advanced Care agreed to sponsor your petition to work in the United States as a Nurse under an employment based Immigrant ("green card") Visa. Advanced Care also agreed to pay (or reimburse) all the fees in connection with your sponsorship, including, among other things, immigration and credentialing fees. In exchange, you agreed to provide services to Advanced Care in the U.S. for a period of three years.

        Advanced Care fulfilled its obligations to you and successfully sponsored your green card. Advanced Care invested thousands of dollars in getting you to this point. In addition to the sponsorship, Advanced Care provided you with two thousand dollars for housing plus several hundred dollars for groceries (gift cards) and transportation. Additionally, Advanced Care paid you an hourly rate that was higher than what was promised to pay according to the Agreement. All of this was done because you had promised to complete a three-year term. Yet, following your arrival in the U.S. on the Advanced-Care-sponsored visa, you submitted your resignation after **only three months**.

        Your resignation prior to the conclusion of the three-year term causes Advanced Care significant damages. Therefore, in the event you proceed with your resignation, Advanced Care would seek to be made whole as to the benefit of the bargain it made with you. Although Advanced Care's damages would ultimately be determined by an arbitrator pursuant to the Agreement, Advanced Care will present evidence demonstrating that its damages are at least $20,000 (not counting attorney's fees and costs that would be incurred in the arbitration). As mentioned already, Advanced Care would seek the thousands of dollars of lost investment made in helping you get to this point. Also, although Advanced Care is seeking to reduce its losses by seeking a replacement, given the current market conditions, recruiting and hiring a replacement

Benzor Shem Vidal
June 22, 2022

nurse(s) is expected to cost over $9,000 dollars per year over the remainder of your three-year term.

When you signed the Agreement, you acknowledged that resigning without Good Reason prior to completion of your promised term would cause Advanced Care to suffer damages. Section 10(a)(1) of the Agreement states:

> Employee acknowledges that if Employee fails to fulfill Employee's obligations under this Agreement, Employer will suffer significant harm arising from the significant investment related to the recruitment, training, credentialing, and placement in the United States and the reasonable expectation that Employee will maintain full-time employment with Employer for the maximum amount of time under this Agreement. In addition, Employee recognizes that Employer will suffer significant loss of profits (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact on Employer's relationship with its Clients) in the event Employee fails to fulfill Employee's obligations under this Agreement. Therefore, the parties agree that if Employee terminates this Agreement without Good Reason (as defined below), or if Employer terminates this Agreement for Cause (as defined below), Employer shall be entitled to all damages and other relief to redress the harm caused by the failure of Employee to fulfill Employee's obligations under this Agreement.

In addition, Section 14 of the Agreement provides that "Employee shall reimburse Employer for all reasonable costs, including all attorneys' fees, that Employer incurs in enforcing its rights and remedies under this Agreement."

Without waiver of any of Advanced Care's rights, we invite you to reconsider your course of action and honor your promise to complete the contractual term. Alternatively, if you intend to proceed with your resignation and wish to discuss a pre-arbitration resolution, please contact me at my direct line: 860-740-1357.

If we do not hear from you on or before June 29, 2022, we will proceed accordingly, with Advanced Care reserving the right to pursue all available legal remedies.

Very truly yours,

Sami Asaad