UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

Benzor Shem Vidal,

                *Plaintiff*,

     -against-

ACS Staffing, LLC

            *Defendant*.

---

Civ. Action. No. 1:22-cv-05535-NRM-MMH


## DEFENDANT'S MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION


**FordHarrison, LLP**
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
Tel #:  860-740-1357
Fax #: 860-740-1397
*Counsel for Claimant Advanced Care Staffing, LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 3

    A. Plaintiff's Employment with Defendant ..................................................................... 3

    B. Initiation of Arbitration ............................................................................................... 9

LEGAL ARGUMENT ........................................................................................................ 12

    A. Legal Standard .......................................................................................................... 12

    B. Plaintiff's Delegation Clause argument is a red herring because Plaintiff does not (and cannot) dispute that ACS's breach of contract claim is arbitrable. ............................... 13

    C. Second Circuit Authority Mandates that any arbitrability questions in this case be decided by the arbitrator. ................................................................................................ 15

    D. Plaintiff cannot prove irreparable harm. .................................................................... 17

    E. Plaintiff is unlikely to succeed on the merits. ........................................................... 18

        1.   The Amended Agreement and Revised DRP are not unconscionable. .......... 18

            a.   The fee shifting provisions are not unconscionable. .................................. 20

            b.   Wage and Hour laws do not bar ACS's claim here. .................................. 21

            c.   Plaintiff's TVPA argument does not bar arbitration. ................................. 23

    F.   There is no "serious question" warranting a stay. ....................................................... 26

    G.   Balance of Equities ................................................................................................... 27

    H.   Public Interest. .......................................................................................................... 28

CONCLUSION .................................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adia v. Grandeur Mgmt., Inc.*,
    933 F.3d 89 (2d Cir. 2019) .................................................................................... 25

*Aguirre v. Best Care Agency, Inc.*,
    961 F. Supp. 2d 427 (E.D.N.Y. 2013) .................................................................... 25

*Allstate Ins. Co. v. Elzanaty*,
    929 F. Supp. 2d 199 (E.D.N.Y. 2013) .................................................................... 30

*AT&T Mobility, LLC v. Concepcion*,
    563 U.S. 333 (2011) .................................................................................................. 2

*AT&T Technologies v. Communications Workers of America*,
    475 U.S. 643 (1986) ................................................................................................ 14

*Badinelli v. Tuxedo Club*,
    183 F. Supp. 3d 450 (S.D.N.Y. 2016) .................................................................... 13

*Baldia v. RN Express Staffing Registry LLC*,
    2022 WL 4777836 (S.D.N.Y. Oct. 3, 2022) .......................................................... 24

*Borey v. National Union Fire Ins.*,
    934 F.2d 30 (2d Cir. 1991) ...................................................................................... 12

*Broadcast Arts Productions, Inc. v. Screen Actors Guild, Inc.*,
    673 F. Supp. 701 ...................................................................................................... 14

*Citigroup Global Markets v. VCG Special Opportunities Master Fund,
    Unlimited*, 598 F.3d 30 (2d Cir. 2010) ............................................................. 26, 27

*Coca Cola Co. v. Tropicana Prods. Inc.*,
    690 F.2d 312 (2d Cir. 1982) .................................................................................... 12

*Collins & Aikman Prods. Co. v. Building Sys.*,
    58 F.3d 16 (2d Cir. 1995) .................................................................................. 14, 15

*Daly v. Citigroup Inc.*,
    939 F.3d 415 (2d Cir. 2019) .............................................................................. 13, 29

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
    6 F.4th 308 (2d Cir. 2021) ...................................................................................... 16

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985)...................................................................... 13

*Desiderio v. National Ass'n of Sec. Dealers, Inc.*,
    191 F.3d 198 (2d Cir.1999)........................................................... 19

*Emery Air Freight Corp. v. Local Union 295*,
    786 F.2d 93 (2d Cir. 1986)............................................................ 17

*Epic Systems Corp. v. Lewis*,
    138 S. Ct. 1612, 200 L. Ed. 2d 889 (2018) ............................ 2, 29, 30

*Equal Employment Opportunity Commission v. Waffle House, Inc.*,
    534 U.S. 279 (2002)...................................................................... 13

*Eyewonder, Inv. v. Abraham*, No. 08 CV 3579 (GBD)
    2010 WL 3528882 (S.D.N.Y. Sept. 3, 2010)................................. 21

*Forest City Daly Housing, Inc. v. Town of*,
    *Northhampstead*, 175 F.3d 144 (2d Cir. 1999) ............................. 12

*General Textile Printing & Processing Corp. v. Expromtorg International Corp.*,
    862 F. Supp. 1070 (S.D.N.Y. 1994)............................................... 12

*Gilbert v. Indeed, Inc.*,
    513 F. Supp. 3d 374 (S.D.N.Y. 2021)............................................ 29

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991)......................................................................... 2

*Gingras v. Think Fin., Inc.*,
    922 F.3d 112 (2d Cir. 2019)........................................................... 27

*Graphic Communications Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v.*
    *Chicago Tribune Co.*,
    779 F.2d 13 (7th Cir.1985) ............................................................ 18

*In re American Express Financial Advisors Securities Litigation*,
    672 F.3d 113 (2d Cir. 2011)........................................................... 30

In *re American Honda Motor Co., Inc., Dealerships Relations Litigation*,
    315 F.3d 417 (4th Cir. 2003) ......................................................... 30

*Isaacs v. OCE Bus. Servs., Inc.*,
    968 F. Supp. 2d 564 (S.D.N.Y. 2013)............................................ 19

*Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*,
    434 F. Supp. 2d 211 (S.D.N.Y. 2006)............................................ 13

*Latif v. Morgan Stanley & Co. LLC*,
  2019 WL 2610985 (S.D.N.Y. June 26, 2019) ..................................................... 29

*Magtoles v. United Staffing Registry, Inc.*,
  2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) ..................................................... 26

*Maity v. Tata Consultancy Servs., Ltd.*,
  2021 WL 6135939 (D.N.J. Dec. 29, 2021) .................................................. 19, 20

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995) ................................................................................................ 13

*Mehler v. Terminix Int'l Co.*,
  205 F.3d 44 (2d Cir. 2000) .............................................................................. 14, 15

*Moore v. T-Mobile USA, Inc.*, 10 CV 527 (SLT),
  2010 U.S. Dist. LEXIS 143874, at *10 (E.D.N.Y. Nov. 8, 2010) ..................... 16

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*,
  460 U.S. 1 (1983) ............................................................................................... 2, 14

*Nayal v. HIP Network Servs. IPA, Inc.*,
  620 F. Supp. 2d 566 (S.D.N.Y. 2009) .............................................................. 18, 20

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
  537 F.3d 168 (2d Cir. 2008) ................................................................................. 21

*Oldroyd v. Elmira Savings Bank, FSB*,
  134 F.3d 72 (2d Cir. 1998) .............................................................................. 14, 15

*Paguirigan v. Prompt Nursing Emp.Agency LLC*,
  286 F. Supp. 3d 430 (E.D.N.Y. 2017) ................................................................. 25

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ................................................... 25

*Panwar v. Access Therapies, Inc.*,
  2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) ................................................... 24

*Park v. FDM Grp., Inc.*,
  2018 WL 4100524 (S.D.N.Y. Aug. 28, 2018) ................................................... 21

*Polymer Technology Corp. v. Mimran*,
  37 F.3d 74 (2d Cir. 1994) ..................................................................................... 12

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ......................................................................................... 16, 21

iv

*Reuters, Ltd. v. United Press International, Inc.*,
  903 F.2d 904 (2d Cir. 1990) ................................................................................ 17

*Rodriguez v. DeBuono*,
  162 F.3d 56 (2d Cir. 1998) ................................................................................... 12

*Saizhang Guan v. Uber Techs., Inc.*,
  236 F. Supp. 3d 711 (E.D.N.Y. 2017) ................................................................. 21

