UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BENZOR SHEM VIDAL,

    Plaintiff,

v.

ADVANCED CARE STAFFING, LLC,

    Defendant.

Civ. Action No.: 22-cv-5535 (NRM)(MMH)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Dated:    Brooklyn, NY
             February 15, 2023

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii
INTRODUCTION ....................................................................................................................... 1
RELEVANT BACKGROUND ................................................................................................... 2
ARGUMENT ................................................................................................................................ 3

    I.    There is No Presumption that Arbitration Provisions are Validly Formed and Enforceable, and Those Questions are for the Court to Decide Absent a Clear and Unmistakable Delegation Clause. ................................................................................. 3

    II.    Contrary to Defendant's Claims, Mr. Vidal Signed the Arbitration Provision and Putative Delegation Clause Under Duress, and It Was Therefore Not Validly Formed Under New York Law. ................................................................................................. 6

    III.    Plaintiff Contends the Arbitration Provision and Putative Delegation Clause Is Unconscionable in Light of Procedural and Substantive Issues, Not Merely Because it is an Adhesion Contract. ................................................................................................... 6

    IV.    Contrary to ACS's Claims, ACS Is Seeking to Recoup Employment Costs that are Primarily for its Benefit, In Violation of Wage and Hour Laws. ................................... 7

    V.    ACS's Use of the Arbitration Proceeding Here, and Against Other Workers, Plainly Violates Anti-Trafficking Laws. .................................................................................. 9

    VI.    ACS Cannot Save its Arbitration Provision by Hiding behind AAA's Employment Rules or Urging the Court to Sever the Loser Pays Term. ........................................... 12

    VII.    Serious Questions About the Arbitrator's Authority Warrant a Preliminary Injunction. 13

    VIII.    A Preliminary Injunction is Plainly in the Public Interest. ........................................... 14

CONCLUSION .......................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**

*Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, No. 19-cv-1422 (WFK), 2021 WL 7186030, at *6 (E.D.N.Y. Apr. 30, 2021) .................................................................................................. 9

*Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1236 (11th Cir. 2002) ................................. 7, 9

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ............................... 5

*Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971) ............................................. 6

*Baldia v. RN Express Staffing Registry LLC*, No. 19-cv-11268-PGG, 2022 WL 4777836, at *1 (S.D.N.Y. Oct. 3, 2022) ............................................................................................... 10

*Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 WL 2476882, at *2 (S.D. Ohio June 17, 2021) ................................................................................................................. 10, 11

*Citigroup Glob. Mkt.s, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010) .............................................................................................................. 14

*Gov't Emps. Ins. Co. v. Grand Med. Supply, Inc.*, No. 11-cv-5339 (BMC), 2012 WL 2577577, at *3 (E.D.N.Y. Jul. 4, 2012) ............................................................................................... 4

*Hale v. Brinker Int'l, Inc.*, No. 21-CV-09978-VC, 2022 WL 2187397, at *1 (N.D. Cal. June 17, 2022) ............................................................................................................................. 13

*In re: Albany Med. Health Sys.*, AOD No. 22-058 (Sept. 13, 2022) ........................................... 11

*Javier v. Beck*, No. 13-cv-2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014) ........................ 9, 12

*Javier v. Beck*, No. 13-cv-2926, 2014 WL 3058456, at *1 (S.D.N.Y. July 3, 2014) ................... 10

*Macolor v. Libiran*, No. 14-cv-4555-JMF-RLE, 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016) ........................................................................................................................ 10, 11

*Morgan v. Sundance, Inc.*, 142 S. Ct. 1709, 1713 (2022) ................................................... 1, 4, 15

*Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 676 (6th Cir. 2003) ................................... 13

*Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 205 (3rd Cir. 2010) ................................................. 13

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011) ....................................................................................................................................... 11

*Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) .. 9, 11, 12

*Panwar v. Access Therapies, Inc.*, No. 1:12–cv–00619–TWP–TAB, 2015 WL 1396599, at *5 (S.D. Ind. Mar. 25, 2015) ................................................................................................ 12