*Schiavone Construction Co. v. New York City Transit Authority*,
  593 F. Supp. 1257 (S.D.N.Y. 1984) ..................................................................... 12

*Shoppe Int'l, Inc. v. Mitsopoulos*,
  2006 WL 8438209 (E.D.N.Y. May 5, 2006) ........................................................ 17

*Smith v. AHS Oklahoma Heart, LLC*,
  2012 WL 3156877 (N.D. Okla. Aug. 3, 2012) ..................................................... 22

*Southland Corp. v. Keating*,
  465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) ................................................. 29

*Suqin Zhu v. Hakkasan NYC LLC*,
  291 F. Supp. 3d 378 (S.D.N.Y. 2017) .................................................................. 19

*Trump v. Vance*,
  941 F.3d 631 (2d Cir. 2019) ................................................................................. 27

*United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*,
  804 F.3d 270 (2d Cir. 2015) ................................................................................. 13

*United States v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) .............................................................................. 23

*United States v. Int'l Blvd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
  907 F.2d 277 (2d Cir. 1990) ................................................................................. 30

*United States v. New York Tel.*,
  434 U.S. 159 (1977) ............................................................................................. 30

*United States v. Toviave*,
  761 F.3d 623 (6th Cir. 2014) ............................................................................... 23

*Valle v. ATM Nat., LLC*,
  2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ......................................................... 22

*Vittoria Corp. v. New York Hotel & Motel Trades Council, AFL-CIO*,
  30 F. Supp. 2d 431 (S.D.N.Y. 1998) .................................................................... 13

*White v. WeWork Cos., Inc.*,
   2020 WL 3099969 (S.D.N.Y. June 11, 2020) .......................................................... 29

*Woodlawn Cemetery v. Loc. 365, Cemetery Workers & Greens Attendants Union*,
   1990 WL 150472 (S.D.N.Y. Oct. 2, 1990) ......................................................... 17, 18

*WorldCrisa Corp. v. Armstrong*,
   129 F.3d 71 (2d Cir. 1997) ................................................................................... 14

**Statutes**

9 U.S.C. § 4 ............................................................................................................... 13

18 U.S.C. §1589 ......................................................................................................... 23

18 U.S.C. § 1589 ........................................................................................................ 23

**Rules**

CPLR § 7515 ............................................................................................................... 29

**Regulations**

20 CFR § 655.731 ...................................................................................................... 26

**INTRODUCTION**

Plaintiff Benzor Vidal ("Plaintiff") walks a well-worn path of employees challenging lawful arbitration agreements with their employers. In that connection, Plaintiff attempts to portray himself as an unfortunate victim. He is not.

While he may have family financial obligations, he is not an unsophisticated, illiterate victim of "coyotes" who bilked him out of his life savings to smuggle him across the border. Nor is he the victim of any manner of "forced labor" or human trafficking. To the contrary, he is an educated nurse who has a command of the English language and a lawful permanent resident of the United States. Unlike actual victims of human trafficking coerced into exploitive work arrangements, he leveraged his skill set against a high demand for his services in this country to negotiate assistance securing the right to work in this country legally. In exchange for lengthy and costly assistance from ACS Staffing ("ACS") navigating the immigration system to secure a Green Card, as well as support securing a nursing license and other credentials to work in New York, Plaintiff agreed to remain employed with ACS for a three-year period. After securing his Green Card and New York nursing license, he was not smuggled here in the back of a truck or in the hold of a cargo ship; he was provided company-paid airfare. Upon his arrival, he was not left to his own devices for food, transportation, and shelter, or, worse yet, imprisoned; he was provided grocery money, a transit card, and a rent subsidy. Finally, during his agreed upon period he was not relegated to working in a back alley sweat shop, a remote lettuce field, or a massage parlor for substandard wages; he was lawfully employed as a licensed registered nurse at an authorized healthcare facility, paid more than prevailing wage, and provided paid vacation, sick time, and other benefits.

If Plaintiff had satisfied the terms of his agreement and completed the agreed upon 3 year term, he would have been free to negotiate a new agreement with ACS or enter the labor market as an "unrestricted free agent." He did not do so. Instead, after he received the benefit of his bargain – particularly assistance securing the invaluable benefit of lawful permanent residency in this country – he shirked his obligations to ACS under their agreement. Having brazenly breached his agreement, he now quarrels with the consequences of his actions. This should not be permitted.

Unlike the cases he references, he faces no punitive consequences. He only faces the legal damages that ACS can prove at arbitration flow from his breach. He now claims that facing those consequences is unconscionable. He was not coerced into signing the agreement; he received valuable consideration. If Plaintiff did not want to face the potential damages flowing from his breach, he should have abided by the terms of his agreement. He should not now look to the court to excuse him from his contractual obligations while he enjoys the benefit of his bargain.

Plaintiff's assertions about weaponized arbitration fly in the face of controlling, well-settled, and unequivocal authority. The United States Supreme Court has repeatedly recognized that the Federal Arbitration Act ("FAA") establishes a liberal policy favoring arbitration when the parties contract for that mode of dispute resolution. See, e.g., *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 337 (2011); see also *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983) (referring to the "liberal federal policy favoring arbitration"). Further, the policy favoring arbitration extends and applies to arbitration agreements between employers and employees. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26-27 (1991); *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619, 200 L. Ed. 2d 889 (2018). Nothing Plaintiff presents warrants deviation from well-settled Supreme Court precedent.

As set forth more fully herein and in the accompanying exhibits, the record amply refutes Plaintiff's factual assertions and legal arguments. In view of the record before the court and controlling case law, Plaintiff's motion should be denied and the already pending arbitration permitted to proceed without further delay.

**FACTUAL BACKGROUND**

    **A.**  <u>**Plaintiff's Employment with Defendant**</u>

Plaintiff Benzor Vidal ("Plaintiff") is a Registered Professional Nurse. (*See* Declaration of Maureen Luy ("Luy Decl."), Ex. G and Ex. I). In addition to his nursing credentials, he has a demonstrated proficiency with the English language. (Luy Decl., Ex. H and Ex. I)

In order to access the more lucrative labor market for nurses in the United States, Plaintiff entered into an Employment Agreement with Defendant Advanced Care Staffing, LLC ("ACS") on May 7, 2019 (the "Original Agreement"). (Luy Decl., Ex. A). Pursuant to the Original Agreement, Mr. Vidal agreed to provide nursing services for ACS's clients at a rate of pay at least as high as that specified by the National Prevailing Wage of the United States Department of Labor. (Luy Decl., Ex. A, para. 9). Pursuant to the Original Agreement, ACS also agreed to provide one way air fare, a rent subsidy for 2 months, and a one-month MTA card. (Luy Decl., Ex. A, Addendum B).

In consideration for Mr. Vidal's services, ACS agreed, *inter alia*, to sponsor Mr. Vidal for an employment-based Immigrant Visa, which allows non-residents to obtain Permanent Residency ("Green Card") status in the United States. (Luy Decl., Ex. A). In that connection, ACS agreed to pay all costs and legal fees associated with sponsoring Mr. Vidal's visa. (Luy Decl., Ex. A, p. 1 and ¶ 16). Not only did they agree to fund his immigration process, they also agreed to pay his costs associated with getting licensed and credentialed to work in the United States. *Id.*  In view

of that outlay, the Original Agreement expressly states: "the Employee agrees that the Employer has spent a considerable sum of money in recruiting costs, licensure/certification review and credentialing costs, exam costs, Visa Screen costs, attorney's fees, petition filing costs, flight and/or transportation costs, housing costs, etc. to enable him/her to work with Employer in the United States." (Luy Decl., Ex. A, ¶ 19). In exchange for this lengthy and expensive undertaking by ACS, Mr. Vidal agreed to remain employed by ACS for a period of three years. (Luy Decl., Ex. A, ¶ 18). Upon completion of that 3 year term, Plaintiff would have been free to negotiate a new agreement with ACS or enter the labor market to work where he felt best suited his needs.