*Rent-a-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 & n.1 (2010) ................................................. 5

*United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) ......................................................... 9

**Statutes & Regulations**

18 U.S.C. § 1589 ............................................................................................................................ 12

18 U.S.C. § 1589(a)(3) ................................................................................................................... 11

18 U.S.C. § 1589(c)(1) ................................................................................................................... 11

18 U.S.C. § 1589(c)(2) ............................................................................................................... 9, 10

20 C.F.R. § 656.12(b) ...................................................................................................................... 9

29 C.F.R. § 531.36(b) ...................................................................................................................... 7

9 U.S.C. § 1 *et seq.* ......................................................................................................................... 4

**Other Authorities**

H.R. Conf. Rep. No. 106-939 .......................................................................................................... 1

## **INTRODUCTION**

Defendant brings nurses from the Philippines to the United States and uses the threat of a harsh and one-sided arbitration provision, and the resulting costs that arbitration would impose on Defendant's employees, to coerce them to continue working for the company. That is textbook trafficking. The Trafficking Victims Protection Reauthorization Act ("TVPA") is not limited, as ACS suggests, to "coyotes" "smuggl[ing]" people "across the border," "back alley sweat shop[s], . . . remote lettuce field[s], . . . "massage parlor[s]," and the like. Rather, Congress amended the TVPA in the early 2000s specifically "to address the increasingly subtle methods of traffickers … such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Conf. Rep. No. 106-939, at 101. Here, ACS's threats were far from subtle. ACS detailed the threatened financial harm and abuse of legal process in writing and reinforced each through its conduct. And when Mr. Vidal defied these threats, ACS launched an arbitration proceeding with the purpose of burying him in debt and recovering its alleged lost profits, plus arbitration costs and its attorneys' fees.

Defendant urges the Court to bury its head in the sand as to Defendant's illegal scheme due to what it describes as a liberal federal policy favoring arbitration, but Plaintiff's motion merely asks the Court to follow the Supreme Court's consistent guidance that the Federal Arbitration Act's policy "is to make arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1709, 1713 (2022) (internal quotation marks omitted). This is proper because "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* (citation omitted).

The Court need not decide now whether ACS is engaged in trafficking or wage

violations. Nor need it decide whether the arbitration provision between the parties is enforceable. This motion simply requests that the Court pause the arbitration proceedings so that the Court—on a complete factual record—can decide whether the arbitrator even has the authority to rule on Plaintiff's serious challenges to the arbitration provision. The arbitrator's authority to rule on this case can only be granted by a "clear and unmistakable" and enforceable delegation clause, but there is no such provision here. By preliminarily enjoining the arbitration—which would cause no harm to ACS—the Court can address the issues raised by this declaratory judgment action on a complete factual record to ensure that Mr. Vidal is not subject to an unauthorized arbitration proceeding that threatens him with devastating debt.

## **RELEVANT BACKGROUND**

ACS blatantly ignores the facts when it portrays Mr. Vidal as a sophisticated actor who has exploited ACS for his personal benefit. When ACS sent Mr. Vidal the 2022 Contract, Mr. Vidal was in England, far from home and family. He had already invested time and resources to begin his journey to the United States, including over $1,000, three-quarters of his life savings, to expedite the paperwork for his relocation. ECF No. 23-3 (Vidal Decl.) ¶ 15. After learning that his visa had been approved, Mr. Vidal quit his job. *Id.* ¶ 20. It was only after he had resigned, with no ongoing source of income, that ACS sent him the new contract. *Id.* ¶ 21. And although ACS cites to a brief, legalistic letter included in a packet with the 2022 Contract that purportedly disclaims the promissory note in Mr. Vidal's earlier contract, nowhere in its correspondence did ACS explain that Mr. Vidal had the option to walk away from the 2022 Contract entirely and still benefit from the release included in the packet. As any reasonable person in his circumstances would, Mr. Vidal believed that he was obligated to sign the new contract and that he would not be released from his obligations under the prior contract unless he signed the new one. *See* Feb.