The Original Agreement also included an agreement to arbitrate disputes arising out of the Employment Agreement. (Luy Decl., Ex. A, ¶ 20). Notably, the Original Agreement states:

> All disputes arising out of this Agreement or Employee's employment, including but not limited to Employee's recruitment, hiring, termination, and/or failure to complete/fully perform paragraph 18 with the Employer, shall be resolved exclusively by mandatory arbitration of the dispute . . . . Employee and Employer both understand and agree that they are knowingly and voluntarily waiving, to the extent permitted by law, any rights they might have to a trial by jury on any discrimination, contractual, employment, or other claims under federal, state, or local law, . . . . *Id.*

Although Mr. Vidal signed the Original Agreement on May 7, 2019, the process for him to secure his Green Card took time. During that process, ACS assisted him with completing and submitting a visa application, amongst other things. In that submission, the parties make clear:

- Plaintiff will be employed full time as a registered nurse earning the prevailing wage of $68,058 per year. (Luy Decl., Ex. J);
- Plaintiff can read and understand English (Doc. No. 23-3); and, *inter alia*,
- Plaintiff has a Bachelor's degree in Nursing (Luy Decl., Ex. H & Ex. I);

On January 4, 2022, well in advance of him commencing actual employment, ACS sent Mr. Vidal an email providing him guidance for his upcoming US Embassy Visa Application interview. (Luy Decl., Exs. B1-B7). In addition, the email attached a cover letter (Luy Decl., Ex. B2), letter waiving a prior promissory note (Luy Decl., Ex. B3), Introductory Guide to Skilled-

Nursing Facility (Luy Decl., Ex. B4), Nurses Quick Guide (Luy Decl., Ex. B5), and an Amended and Restated Employment Agreement ("Amended Agreement") (Luy Decl., Ex. B6 & B7).

The January 4, 2022 cover letter attached to the email explained that ACS had updated their Employment Agreement in accordance with industry best practices and team member feedback. (Luy Decl., Ex. B2). ACS specifically explained that one of the key updates in the Amended Agreement from the Original Agreement was that the new version provides greater clarity of the parties' expectations, obligations, and rights, including that the nursing assignments would be at skilled nursing facilities and nursing homes. (Luy Decl., Ex. B2).

The January 4, 2022 cover letter also explained other updates to the Amended Agreement that are central to the current controversy. First, it explains that the Amended Agreement removed the liquidated damages provision and promissory note that were part of the Original Agreement. The letter further explained, however: "We have tried to be clear from the beginning that ACS is making a significant investment in our nurses, and we only agree to sponsor nurses who are committed to providing services to ACS for a three-year term." (Luy Decl., Ex. B2). With that set forth explicitly, the cover letter further explains that the Amended Agreement would permit ACS to recover any damages that it could prove, which "might be higher or lower" than the amount specified in the Original Agreement. (Luy Decl., Ex. B2). This is not inscrutable legalese; it is a straightforward summary of some revisions in the Amended Agreement. Further, it is in no way coercive; it simply explains the consequences of disregarding the obligations in the agreement.

In addition to the changes summarized in the cover letter, the Amended Agreement reiterates that ACS will pay in accordance with prevailing wage requirements, provide paid time off and other benefits, a one way air fare, a rent subsidy for two months, a gift card for groceries, and a monthly MTA card. (Luy Decl., Ex. B6, p. 4, Section 4, p. 5, Sections 7 and 8)). The

Amended Agreement also specifies a term of 3 years. (Luy Decl., Ex. B6, p. 6, Section 9). The Amended Agreement again sets forth the other costs it was advancing on behalf of or reimbursing Plaintiff for, including but not limited to licensing costs, credentialing costs, review course costs, nursing exam costs, and visa screening costs. (Luy Decl., Ex. B6, p. 4, Section 4). In that connection, the Amended Agreement also states: "Employee acknowledges that Employer is incurring Advanced Costs upon the express condition that Employee will complete the Term in full. Therefore, Employee shall immediately repay all Advanced Costs in the event that Employee fails to complete the Term for any reason." *Id.*

Finally, the Amended Agreement incorporates a revised Dispute Resolution Provision ("Revised DRP"). (Luy Decl., Ex. B7, Schedule B). Crucially, it states:

> I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds. . . .

*Id.* The Revised DRP further explicitly states: "This agreement to arbitrate shall be governed by the Federal Arbitration Act and shall remain in force even after I separate from Employer for any reason." *Id.* The Revised DRP also states that any arbitration "will be administered by the American Arbitration Association ("AAA") …." *Id.* The Revised DRP also explains that, "the employer will initially bear all other filing fees, administrative fees, hearing fees, and arbitrator compensation." *Id.* The Revised DRP also provides that "should there be arbitration proceedings in accordance with this Provision, [Mr. Vidal] would be free to pursue all available substantive or procedural rights or remedies in such arbitration proceedings." *Id.* The Revised DRP expressly

provides that Plaintiff understood that "all disputes or claims relating to [his] employment (or termination of employment) will instead be decided by an arbitrator." *Id.*

As part of the January 4, 2022 transmittal, ACS also sent a letter to Plaintiff regarding the Promissory Note that was part of the Original Agreement. (Luy Decl., Ex. B3). Notwithstanding Plaintiff's efforts to mischaracterize that letter as somehow confusing or coercive, the opposite is self-evident. Contrary to any assertions of stultifying legalese, the letter states in plain terms that: "ACS Staffing hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to ACS Staffing, dated May 8, 2019." (Luy Decl., Ex. B3). Plaintiff was thus clearly advised that he was free from the obligation set forth in the promissory note.

Also contrary to any claim of confusion or coercion, neither the January 4, 2022 cover letter nor email set forth a deadline by when Mr. Vidal was required to sign the Amended Agreement. (Luy Decl., Ex. B1 and Ex. B2). Instead, the letter concluded by asking Mr. Vidal to contact ACS if he had any questions prior to signing the agreement. (Luy Decl., Ex. B2).

Despite the express invitation to discuss any questions or concerns, Mr. Vidal did not send an email to or call anyone at ACS with any questions regarding the revised agreement. (Luy Decl., Ex. D). Instead, Mr. Vidal returned a fully executed revised agreement (the "Agreement") to ACS *the same day* he received it. (Luy Decl., Ex. C and Ex. D).

On January 6, 2022, ACS emailed Mr. Vidal an invitation to a call to discuss the Amended Agreement. (Luy Decl., Ex. E). He responded to that invitation, but did not ask any questions about the Amended Agreement or give any indication that he wished to revoke it. (Luy Decl., Ex. E). On January 13, 2022, Plaintiff sent another email to ACS regarding his pending work assignment and did not raise any concerns about the Amended Agreement. (Luy Decl., Ex. F). Rather than conveying any concerns, Plaintiff made clear he was eager to start work.

Mr. Vidal began working for ACS three months later, on March 8, 2022. (Luy Decl., Ex. G). As a result, the three-year work term set forth in the Agreement would expire on March 7, 2025. (Luy Decl., Ex. G).

While Plaintiff attempts to portray this assignment as some sort of Dickensian workhouse, it was at an accredited institution and the duties were consistent with any nurse assigned there. Also, contrary to any suggestion of involuntary servitude, when Plaintiff arrived in the United States, he requested to work in a different facility from the one to which he was originally assigned, and ACS granted him his desired work assignment. (Luy Decl., Ex. F). Finally, ACS, actually paid Mr. Vidal more than prevailing wage. (Luy Decl., Ex. G, Ex. C, and Ex. K).

After only three months of work, part of which was spent on vacation, Mr. Vidal tendered his resignation to ACS by email dated June 15, 2022, effective on June 29, 2022. (Luy Decl., Ex. G). Contrary to his allegations in this suit, Mr. Vidal never expressed any complaints or dissatisfaction to ACS regarding his assigned work location or any other term or condition of his employment with ACS prior to submitting his resignation. (Luy Decl., Ex. G). Rather than any legitimate concern over his working conditions, Mr. Vidal resigned in order to pursue other opportunities. Indeed, once he received all the front-loaded benefits from ACS – including but not limited to airfare, rent subsidy, grocery money, and crucial immigration and licensing assistance – he ignored his obligations to ACS and "cashed in" by securing a higher paid position. While that was his prerogative, there were agreed upon consequences for pursuing that course of action. Crucially, he acknowledged them in his resignation email. (Luy Decl., Ex. G).