15, 2023 Supp. Decl. of Benzor Vidal ("Vidal Supp. Decl."), annexed as Ex. 26 to Feb. 15, 2023 Decl. of Hugh Baran ("Baran Decl."). Mr. Vidal had invested most of his life savings to begin the immigration process, which would not be reimbursed until he got to the United States. Vidal Supp. Decl. ¶ 4. He was already invested in coming to the United States; had resigned his position in London; and believed that if he did not sign the new contract ACS could come after him for substantial penalties. *Id.* ¶¶ 3-4. Under these circumstances, Mr. Vidal had no choice but to sign.

ACS also suggests that Mr. Vidal's signing the 2022 Contract the same day he received it somehow implies that he had no qualms about doing so. To the contrary, he feared that raising concerns at that late stage might negatively impact his employment prospects—after he had already invested most of his life savings in the venture. *Id.* ¶ 6; *see also* ECF No. 23-3 ("Vidal Decl."), ¶ 15. These concerns were compounded by a conversation he had with an ACS staff member, urging him to sign the new contract quickly. Vidal Supp. Decl. ¶ 7.

Finally, ACS's assertion that Mr. Vidal did not raise concerns about his horrendous working conditions prior to resigning is false. He spoke up to his supervisors at the facility about the stress and exhaustion he was experiencing. *Id.* ¶ 9. He also spoke to ACS personnel at Defendant's Brooklyn office. *Id.* ¶ 9. But he received little more than assurances that he could handle the stress. *Id.* ¶ 9. Instead of addressing his concerns, ACS urged Mr. Vidal to work even more hours. *Id.*

## ARGUMENT

**I.     There is No Presumption that Arbitration Provisions are Validly Formed and Enforceable, and Those Questions are for the Court to Decide Absent a Clear and Unmistakable Delegation Clause.**

ACS suggests that the purported strong federal policy in favor of arbitration requires the Court to step aside and allow the arbitrator and AAA to do what they want. That is not the law.

3

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), embodies a federal "policy . . . to make arbitration agreements as enforceable as other contracts, but not more so." *Morgan*, 142 S. Ct. at 1713 (citation and internal quotation marks omitted).

ACS also spills considerable ink citing to cases about the presumption that a "broad" arbitration provision covers a dispute between parties to that arbitration provision. ECF No. 29 (Def's Opp.) at 14-15. But Mr. Vidal does not dispute that ACS's breach of contract claim is, in theory, one that falls within the scope of the arbitration provision. The question here is not about the *scope* of the arbitration provision. Rather, this case is ultimately about whether there was a valid arbitration provision at all here—i.e., whether the arbitration provision was validly formed and is enforceable. The FAA does not put a thumb on the scale in any direction with respect to that question. *See Gov't Emps. Ins. Co. v. Grand Med. Supply, Inc.*, No. 11-cv-5339 (BMC), 2012 WL 2577577, at *3 (E.D.N.Y. Jul. 4, 2012) ("When determining whether to compel arbitration under the FAA, a court must answer two questions: '(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement.' The first question—whether there is a valid arbitration agreement—is determined solely by state contract law, without influence from the general presumption in favor of arbitration underlying the FAA.") (quoting and citing Second Circuit cases).

The question of whether an arbitration provision is unenforceable or illegal is generally a question for courts to decide under general principles of contract law. *See* ECF No. 23-1 (Pls.' Br.) at 11-12. At this time, however, Plaintiff does not ask the Court to reach that issue because the Court must first address the threshold question of whether the arbitration provision contains a "clear and unmistakable" delegation clause, delegating Plaintiff's challenges to the arbitration

4

provision to the arbitrator. Defendant asserts that it does, *see* Def's Opp. at 15-16, while Plaintiff disagrees, *see* Pl.'s Br. at 14–16. The question is of critical importance at this stage because absent a "clear and unmistakable" and valid delegation clause, the arbitrator has no authority to address the enforceability of ACS's arbitration requirement. *See Rent-a-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 & n.1 (2010).