Thus, in response to his resignation, ACS reminded Mr. Vidal that he had signed an agreement to work for a term of three years and that he had barely even worked for three months. (Luy Decl., Ex. G). Mr. Vidal refused to reconsider his resignation. (Luy Decl., Ex. G). ACS thus

issued a letter on June 22, 2022, confirming that Plaintiff's resignation was a breach of the Amended Agreement. (Declaration of Sami Asaad ("Asaad Decl."), Ex. 1). Mr. Vidal's last day of work for ACS was June 29, 2022. (Luy Decl., Ex. G).

**B.  Initiation of Arbitration**

Plaintiff initially promised ACS that he would pay the costs it incurred as required by the Amended Agreement. (Luy Decl., Ex. G). Shortly thereafter, however, Plaintiff's original counsel, Reuben Seguritan, Esq., contacted ACS's counsel after which no payment was ever made. (Luy Decl., Ex. G; Asaad Dec., Ex. 2).

As a result, ACS initiated arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA"). (Asaad Dec., Exs. 2-4). On August 1, 2022, Towards Justice informed the AAA that they were not representing Mr. Vidal in the arbitration but were nevertheless requesting a stay on his behalf. (Asaad Dec. Ex. 5). The Arbitration Manager explained that because they were not entering an appearance in the proceeding, she could not communicate with Towards Justice about the administration of the arbitration. *Id.* The AAA denied the request for a 60-day stay but granted a shorter extension of time for the parties to respond to the upcoming deadlines. *Id.* Plaintiff continued to request extensions to delay the arbitration. (Asaad Dec., Exs. 6 and 7). As such, he engendered delay and additional expense, not ACS.

On September 16, 2022, Plaintiff filed the complaint to initiate this litigation. (*See* Doc. No. 1). On September 22, 2022, Arbitrator Sara Kula held a Preliminary Conference at which Plaintiff again requested the opportunity to argue for a stay, which maneuver would again engender delay and additional expense. (Asaad Dec., Ex. 8). On October 6, 2022, Plaintiff, through Towards Justice, sent a letter to Arbitrator Kula again setting forth the arguments for why they believed Plaintiff was entitled to a stay of the arbitration. (Asaad Dec., Ex. 9). ACS responded by letter

9

dated October 20, 2022. (Asaad Dec., Ex. 10). On October 24, 2022, Arbitrator Kula sent the

parties an order finding, among other things, that:

> Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the
> Arbitrator in this matter, I have the authority to rule on my own jurisdiction,
> including with respect to the validity of the arbitration agreement or the arbitrability
> of any claim. Many of the arguments made by Respondent are premature and do
> not support the issuance of a stay. Respondent shall have the opportunity during the
> course of the arbitration to argue that the contract at issue is unenforceable, in whole
> or in part, and to assert counter-claims concerning the Claimant's alleged unlawful
> conduct.

(Asaad Dec., Ex. 11).

On October 28, 2022, Plaintiff sent a letter to the Arbitration Manager requesting that AAA

determine whether the arbitration should be stayed or, in the alternative, the AAA should decline

to administer it in its entirety pending judicial resolution. (Asaad Dec., Ex. 12). Plaintiff sought a

further extension from the AAA on November 1, 2022. (Asaad Dec., Ex. 13). Again, it was the

Plaintiff increasing the duration and cost of the arbitration, not ACS.

By letter dated November 10, 2022, Plaintiff submitted arguments to Arbitrator Kula

regarding his allegation that the Revised DRP was unconscionable. (Asaad Dec., Ex. 14). By letter

dated November 20, 2022, ACS refuted each of Plaintiff's arguments. (Asaad Dec., Ex. 15). On

November 22, 2022, Arbitrator Kula requested further briefing from the parties on the issue of

whether the AAA's Commercial or Employment Rules should apply to the proceeding. (Asaad

Dec., Ex. 16). On December 2, 2022, ACS sent a letter to Arbitrator Kula stipulating to the

application of the Employment Rules and explaining that regardless of which rules Arbitrator Kula

applied to the proceeding, Mr. Vidal was not entitled to a stay of this arbitration. (Asaad Dec., Ex.

17). Plaintiff submitted a letter arguing for the application of the Employment Rules the same day.

(Asaad Dec., Ex. 18). In view of the parties' agreement, there can be no contention about whether the AAA's Employment Rules apply.[1]

By order dated December 9, 2022, Arbitrator Kula denied Mr. Vidal's request for a stay explaining that "[n]either Respondent's initial or supplemental submission provided sufficient factual or legal support for the argument that the arbitration agreement is unconscionable…." (Asaad Dec., Ex. 20). Moreover, Arbitrator Kula held that: "Based on those submissions and the facts related to the execution of the parties' Arbitration Agreement, the Arbitrator will apply AAA's Employment Arbitration Rules." As a result of AAA's Employment Rules, the costs and fees associated with the arbitration have been and shall be borne by ACS. (See AAA Employment Rules and Employment Fee Schedule at Rule 7.) Any concerns Plaintiff asserts regarding such fees and costs are thus unfounded.

Plaintiff sent an email the same day again arguing that Arbitrator Kula lacked the authority to determine the validity and enforceability of the Revised DRP in the Amended Agreement, but provided no legal support. (Asaad Dec., Ex. 21). Of course, this bald assertion is belied by both the express terms of the Revised DRP, as well as AAA Commercial Rule number 7 and Employment Rule number 6, all of which make clear the Arbitrator is empowered to determine whether she had the authority to arbitrate the dispute.

In response to Arbitrator Kula's order, ACS attempted to move forward with the schedule she established and served discovery on Plaintiff. (Asaad Dec., Ex. 22). Further, on January 4, 2023, ACS sent a letter to Ms. Lesser setting forth why Mr. Vidal's claims and arguments in support of a stay lacked merit. (Asaad Dec., Ex. 23).

---

[1] On December 6, 2022, Plaintiff submitted a request to Ms. Gomez and Ann Lesser, Esq, the AAA's Vice President of Labor, Employment, and Elections, arguing that the AAA has its own authority to stay the arbitration outside of Arbitrator Kula. (Asaad Dec., Ex. 19). This went nowhere.

Months after filing this matter, and having failed to prevail upon the assigned Arbitrator and the AAA to stay an arbitration he obviously wants to avoid at all costs because he has undeniably received the benefit of his bargain without reciprocating, he reboots his court claim by filing the present motion for preliminary injunction. This effort should also be rebuffed.

**LEGAL ARGUMENT**

    **A.  <u>Legal Standard</u>**

The Second Circuit has made clear that the grant of a preliminary injunction is an extraordinary and drastic remedy which should not be routinely granted. *General Textile Printing & Processing Corp. v. Expromtorg International Corp.*, 862 F. Supp. 1070, 1074 (S.D.N.Y. 1994) *citing Borey v. National Union Fire Ins.*, 934 F.2d 30, 33 (2d Cir. 1991). It is well settled that a court in this Circuit will grant a temporary restraining order or a preliminary injunction only if there is proof of:

      (a) irreparable harm; and,
      (b) either      (1) likelihood of success on the merits; or,
                   (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994) citing *Coca Cola Co. v. Tropicana Prods. Inc.*, 690 F.2d 312, 314-315 (2d Cir. 1982). The standards for granting a TRO are the same as those governing the granting of preliminary injunctive relief. *Schiavone Construction Co. v. New York City Transit Authority*, 593 F. Supp. 1257, 1260 (S.D.N.Y. 1984). Both remedies are extraordinary ones that will be granted only upon a showing that the alleged threat of irreparable harm is not remote or speculative, but actual and imminent. *Forest City Daly Housing, Inc. v. Town of Northhampstead*, 175 F.3d 144, 153 (2d Cir. 1999) citing *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998).