Whether the delegation clause is enforceable is a question for the Court. That is because a delegation clause is just another kind of arbitration contract, and ACS cannot strip the Court of its jurisdiction merely by pointing to a purported delegation clause. There is, however, a key difference between delegation clauses and other arbitration contracts that cuts against ACS's arguments here: the so-called "presumption of arbitrability" that applies to the question of whether a claim is subject to a valid arbitration agreement does not apply to delegation provisions (even valid ones). That is because, as a general matter, the question of whether a dispute should be arbitrated is for courts to decide. The Supreme Court has explained that to overcome this presumption, a delegation provision must be "clear and unmistakable." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Rent-a-Center*, 560 U.S. at 69 n.1.

Defendant's brief largely sidesteps the serious and substantial arguments Mr. Vidal has made that his contract does not include a "clear and unmistakable" delegation clause, and that any such clause is unenforceable, but the arbitrator has no authority to proceed absent such a provision. *See* Pl.'s Br. at 12-16. The Court should accordingly grant Mr. Vidal's motion, preliminarily enjoin the arbitration proceedings, and take the time needed to resolve these weighty questions.

II. **Contrary to Defendant's Claims, Mr. Vidal Signed the Arbitration Provision and Putative Delegation Clause Under Duress, and It Was Therefore Not Validly Formed Under New York Law.**

Mr. Vidal believed that he had to sign the revised contract or risk financial ruin. *See* ECF No. 23-3 (Vidal Decl.) ¶ 15; Vidal Supp. Decl. ¶¶ 4-7. As a consequence, Mr. Vidal signed the 2022 Contract under economic duress, and that contract was not validly formed under New York law. *See Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971).

The Court need not finally resolve Mr. Vidal's duress arguments to resolve this motion. Because these arguments raise a formation question that goes to the arbitration provision as a whole and the delegation clause in particular, they cannot be delegated to an arbitrator. Therefore, at this stage, Mr. Vidal requests that the Court preliminarily enjoin the arbitration so that the Court may take the time to examine whether any arbitration provision was validly formed on a more fully developed factual record.

III. **Plaintiff Contends the Arbitration Provision and Putative Delegation Clause Is Unconscionable in Light of Procedural and Substantive Issues, Not Merely Because it is an Adhesion Contract.**

ACS misrepresents Mr. Vidal's arguments concerning the procedural unconscionability of the contract and the putative delegation clause. Mr. Vidal does not contend that the 2022 contract and putative delegation provision are procedurally unconscionable merely because they are part of a "contract of adhesion," *see* Def.'s Opp. at 18. They are also unconscionable because Mr. Vidal was under substantial pressure to sign the agreement. Specifically, when he signed the 2022 Contract Plaintiff: (1) had already tendered his resignation from a position in London and was worried that refusing to sign would leave him stranded without employment there; and (2) believed that if he refused to sign the 2022 Contract he would have been required to pay $20,000

6

in liquidated damages.[1] As explained in Plaintiff's moving brief, these were exceptionally coercive circumstances that are unlike those that typically arise in the employment context. *See* Pl.'s Br. at 23–24.

The arbitration provision and the putative delegation clause are also substantively unconscionable, as explained in Plaintiff's moving brief, because the arbitration provision contains a "loser pays" provision. *See* Pl.'s Br. at 24–25. If Mr. Vidal were required to adjudicate the arbitration provision's validity and enforceability in arbitration, he would potentially face tens of thousands of dollars in arbitration costs and Defendant's attorneys' fees. He cannot afford those costs and attorney's fees.

### IV. Contrary to ACS's Claims, ACS Is Seeking to Recoup Employment Costs that are Primarily for its Benefit, In Violation of Wage and Hour Laws.

The core of Mr. Vidal's argument that the arbitration provision and its loser pays term are illegal under state and federal wage and hour laws is that in the underlying "breach of contract" action ACS seeks an illegal kickback against Mr. Vidal's wages, and therefore the costs and attorney's fees of collecting that kickback are an illegal kickback as well. *See* Pl.'s Br. at 21-22.