**B. Plaintiff's Delegation Clause argument is a red herring because Plaintiff does not (and cannot) dispute that ACS's breach of contract claim is arbitrable.**

Plaintiff attempts to misdirect by asking whether the Court or the arbitrator should determine whether ACS's Breach of Contract claim is arbitrable. The real issue, however, is whether or not the breach of contract claim is arbitrable, which Plaintiff does not and cannot dispute because the Revised DRP is an express agreement to arbitrate that Plaintiff assented to.

To begin with, the Revised DRP explicitly states: "This agreement to arbitrate shall be governed by the Federal Arbitration Act . . . ." (Luy Decl., Ex. B7) "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019), quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). See also, *Badinelli v. Tuxedo Club*, 183 F. Supp. 3d 450, 453 (S.D.N.Y. 2016), quoting *Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F.Supp.2d 211, 214–15 (S.D.N.Y. 2006).

In that connection, the FAA requires courts to order arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4. In determining whether Plaintiff's claims are subject to arbitration, the threshold inquiry is an analysis of the contractual language. *Equal Employment Opportunity Commission v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002)("Absent some ambiguity in the agreement ... it is the language of the contract that defines the scope of disputes subject to arbitration.") See also, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995). Indeed, courts are obligated to "rigorously enforce arbitration agreements according to their terms," *United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*, 804 F.3d 270, 274 (2d Cir. 2015). "In doing so, a court is not to rule on the potential merits of the underlying claims." *Vittoria Corp. v. New York Hotel & Motel Trades Council, AFL-CIO*, 30 F. Supp. 2d 431,

13

436 (S.D.N.Y. 1998), citing *Broadcast Arts Productions, Inc. v. Screen Actors Guild, Inc.*, 673 F.

Supp. 701, 706

Moreover, in reviewing the scope of the arbitration agreement, the Court must be guided

by the principle that arbitration agreements are favored and are to be broadly construed with doubts

being resolved in favor of coverage. *AT&T Technologies v. Communications Workers of America*,

475 U.S. 643, 648-650 (1986); *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25. Indeed, prevailing

federal precedent directs courts to "construe arbitration clauses as broadly as possible." *Collins &*

*Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal quotations and citations

omitted). "[A]s a matter of federal law, any doubts concerning the scope of the arbitrable issues

should be resolved in favor of the arbitration, whether the problem at hand is the construction of

the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*Moses H. Cone Mem. Hosp.*, 460 U.S. at 24-25.

Further, the "existence of a broad agreement to arbitrate creates a presumption of

arbitrability which is only overcome if it may be said with positive assurance that the arbitration

clause is not susceptible of an interpretation that [it] covers the asserted dispute." *Oldroyd v.*

*Elmira Savings Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998); see also, *Mehler v. Terminix Int'l Co.*,

205 F.3d 44, 49 (2d Cir. 2000), *cert. denied*, 533 U.S. 911 (2001) (citing *Collins & Aikman Prods.*

*Co.*, 58 F.3d at 19); *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997). In cases

where the arbitration clause is broad, "only the most forceful evidence of a purpose to exclude the

claim from arbitration can prevail." *AT & T Technologies v. Communications Workers of America*,

475 U.S. 643, 650 (1986).

Here the Revised DRP expressly and unequivocally requires that all disputes arising under

the agreement itself and all other disputes between the parties are to be resolved through

arbitration. It states: "I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision")."

The Second Circuit has held that this is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability." *Oldroyd*, 134 F.3d at 76 (clause in employment agreement requiring arbitration of "any dispute, controversy or claim arising under or in connection with this Agreement" creates presumption of arbitrability of employment-related claims). See also, *Mehler*, 205 F.3d at 49-50 (clause providing for arbitration of "'any controversy or claim . . . arising out of or relating to the agreement is ...' a classically broad one."); *Collins & Aikman Prods. Co.*, 58 F.3d at 20 (clause requiring arbitration of "'any claim or controversy arising out of or relating to the agreement'" is "the paradigm of a broad clause."). Because Plaintiff's claims clearly arise out of his employment with ACS, any argument that it does not apply to the claims advanced by Plaintiff in this case is specious.[2]

### C. Second Circuit Authority Mandates that any arbitrability questions in this case be decided by the arbitrator.

The issue of whether questions of arbitrability in this case are to be decided by the court or arbitrator is controlled by the Second Circuit's decision in *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, in which the court held that "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this – coupled with incorporation of rules that expressly

---

[2] Assuming *arguendo* that the Revised DRP somehow was not operative through some fault in the reformation of contract through the Amended Agreement (which is not the case), the arbitration agreement incorporated into the Original Agreement would then remain in force. That agreement also requires arbitration of all disputes arising out of this Agreement or Employee's employment, so it, too, would require arbitration of this matter. Plaintiff does not (and cannot) contend that the arbitration provision in the Original Agreement is invalid. Therefore, it is indisputable that ACS's breach of contract claim is arbitrable.

empower an arbitrator to decide issues of arbitrability – constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." 6 F.4th 308, 318-19 (2d Cir. 2021). The Revised DRP also states that any arbitration "will be administered by the American Arbitration Association ("AAA") …." (Luy Decl., Ex. B7) Coupled with the broad arbitrability language in the Revised DRP, the AAA rules applicable to this dispute also invest the arbitrator with the authority to determine arbitrability. See Rule 7 of the AAA's Commercial Rules and Rule 6 of the AAA's Employment Rules.

Given the terms of the Revised DRP and well-settled law, any argument that the Court must rule on the scope or enforceability of the Revised DRP before referral to arbitration must be rejected. Indeed, a court should not determine whether an arbitration agreement is enforceable or whether a particular claim is covered by the arbitration agreement where the parties have clearly and unmistakably delegated that task to an arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); *Moore v. T-Mobile USA, Inc.,* 10 CV 527 (SLT), 2010 U.S. Dist. LEXIS 143874, at *10 (E.D.N.Y. Nov. 8, 2010) ("the question of whether the parties have agreed to arbitrate a specific controversy or even agreed to arbitration at all may be delegated to the arbitrator to decide").

Thus, it is for an arbitrator to decide whether the current claims regarding Plaintiff's employment fall within the scope of the agreement, not this court. That outcome is consistent with well-settled law on the issue and further compels the conclusion that the arbitration should not be stayed, but instead directed to proceed apace. It is all the more compelling in this instance because the assigned Arbitrator has already considered the Plaintiff's arguments and determined:

> Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim. Many of the arguments made by Respondent are premature and do not support the issuance of a stay. Respondent shall have the opportunity during the course of the arbitration to argue that the contract at issue is unenforceable, in whole or in part, and to assert counter-claims concerning the Claimant's alleged unlawful conduct.

(Asaad Decl., Ex. 11). On the record before the court, the arguments over the delegation clause are nothing more than a delay tactic. The motion for an injunction should be denied and the parties directed to proceed with the pending arbitration forthwith.

### D.  Plaintiff cannot prove irreparable harm.

A showing of irreparable harm is the single most important prerequisite for the issuance of injunctive relief. *See Reuters, Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). Plaintiff cannot prevail on this issue.