The parties appear to agree that ACS would be engaging in an illegal kickback if it sought to recover costs that were "primarily for [its] benefit" as opposed to Mr. Vidal's benefit. 29 C.F.R. § 531.36(b). ACS argues, however, that it is not seeking "costs" but rather "lawful damages, as determined by the Arbitrator." Def.'s Opp. at 22. But as a wage-and-hour matter, requiring Mr. Vidal to pay costs through a legal action is no different than deducting those costs directly from his paycheck. *See Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1236 (11th Cir. 2002) ("[T]here is no legal difference between deducting a cost directly from the worker's wages

---

[1] Although Defendant submitted a letter it claims was a unilateral waiver of the liquidated damages provision of the prior contract, it was not clear on its face that such a waiver was effective absent Mr. Vidal executing the 2022 agreement.

7

and shifting a cost, which they could not deduct, for the employee to bear.").

It is also apparent from ACS's contracts and its communications with Mr. Vidal that the costs ACS seeks to recover through the arbitration are primarily for ACS's benefit. Those costs include ACS's purported "lost profits" because of Mr. Vidal's departure, including the costs of hiring a replacement. Pl.'s Br. at 6. It may make sense in a non-employment contracting context to permit the recovery of "lost profits" as a kind of expectation damage. But employers will always bear some costs when an employee departs from employment, including the opportunity costs of having a role unfilled, the costs of recruitment and hiring, and the costs of training a replacement. If employers could, by contract, shift those costs onto their employees and sue to recover those costs as "damages," they would eviscerate the minimum wage laws. Even minimum wage workers would be paid their wages subject to the condition that they continue working lest they be sued for all the headaches their departure might cause.

ACS cannot escape liability by suggesting that it is merely seeking to recover the hard costs it incurred in bringing Mr. Vidal into the United States, including "recruiting costs, licensure/certification review and credentialing costs, exam costs, Visa Screen costs, attorney's fees, petition filing cots, flight and/or transportation costs, housing costs, etc." Def.'s Opp. at 4 (internal quotation marks omitted). For one thing, the 2022 Contract, as well as the demand for arbitration, clearly contemplate that ACS seeks to recover "lost profits"; ACS cannot save the contract now by disclaiming that purpose. Moreover, the costs that ACS admittedly seeks to recoup are, as a matter of law, for the benefit of ACS and not Mr. Vidal. Federal regulations are clear that employers like ACS may not "seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees . . . or as a reimbursement for costs incurred in preparing or filing a permanent

8

labor certification application." 20 C.F.R. § 656.12(b); *see also Arriaga*, 305 F.3d at 1244.

V.   **ACS's Use of the Arbitration Proceeding Here, and Against Other Workers, Plainly Violates Anti-Trafficking Laws.**

ACS's response to Mr. Vidal's trafficking allegations boils down to: (1) ACS's conduct is not serious enough to be trafficking; (2) the dollar amount at issue is insignificant; (3) ACS is using arbitration properly; and (4) there is no liquidated damages clause. On all four points, ACS is wrong.

First, the TVPA, as amended, "was intended to broaden the punishable conduct . . . beyond [what] constitutes involuntary servitude . . . ." *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, No. 19-cv-1422 (WFK), 2021 WL 7186030, at *6 (E.D.N.Y. Apr. 30, 2021). This includes "nonviolent coercion" given "that the means used by modern-day traffickers are 'increasingly subtle.'" *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R. Conf. Rep. No. 106–939 at 101, 2000 WL 1479163, at *91 (106th Cong. 2000)).