This Circuit has concluded that forcing a party to participate in an even potentially unwarranted arbitration "by itself imposes no [irreparable] injury to the resisting party, except perhaps in 'extraordinarily rare' circumstances;" "[t]he monetary cost of arbitration certainly does not impose such legally recognized irreparable harm." *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93, 100 (2d Cir. 1986). Where there is a valid agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate. *Med. Shoppe Int'l, Inc. v. Mitsopoulos*, 2006 WL 8438209, at *3 (E.D.N.Y. May 5, 2006), *report and recommendation adopted*, 2006 WL 8438198 (E.D.N.Y. May 12, 2006), citing *Emery Air Freight Corp.*, *supra*. If the mere opportunity costs or out-of-pocket expenses associated with an order to arbitrate constitutes irreparable harm, "every order to arbitrate would be deemed to create irreparable harm, and it would be easy to get such orders stayed." *Woodlawn Cemetery v. Loc. 365, Cemetery Workers & Greens Attendants Union*, 1990 WL 150472, at *3 (S.D.N.Y. Oct. 2, 1990), *aff'd*, 930 F.2d 154 (2d Cir. 1991), quoting

*Graphic Communications Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co.*, 779 F.2d 13, 15 (7th Cir. 1985). "Such a harm does not warrant the extraordinary relief of a stay since it 'is no different from the harm of being turned down on a motion to dismiss or for summary judgment, thereby being forced to try a case that one does not believe should be tried....'" *Id.*

In light of the fact that it is well settled that simply being compelled to arbitrate a claim that falls within the scope of an agreement to arbitrate does not constitute irreparable harm, Plaintiff's motion should fail on this basis alone.

**E.   Plaintiff is unlikely to succeed on the merits**

Plaintiff advances several arguments for the proposition he is likely to succeed on the merits. None of them are persuasive.

■ *The Amended Agreement and Revised DRP are not unconscionable.*

Under New York law, "a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F.Supp.2d 566, 571 (S.D.N.Y. 2009) (internal citations and quotations omitted). To prove unconscionability, "there must be a showing that such a contract is both procedurally and substantially unconscionable. The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *Id.* (internal citations omitted) (emphasis added). Here, there is neither procedural nor substantive unconscionability.

Plaintiff contends that the arbitration agreement is procedurally unconscionable because it is an employment contract of adhesion, but this argument has already been considered by courts and universally rejected. "A contract or clause is unconscionable when there is an absence of

meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999); see also, *Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[I]t is well accepted under New York law that it is not unconscionable to be bound by an arbitration agreement in the course of securing employment. Moreover, the fact that there is inequality in bargaining power between an employer and a potential employee is not a sufficient reason to hold that arbitration agreements are not enforceable in the employment context. Therefore, the fact that [the employer] unilaterally drafted the Policy and required the plaintiff to sign the Policy as a condition of his employment does not in itself render the Policy unconscionable.") (Internal citations omitted).[3] That Plaintiff subjectively believed he would have lost his opportunity to work for Claimant if he did not sign the arbitration agreement does not support a finding of procedural unconscionability. See *Maity v. Tata Consultancy Servs., Ltd.,* 2021 WL 6135939, at *7 (D.N.J. Dec. 29, 2021).

In addition, contrary to Plaintiff's assertions, he was not coerced into signing the agreement with high-pressure tactics. ACS sent Plaintiff the Amended Agreement on January 4, 2022 "for [his] perusal" with a message letting him know that a conference call would be scheduled in the following week to go over it. Additionally, the cover letter attached with the agreement expressly invited Plaintiff to ask questions by phone or email before signing and to sign only if he had no questions. *Id.* The cover letter to the Amended Agreement also highlighted the key differences

---

[3] Even in instances where non-English speakers were told to sign an agreement without providing a translation, New York courts have refused to find the agreements procedurally unconscionable. See *Suqin Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 391 (S.D.N.Y. 2017) ("Plaintiffs do not allege that they ever tried to negotiate the terms of the Agreement or that Defendants prevented them from doing so; that Plaintiffs requested and were denied a translated version of the Agreement or the opportunity to review it; or that Defendants used high-pressure or coercive tactics."). Here, Plaintiff is a fluent English speaker, which cuts against any finding of unconscionability.

between the original contract and the amended agreement, including the elimination of liquidated damages, making clear that in the event of breach, the contract "allows for recovery of whatever damages are proven". *Id.* Plaintiff chose not to ask any questions or wait for the conference call. Instead, Plaintiff signed the agreement on the same day that he received it and emailed it back to ACS. Plaintiff's contention that he had no bargaining power is palpably false. While he elected not to engage in those discussions, he was demonstrably able to negotiate the terms of his employment because on January 13, 2022, Plaintiff requested that his facility assignment be changed to Downtown Brooklyn, New York and ACS granted Plaintiff's requested assignment. (Luy Decl., Ex. F)

Although the absence of procedural unconscionability is sufficient to reject Plaintiff's claim that the arbitration agreement is unconscionable, *see Nayal,* 620 F.Supp.2d at 571 (S.D.N.Y. 2009), Plaintiff also has failed to demonstrate that the arbitration agreement is substantively unconscionable. Plaintiff's assertion that the terms of the agreement are substantively unconscionable is without merit, having previously been considered and rejected by courts.

### a. The fee shifting provisions are not unconscionable.

Plaintiff's claim that the arbitration agreement's prevailing-party ("loser pays") provision violates federal or state wage and hour or trafficking laws are meritless. To begin with, Plaintiff's arguments are premised upon incurring arbitration costs and fees, which is false. Not only has ACS paid the filing fee, but the Arbitrator has determined (and ACS had already stipulated) that the AAA's Employment Rules apply. Those rules require the employer to pay the arbitrator's compensation unless the employee or individual, post dispute, voluntarily elects to pay a portion

of the arbitrator's compensation.[4] As a result, Plaintiff has not and will not incur fees for the AAA's administration and the arbitrator's consideration of the case.

Plaintiff's arguments premised on the attorney fee shift in the Revised DRP are similarly unpersuasive. In fact, controlling authority holds otherwise. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017)(rejecting an attack on arbitration based on fee-splitting because the challenge was limited to a review of the potential costs for "the arbitration of enforceability")(quoting *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 74 (2010)); *Eyewonder, Inv. v. Abraham*, No. 08 CV 3579 (GBD), 2010 WL 3528882, at *4 (S.D.N.Y. Sept. 3, 2010) ("The arbitrator was within his power under the Employment Agreement to shift all costs and did not exceed his authority by permitting Plaintiff to recover monies it spent on attorneys' fees in the arbitration, and arbitration costs and fees.")

### b.  Wage and Hour laws do not bar ACS's claim here.

Plaintiff's arguments about wage and hour law are without merit. Indeed, New York courts have found that even termination fees imposed by employment agreements did not constitute illegal kickbacks under the Fair Labor Standards Act ("FLSA"). *See Park v. FDM Grp., Inc.*, 2018 WL 4100524, at *4 (S.D.N.Y. Aug. 28, 2018).

None of the cases cited by Plaintiff support his claim that the cost-shifting provision of the arbitration agreement violates the Fair Labor Standards Act or New York wage and hour law. Indeed, the cases cited by Plaintiff are inapposite to the facts in this case. Unlike the employers in

---

[4] See, https://www.adr.org/sites/default/files/Employment_Group_Filing_FeeSchedule.pdf

cases cited by Plaintiff, ACS is not trying to deduct costs that are primarily for its benefit from Plaintiff's wages. Instead, ACS is seeking lawful damages, as determined by the Arbitrator, for Plaintiff's breach of contract. Moreover, Plaintiff's argument that the damages alleged in ACS's breach of contract claim arose from issues that primarily benefitted ACS is specious. The damages at issue arise out of ACS's expenditures pertaining to, among other things, Plaintiff a Green Card and license to work as a Registered Professional Nurse in New York. While ACS would benefit from Plaintiff being able to work during the circumscribed term of the agreement, Plaintiff would benefit from his New York license and the access to the U.S. job market provided by his Green Card for the rest of his life.