Threatened or actual financial harm is serious harm under the TVPA. 18 U.S.C. § 1589(a)(2), (c)(2); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) ("Allegations of such a severe financial burden are more than enough to rise to the level of harm necessary to state a TVPA claim"); *see also Javier v. Beck*, No. 13-cv-2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014). Financial harm is actionable under the TVPA when considering "all the surrounding circumstances, [it] compel[s] a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

Here, regardless of whether ACS is abusing legal process (and Plaintiff contends that it is), "serious harm" exists because of the threat that an arbitration, even regarding the threshold question of arbitrability, could force him to bear tens of thousands of dollars in Defendant's

9

attorney's fees and in arbitration costs.[2] Many courts, including federal courts in New York, have concluded that these types of financial threats under similar circumstances amount to forced labor. *See* Pl.'s Br. at 18–20; *Baldia v. RN Express Staffing Registry LLC*, No. 19-cv-11268-PGG, 2022 WL 4777836, at *1 (S.D.N.Y. Oct. 3, 2022) (denying motion to dismiss TVPA claims of Filipino nurse);[3] *Macolor v. Libiran*, No. 14-cv-4555-JMF-RLE, 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016) (finding Filipino physical therapist entitled to damages where employer threatened and, through a collection agency, sought more than $20,000 when therapist left job), *R & R adopted*, No. 14-CV-4555 (JMF), 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016); *Javier v. Beck*, No. 13-cv-2926, 2014 WL 3058456, at *1 (S.D.N.Y. July 3, 2014) (denying motion to dismiss physical therapy rehab manager's TVPA claims); *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 WL 2476882, at *2 (S.D. Ohio June 17, 2021) (denying motion to dismiss Filipino nurse's TVPA claim). This Court should, too.

ACS attempts to downplay the seriousness of the harm by citing the dollar value at issue in other trafficking cases. But here, ACS's lawyers *themselves* characterized the threat of "at least $20,000" as "significant damages," ECF No. 31-1 (emphasis in original), and the costs of arbitration and ACS's attorney's fees would likely come close to or exceed that amount. When he left his employment, Mr. Vidal was a new immigrant to the United States, had only started earning money, and was reasonably terrified of the financial burdens ACS is imposing through its arbitration provision. *See* 18 U.S.C. § 1589(c)(2) (evaluating serious harm requires examining

---

[2] Though ACS has subsequently agreed that the AAA's Employment Rules apply and require ACS to pay the costs of the arbitration itself, that is a recent development, occurring months after ACS reiterated its threat of fees and costs through its lawyers' letter to Mr. Vidal. ECF No. 23-7. And besides, ACS has not withdrawn its threats to seek reimbursement of *its own* attorneys' fees and costs (in fact, it continues to defend them here). *See* Def.'s Opp. at 21.

[3] ACS's attempt to set *Baldia*, *Magtoles*, and *Paguirigan* apart fail for the reasons discussed below as to dollar values and liquidated damages provisions.

all the surrounding circumstances of a reasonable person of like background); *see also Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011) (noting $5,000 is more than one-and-a-half times the Philippines' average annual household income); *Javier*, 2014 WL 3058456 (where $15,000 was at issue); *Macolor,* 2016 WL 1488121, at *4 (where $20,000 was at issue); *In re: Albany Med. Health Sys.*, AOD No. 22-058 (Sept. 13, 2022) (where $20,000 was at issue); *Carmen*, 2021 WL 2476882, at *2 (where $20,000 was at issue); *Paguirigan*, 2019 WL 4647648, at *8 (where $25,000 was at issue).

Again, ACS's conduct also constitutes abuse of legal process. Abuse of legal process hinges on whether actual or threatened abuse of legal process forced workers to stay in their jobs by using that process in any manner or for any purpose for which the law was not designed. 18 U.S.C. § 1589(a)(3); *see* 18 U.S.C. § 1589(c)(1)

Here, ACS essentially admits that it used the threat of arbitration to try and convince Mr. Vidal to stay in his job: "[I]n response to his resignation, ACS reminded Mr. Vidal that he had signed an agreement to work for a term of three years and that he had barely even worked for three months . . . . Mr. Vidal refused to reconsider his resignation." *See* Def.'s Opp. at 8. This "reminder" included telling Mr. Vidal, "You signed a **3 Year contract** with Advanced Care Staffing that you need to fulfill." ECF No. 30-13 (Ex. G) (emphasis in original). Further, ACS's lawyer followed up with a letter explaining how much Mr. Vidal would owe "in the event [he] proceed[ed] with [his] resignation" and invited him to reconsider resigning specifically in light of the financial burdens imposed on him through the arbitration provision's loser pays clause. ECF No. 31-1. These were not isolated incidents. They appear part of a pattern of conduct designed to force nurses to keep working for ACS and punish those like Mr. Vidal who dare to