Similarly, Plaintiff has not cited a single case that states that a prevailing party fee-shifting provision is unenforceable in a breach of contract case involving the employee's breach. The cases Plaintiff cites are, again, inapposite, involving cases initiated by employees to enforce statutory rights. For instance, Plaintiff cites to *Smith v. AHS Oklahoma Heart, LLC*, 2012 WL 3156877, at *4 (N.D. Okla. Aug. 3, 2012), which found "the arbitration clause requires Plaintiff to pay Defendant's attorneys' fees if she does not prevail, which is inconsistent with Plaintiff's statutory rights under Title VII and the EPA." Again, this is not the case here because Title VII and the EPA aren't at issue; ACS is seeking to enforce a breach of an employment agreement.[5]

---

[5] Although ACS contends that there is no reason to sever the fee-shifting provision, its presence does not render the agreement unconscionable because it can be severed from the arbitration agreement if necessary. Courts have found that fee-shifting provisions are not essential to the bargain and that severance is proper when warranted. See *Smith v. AHS Oklahoma Heart, LLC*, No. 11-CV-691-TCK-FHM, 2012 WL 3156877, at *4 (N.D. Okla. Aug. 3, 2012) (noting "severance was proper, even in absence of severability clause, because "the primary purpose of the arbitration bargain ... was not to regulate costs or attorney's fees" but instead "was designed to provide a mechanism to resolve employment-related disputes."). Just as in *Smith*, the purpose of the arbitration agreement is to set a mechanism to resolve employment disputes. Unlike *Smith*, the Revised DRP contains an express severability clause. Therefore, even if the fee-shifting were deemed unenforceable, it would not render the agreement unconscionable because it can readily be severed from the rest of the arbitration agreement if the arbitrator deems that appropriate. See *Valle v. ATM Nat., LLC*, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (finding the appropriate remedy is to sever the

c.   Plaintiff's TVPA argument does not bar arbitration.

Plaintiff attempts to vilify ACS by accusing it of engaging in modern-day slavery. His arguments are baseless.

"Forced Labor" is prohibited by 18 U.S.C. § 1589. Through this statute:

> Congress intended to address <u>serious</u> trafficking, or cases where traffickers…restrain their victims without physical violence or injury, or threaten <u>dire consequences</u> by means other than overt violence. According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to compel that person to remain.

*United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (emphasis added). There are no allegations of any threat of violence, so that is no concern here. Instead, Plaintiff argues he was coerced through threatened use of the legal process. He fails on that front.

"Abuse or threatened abuse of law or legal process" is defined as: "[T]he use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose <u>for which the law was not designed</u>, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. §1589(c)(1) (emphasis added). Thus, § 1589(c)(1) prohibits use of the legal system for a reason it is not otherwise meant to be used. *Dann*, 652 F.3d at 1170; see *United States v. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014). Thus, Plaintiff's persistent assertion that ACS is trying to weaponize arbitration is unavailing. Using a tool for its intended purpose does not weaponize it. Using a hammer to drive a nail or a wrench to turn a bolt does not turn them into weapons. Similarly, using a federally authorized and encouraged dispute resolution tool to resolve a contract dispute, which is what ACS's effort to arbitrate its breach of contract claims against Plaintiff involves, does not transform that arbitration into an "abuse of process" weapon. See *Dann* and *Toviave*, *supra*.

---

improper "loser pays" provision of the arbitration agreement and not to invalidate the entire arbitration provision).

*Panwar v. Access Therapies, Inc.,* provides a counterpoint to this case. 2015 WL 1396599, at *5 (S.D. Ind. Mar. 25, 2015). In *Panwar*, the plaintiffs signed employment agreements and promissory notes requiring them to repay their employer for expenses and lost revenue if they resigned before the term of the agreement was completed. *See id*. at * 2. The court dismissed the "forced labor" claims, explaining:

> [The] [p]laintiffs conflate the "use" of legal process with the "abuse" of legal process…. [A]buse of legal process requires a finding that the legal process has been utilized to achieve an end other than one which the process was designed to accomplish. The motive behind such action is irrelevant.
>
> ***
>
> …[F]iling lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish. It is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed. By [the] [p]laintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of process, which would be an absurd outcome. Thus, the Court concludes that…the enforcement of contract rights [did not] constitute[] an "abuse of law or legal process" for purposes of TVPA liability.

*Id*. at * 5 (citations omitted).

*Baldia v. RN Express Staffing Registry LLC*, also provides a meaningful contrast to the current case. 2022 WL 4777836 (S.D.N.Y. Oct. 3, 2022). Similar to this case, the defendant in *Baldia* recruited Filipino nurses to work in New York. 2022 WL 4777836 *1. Applying a vastly different standard than the irreparable harm/success on the merits standard here, the *Baldia* court denied the employer's motion to dismiss on two grounds that are absent in this case. First, the employment agreement at issue in *Baldia* contained both liquidated damages and promissory note, which the court found potentially coercive. *Id.* at *7-9. ACS removed similar provisions when it asked Plaintiff to sign the Amended Agreement before starting work in New York. *Baldia* also recognized that the threat of deportation may qualify as abuse of legal process. *Id.* at *10, citing

*Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019); *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013).There is no evidence of any such threat in this matter.

Plaintiff's comparison of this case to *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019), is grossly inapposite.[6] As a preliminary matter, *Paguirigan* does not even prohibit recovery of liquidated damages from an employee, stating, "of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts." *Id.* at *17 (emphasis added). In *Paguirigan,* the court found that the employer violated the Trafficking Victims Protection Act because of multiple actions that together were tantamount to holding a proverbial gun to workers' heads. Those actions included (a) continuing to impose a $25,000 contract termination fee under a judge had already ruled against it, (b) forcing workers to sign a $25,000 confession of judgment in favor of their employers, (c) filing lawsuits against workers claiming damages of $250,000, and (d) criminally prosecuting workers who quit. *See* 286 F. Supp. 3d 430, 435 (E.D.N.Y. 2017). While none of those things is true in this case, Plaintiff contends that ACS's arbitration demand constitutes a more egregious example of human trafficking because ACS is seeking an opportunity to prove liability and damages in the arbitration hearing. He overstates his case.

The other trafficking cases cited by Plaintiff involve disproportionate liquidated damages and other transgressions that are also easily distinguishable from this case. For example: *NY Attorney General Investigation of Albany Med Health System*, https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058_-_fully_executed_9.13.22.pdf

---

[6] The NYAG's reference to *Paguirigan* in its letter to the AAA reveals that the NYAG is accepting Plaintiff's counsel's representation of the facts at face value without determining whether or not Plaintiff was subject to a liquidated damages provision or some other contract termination fee, whether he was sued for a large sum certain of money, or whether he was the subject of criminal prosecution like Paguirigan. Mr., Vidal was not, so the NYAG's concerns are not applicable to this case.

("The employment contract provided to these nurse recruits faced mandatory repayment provisions that obligated payments between $10,000 to $20,000 and threatened reporting to immigration authorities upon non-compliance." No comparable facts are present here.) *Magtoles v. United Staffing Registry, Inc*., is similarly distinguishable. 2021 WL 6197063, at *1 (E.D.N.Y. Dec. 30, 2021). Unlike the case before the court, that matter involved a liquidated damages provision that required employees to pay up to $90,000 and threats the employer would report a change in employment status to immigration authorities and face possible deportation. *Id*. Again, are no comparable facts are present here.[7]

**F.   There is no "serious question" warranting a stay.**

Plaintiff contends that if the court is not able to resolve the question of Likelihood of Success on the Merits in his favor, an injunction should still issue because of "serious questions" about the arbitrator's authority warrant an injunction. He is mistaken.

In this regard, the Plaintiff's reliance on *Citigroup Global Markets v. VCG Special Opportunities Master Fund Unlimited*, 598 F.3d 30 (2d Cir. 2010), is misplaced. While that case sets forth an oft-quoted recitation of the appropriate test for determining whether a preliminary injunction is warranted, including support for the "serious question" basis for granting injunctive relief, its usefulness is limited because that case is so factually inapposite. Instead of an agreement directly between an employee and an employer, that matter dealt with a complex credit default swap transaction between a hedge fund, a brokerage service, and a third party that resulted in a

---

[7] Interestingly, the presence of a liquidated damages clause should not be considered *per se* an unenforceable penalty.  In fact, the opposite is true. Although 20 CFR § 655.731(c)(10)(i) (A) prohibits imposition of a "penalty" on H-1B non-immigrant workers, subsection (B) specifically approves of liquidated damages in that context, and subsection (C) explains that whether a set sum is an appropriate liquidated damages amount vs penalty is to be determined by state law. H-1B <u>non-immigrant</u> workers have no lawful permanent status in the United States, so they are more vulnerable to such provisions. By contrast, Vidal has a green card (Lawful Permanent Resident status) and is free to work where he wishes.

claim for $10,000,000. 598 F.3d at 32. In addition to a suit between the parties to the credit default swap agreement, the hedge fund also initiated arbitration against the brokerage service provider before FINRA. *Id*. In response, the brokerage service provider sought an injunction to stay the FINRA arbitration pending the outcome of the suit between the parties to the credit default swap. *Id*. In affirming the utility of the "serious question" basis for granting an injunction, the court observed: "The value of this circuit's approach to assessing the merits of a claim at the preliminary injunction stage lies in its flexibility in the face of varying factual scenarios and the greater uncertainties at the outset of particularly complex litigation." *Id*. at 35.