11

find another job. *See* ECF No. 32 (attaching letter to AAA referencing two others against whom ACS has initiated arbitration).[4]

Finally, ACS places outsized emphasis on the absence of a "liquidated damages" provision in its contract. But nothing in the TVPA requires financial harm or abuse of legal process to be accompanied by a "liquidated damages" provision. *See generally* 18 U.S.C. § 1589. True, employers in similar cases have attempted to disguise serious financial harm by dressing it up as purportedly legal "liquidated damages" clauses, resulting in a fight over whether the clause is legal or is an unenforceable penalty. That ACS eliminated that fight here by simply making and carrying out on its threatened financial harm via arbitration costs and attorneys' fees does not make its conduct legal. Any reasonable reading of ACS's communications with Mr. Vidal makes clear that it is using its contract—and the arbitration and loser pays provisions therein—to obtain forced labor. Whether that contract contains a liquidated damages clause is immaterial. *See Javier*, 2014 WL 3058456, at *6 ("Regardless of whether the contract was in fact enforceable, the Complaint alleges that the Defendants used it as a threat to obtain Javier's continued services.").

### VI.  ACS Cannot Save its Arbitration Provision by Hiding behind AAA's Employment Rules or Urging the Court to Sever the Loser Pays Term.

Throughout its briefing, ACS urges the Court to save its arbitration provision by looking past its loser pays provision. ACS argues, for example, that because the arbitrator has concluded that the Employment Rules apply, ACS is absolved of the contractual language that would have

---

[4] ACS relies upon *Panwar v. Access Therapies, Inc.* for support that it is not abusing legal process. *Panwar v. Access Therapies, Inc.*, No. 1:12–cv–00619–TWP–TAB, 2015 WL 1396599, at *5 (S.D. Ind. Mar. 25, 2015). *Panwar*, an older case from the Southern District of Indiana, is wrong, an outlier, and inconsistent with more recent decisions from New York federal courts, as well as with the view of the New York Attorney General. *See Paguirigan*, 286 F. Supp. 3d at 435 (holding "baseless and abusive" lawsuits against foreign nurses constitute abuse of legal process); ECF No. 23-22 (OAG Ltr.).

12

required Mr. Vidal to pay the costs of arbitration if he does not prevail in the action. *See* Def.'s Opp. at 11.[5] But ACS also cannot sidestep the unenforceability of the arbitration requirement just because AAA's rules conflict with the contractual language it drafted. "An arbitration agreement in an employment contract does not, in the context of litigation, become the employer's opening bid in a negotiation with the employee or the court over the agreement's unconscionable terms. . . . Because the employer drafted the arbitration agreement, the employer is saddled with the consequences of the provision *as drafted*." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 205 (3rd Cir. 2010) (emphasis in original and internal quotation marks omitted); *see also Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 676 (6th Cir. 2003) ("In considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay . . . .").

For these same reasons, the Court should not sever the loser pays provision and allow the arbitration to proceed in its absence. *See* Pl.'s Br. at 25-26. As the language of the arbitration requirement and ACS's own conduct reveals, the loser pays provision is not merely ancillary to the arbitration requirement; it is core to ACS's purposes. *See id.* at 25. "Were courts to excise [unenforceable] provisions [in arbitration requirements] and enforce arbitration agreements anyway, employers would have no incentive not to chill claims by including [such] provisions in arbitration agreements." *Hale v. Brinker Int'l, Inc.*, No. 21-CV-09978-VC, 2022 WL 2187397, at *1 (N.D. Cal. June 17, 2022).