Clearly this matter is far from that presented to the court in *Citigroup Global Markets*. Instead of two competing suits between three parties before different forums, this matter involves the straightforward breach of an employment agreement between two parties in a single forum. Plaintiff's reliance on *Trump v. Vance* also misses the mark because it is also completely inapposite. 941 F.3d 631 (2d Cir. 2019), *aff'd and remanded*, 207 L. Ed. 2d 907, 140 S. Ct. 2412 (2020)(matter of first impression regarding presidential immunity and enforcement of grand jury subpoena). The same holds true for *Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019)(addressing an issue of first impression regarding tribal sovereign immunity and an arbitration agreement designed to avoid federal and state consumer protection laws through application of tribal law). The fact that Plaintiff clearly does not want to arbitrate this matter does not convert the breach of contract claim into a "serious question" warranting an injunction, even if the arbitrator will consider Plaintiff's other claims in the process.

### G. **Balance of Equities**

Plaintiff argues that the balance of the equities weigh in his favor. He is wrong.

Plaintiff has received the benefit of his bargain. He was assisted and underwritten through the visa sponsorship and licensing process. Once that was process was completed, he was flown

to the United States, provided grocery money, a transit card, a rent subsidy, and a job paying above prevailing wage, as well as other meaningful employment benefits. Rather than comply with his part of the bargain to remain employed by ACS for three years, he reneged on his agreement after only three months and used the Green Card and New York license ACS helped him secure to find another, better paying job. He clearly made a cost-benefit analysis that he could earn more money elsewhere and that difference would cover any consequences of his breach because he agreed to pay what was due in his resignation. Apparently he now regrets the cost benefit analysis he performed. That he does not want to suffer the consequences of that naked breach, however, does not tip the balance of equities in his favor. Rather, ACS should be able to advance its claims through the agreed-upon arbitration process in a timely fashion.

### H.  **Public Interest.**

Plaintiff argues that the public interest weighs in favor of granting this requested injunction. Again, he misses the mark.

There is no public interest in preventing ACS from arbitrating its breach of contract claim against Plaintiff. To the contrary, the only interest is Plaintiff's personal interest in avoiding the pecuniary consequences of his breach.

The fact that his attorneys appear to have prevailed on the NYAG to send letters to the AAA does not alter this conclusion. As set forth previously, the NYAG was self-evidently prompted to send those letters based on the distorted portrayal of the underlying facts. In the absence of any action by the NYAG based on a complete understanding of the underlying facts, no determination of a public interest in barring arbitration plaintiff's breach should be found. Instead, his personal interest in avoiding the consequences of his breach should give way to the well-settled public interest in enforcing arbitration agreements.

Contrary to Plaintiff's arguments, well-settled case law mandates that the public interest would be better served by denying the requested injunctive relief and directing the parties to proceed through arbitration. To begin with, the Second Circuit has held that employment-related civil rights claims are arbitrable. *Daly*, 939 F.3d at 422; *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 396–97 (S.D.N.Y. 2021). Indeed, *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), foreclosed any such argument. "The Federal Arbitration Act rests on the authority of Congress to enact substantive rules under the Commerce Clause" and "[i]n enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Id.* at 10-1. Thus, Congress intended to foreclose attempts to undercut the enforceability of arbitration agreements." *Id*. at 16. See also, *White v. WeWork Cos., Inc*., 2020 WL 3099969, at *5 (S.D.N.Y. June 11, 2020) (holding that CPLR § 7515 was preempted by FAA); *Latif v. Morgan Stanley & Co. LLC*, 2019 WL 2610985 (S.D.N.Y. June 26, 2019) (same).

The Supreme Court addressed other challenges to the FAA based on purported statutory conflicts in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619, 200 L. Ed. 2d 889 (2018). There the Court squarely addressed the question: "Should employees and employers be allowed to agree that any disputes between them will be resolved through one-on-one arbitration?" *Id*. In the face of a variety of asserted statutory conflicts to arbitration, the Court observed: "Not only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures." 138 S. Ct. at 1621 It also noted, "[i]n many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected

29

every such effort to date . . . ." 138 S. Ct. at 1627. Against that background, the Court concluded: "The policy may be debatable but the law is clear: Congress has instructed that arbitration agreements like those before us must be enforced as written." 138 S. Ct. at 1632.

In view of the foregoing, Plaintiff's argument that ACS's breach of contract claim should not be arbitrated because of potential conflicts with the Trafficking Victim Protection Act or federal and state wage and hour issues should be rejected. In the absence of an express Congressional exception to the arbitrability of Plaintiff's purported TVPA or wage and hour claims, their presence is no impediment to arbitration of Defendant's breach of contract claim. To the contrary, the breadth of the arbitration agreement, especially the express language that "should there be arbitration proceedings in accordance with this Provision, [Mr. Vidal] would be free to pursue all available substantive or procedural rights or remedies in such arbitration proceedings," weighs against an injunction and in favor of unimpeded arbitration of both ACS's claims and Plaintiff's purported defenses and counterclaims.[8]

---

[8] As an apparent "Hail Mary" pass, Plaintiff argues that an injunction is warranted under the All Writs Act. This effort is out of bounds. The Supreme Court has stated that the All Writs Act empowers courts to issue extraordinary writs "as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued." *United States v. Int'l Blvd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 907 F.2d 277 (2d Cir. 1990) quoting *United States v. New York Tel.*, 434 U.S. 159, 172 (1977). Unlike *Int'l Blvd. of Teamsters*, however, the District Court does not need to take action pursuant to the All Writs Act here because there are clear alternative procedures available for Plaintiff to obtain the relief that he seeks. Specifically, the arbitration to which he agreed to submit any such claims. His attempt to avoid the application of a mandatory arbitration provision in an employment agreement is not an "exceptional circumstance" under the All Writs Act. The other cases cited by the Plaintiff also fail to support resort to the All Writs Act here. I*n re American Honda Motor Co., Inc., Dealerships Relations Litigation*, 315 F.3d 417 (4th Cir. 2003)(affirming denial of potential double recovery when the settlement agreement remained in the court's exclusive jurisdiction); *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d Cir. 2011)( the arbitration enjoined because claims barred by the settlement agreement); *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013)("It is no doubt unwise for a Court to simply step in and stay a contractually deserved arbitration merely because the Court sees a potentially more efficient use of time and resources by litigants, arbitrators, and judges. This is undeniably a slippery slope.").

**CONCLUSION**

For the reasons set forth herein and supported by the accompanying evidence, the Plaintiff's motion for a stay of the arbitration should be denied in its entirety and the parties directed to complete the pending arbitration in a timely fashion.

Dated: February 8, 2023

**FordHarrison, LLP**

*Counsel for Claimant Advanced Care Staffing, LLC*

By: _____

Sami Asaad
Craig Dickinson
Marissa Vitolo
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
Tel #:  860-740-1357
Fax #: 860-740-1397
Email: sasaad@fordharrison.com
         cdickinson@fordharrioson.com
         mvitolo@forharrison.com

**CERTIFICATE OF SERVICE**

This is to certify that on the 8th day of February a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's CM/ECF electronic filing system.

/s/ Sami Asaad
.                                        Sami Asaad