### VII. Serious Questions About the Arbitrator's Authority Warrant a Preliminary Injunction.

The Court should give short shrift to the suggestion that the Second Circuit's "serious

---

[5] Notably, ACS does not appear to disclaim its contractual entitlement to its attorneys' fees pursuant to the loser pays provision, which on its own renders the delegation clause and arbitration requirement unenforceable.

13

question" standard does not apply to Mr. Vidal's motion for a preliminary injunction. *See Citigroup Glob. Mkt.s, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010). It is true *Citigroup* involved a "complex credit default swap transaction," Def.'s Opp. at 27, but that does not mean the equities of this case weigh less heavily in favor of preliminary relief. This case certainly matters a great deal to Mr. Vidal and other workers like him. And ACS has not identified any harm it will suffer by pausing the arbitration proceedings. Because there is a serious question about the enforceability of the arbitration provision and any putative delegation provision, and because the equities weigh in favor of preliminary relief, the Court should grant the motion.

**VIII. A Preliminary Injunction is Plainly in the Public Interest.**

ACS contends that no irreparable harm will come to Mr. Vidal in the absence of an injunction, but as Defendant tacitly acknowledges, the cases it cites to support its position involved valid arbitration agreements, unlike here. See Def.'s Opp. at 17 ("Where there is a valid agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate.") (citations omitted). Here, however, Mr. Vidal contends (1) that there is no valid and enforceable arbitration provision, and (2) that the arbitrator has no authority to rule on those threshold questions because the parties did not clearly and unmistakably agree to arbitrate those threshold issues, and thus there is no valid agreement to arbitrate the validity and enforceability of the overall arbitration provision. See supra at 4–6; Pl.'s Br. at 14–16. In cases where it is established that a party is being forced to arbitrate certain issues absent a valid agreement to do so, it is well-established that there is a *per se* irreparable harm that supports preliminary injunctive relief. See Pl.'s Br. at 27–28 (collecting cases).

ACS also asks the Court to shut its eyes to the publfic interest at issue here, an interest

14

that is demonstrated by the multiple letters from the OAG to the AAA concerning the arbitration proceedings against Mr. Vidal and other former ACS nurses, *see* ECF Nos. 23-22 & 28, as well as a letter of interest sent to the parties yesterday by the United States Department of Labor; *see* Feb. 14, 2023 Ltr. from Regional Solicitor of Labor Jeffrey Rogoff, annexed as Ex. 27 to Baran Decl. That multiple public enforcement agencies have directed attention and energy to ACS and decried its actions—as well as raised alarms about other potentially impacted workers, like those in other arbitrations filed by ACS—demonstrates the public interest in a preliminary injunction so that the Court may consider a complete factual record regarding ACS's conduct.

Finally, ACS has not pointed to any weighty interest of its own in support of proceeding through arbitration without giving this Court an opportunity to assess the arbitrator's authority to resolve this dispute. And there is no public interest in arbitration-at-any-cost that the Court must weigh here. In fact, the public interest in treating this contract like all others, *see Morgan*, 142 S. Ct. at 1713, only further counsels in favor of staying the arbitration proceedings, so that the Court has time to consider the complex legal questions raised by this contract and ACS's novel, abusive use of the arbitration process to coerce workers' labor and punish them for leaving miserable working conditions.

## CONCLUSION

For the reasons stated above and in Plaintiff's opening brief, the Court should enter the requested injunction.

Dated: February 15, 2023                                         Respectfully submitted,

                                                                 /s/ Hugh Baran
                                                                 Hugh Baran (he/him)

                                                                 **KAKALEC LAW PLLC**

                                                                 Hugh Baran (he/him)

.

Patricia Kakalec (she/her)
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**TOWARDS JUSTICE**

David H. Seligman (*pro hac vice*)
Juno Turner
Valerie Collins (*pro hac vice*) (she/her)
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362 (*pro hac vice)* (she/her)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

Matthew C. Helland, CA Bar No. 250451 (*pro hac vice*)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*