UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Benzor Shem Vidal, | No. 1:22-cv-05535-NRM-MMH |
| Plaintiff, | OPINION & ORDER |
| v. | |
| Advanced Care Staffing, LLC, | |
| Defendant. | |

NINA R. MORRISON, United States District Judge:

This proceeding concerns a healthcare worker's legal challenge to an arbitration

provision in an employment contract he entered into with Advanced Care Staffing ("ACS"), a

third-party staffing agency that recruits workers from other countries and places them in

hospitals and care facilities in the United States.  Plaintiff Benzor Shem Vidal ("Vidal") came to

the United States in 2022 on an immigrant visa sponsored by ACS.  The parties' employment

contract included an agreement to arbitrate their contractual disputes.  After Vidal resigned from

his employment with ACS—citing what he contends were "grueling and unsafe working

conditions that threatened his nursing license," Compl. ¶1—ACS initiated arbitration

proceedings against Vidal for his alleged breach of contract.  In September 2022, Vidal filed a

suit in this Court seeking a declaration that the arbitration agreement was unlawful, and an order

enjoining the arbitration from proceeding.

Vidal now seeks a preliminary injunction to pause the ongoing arbitration on the ground

that the arbitrator does not have the authority under the contract to consider threshold issues of

"arbitrability"—such as whether the arbitration agreement is unenforceable under state or federal

law.  Vidal argues that the contract does not contain language unambiguously delegating these

issues to the arbitrator.  He further argues that even if the contract did contain a sufficiently clear delegation clause, the clause is invalid under various state and federal laws.  This is because, Vidal argues, even exercising his right to contest the enforceability of the arbitration agreement could cost him thousands of dollars in ACS's attorneys' fees and arbitration costs under the contract's "loser pays" provision—an amount Vidal has no ability to pay.  For the reasons stated herein, Plaintiff's motion for a preliminary injunction is GRANTED.

## I.    Background

### A.  The parties

Plaintiff Benzor Shem Vidal, originally from the Philippines, came to the United States in 2022 to work as a nurse.[1]  He grew up with limited financial means and sought to come to the United States to make enough money to support his family: his brother, who has a serious disability, and his father, who provides his brother with full-time care.  Vidal Decl. ¶¶ 1–3, ECF No. 23-3.  Vidal went to nursing school in the Philippines and in 2019 began the process to move to the United States to work as a nurse.  *Id.* ¶¶ 7–8, 11–12.

Advanced Care Staffing ("ACS") is a healthcare staffing company in the business of recruiting nurses from other countries and staffing them at various healthcare facilities, including nursing homes, in the United States.  Compl. ¶ 20.  The arrangement between ACS and nurses it sponsors is as follows: ACS covers the nurses' relocation expenses, professional licensing costs, and, importantly, sponsors them for employment-based immigrant visas that allow the nurses to obtain lawful permanent resident status (or a "green card") in the United States—and bears the

---

[1] The parties each submitted factual records accompanying their briefs on the motion for a preliminary injunction.  A preliminary injunction hearing was held on February 21, 2023, at which neither party offered testimony, but both presented argument.  The following facts are taken from their evidentiary submissions and, unless otherwise noted, are undisputed at this stage in the litigation.

costs associated with his immigration applications. *See* Luy Decl. Ex. A ("2019 Contract") at 3–4, 9, ECF No. 30-1.[2]  In exchange, ACS requires nurses to agree to work exclusively with ACS for three years.  2019 Contract at 3.

### B. The 2019 Contract

Hoping to access higher wages and better working conditions in the United States, Vidal contacted ACS in 2019 and signed a contract ("the 2019 Contract") on May 7, 2019.  Vidal Decl. ¶¶ 11–12.  Vidal did not have an opportunity to negotiate this form contract.  *Id.* ¶¶ 12–13.  The 2019 Contract provided for certain penalties if Vidal were to leave his employment before his three-year term expired.  The contract included a liquidated damages clause stating that "the sum of $20,000.00 USD represents a reasonable and legitimate attempt by the Employer to calculate the costs incurred on the Employee's behalf and the amount of damages to which the Employer would be entitled to receive in a legal action brought against the Employee for breach of contract." 2019 Contract at 4.  Attached to the contract was a promissory note in the amount of $20,000 evincing Vidal's promise to fulfill his employment term of three years or else be liable for the amount of the note.  2019 Contract at 6.  The liquidated damages clause further stated: If you breach your contract you will be subject to litigation," explaining that

> The Employer may enforce the liquidated damages provisions contained above of this Employment Agreement through any or all of the following: Enforcing the terms and conditions of the attached promissory note; To the extent of allowable [sic] under New York State, Federal Immigration and Labor Department laws and regulations, the Employer at its discretion may deduct any amounts from the Employee's last Pay check(s).

2019 Contract at 4.  This same paragraph also provided that ACS could "enforce the liquidated damages provisions contained above of this Employment Agreement by legal action of any type." *Id.*  The 2019 Contract also contained an arbitration provision.  *See id.*

---

[2] Page numbers for the 2019 Contract, ECF No. 30-1, refer to the ECF Page numbering.

Once Vidal signed the 2019 Contract, ACS began the process of securing him his immigrant visa and fulfilling the other administrative requirements for placement. Def.'s Mem. in Opp'n to Prelim. Inj. ("Def.'s Opp'n") at 4, ECF No. 29. This process took several years. Vidal Decl. ¶¶ 14–16. During this time, Vidal was bound by the exclusivity provision of the 2019 Contract. As a result, he was unable to seek or accept any other employment in the United States. Pl.'s Mem. in Supp. of Mot. Prelim. Inj. ("Pl.'s Mem.") at 3–4, ECF No. 23-1; 2019 Contract at 2. Still seeking better pay and working conditions, Vidal left the Philippines for the United Kingdom, working at a hospital in London while he waited for his visa to be approved. Vidal Decl. ¶¶ 17–18. While working in London, Vidal could barely afford basic living expenses, and any additional money he made he sent home to support his family. *Id.* ¶¶ 18–19. In late 2021, Vidal learned that his visa paperwork had finally been approved, *see id.* ¶ 20, meaning that all that remained in his application process before he would be cleared to work for ACS in the United States was his interview with the U.S. Embassy. *See* Compl. ¶ 32; Luy Decl. Ex. B1, ECF 30-2. Once he received this news, Vidal quit his job in London, anticipating he would be moving to the United States imminently. Vidal Decl. ¶ 20; *see* Compl. ¶ 35.

### C. The 2022 Contract

On January 4, 2022—two years and eight months after he signed his exclusive contract with ACS—Vidal received a communication from ACS with several significant pieces of information. ACS informed Vidal that he had been scheduled for an interview with the U.S. Embassy in connection with his visa application and sent Vidal an email with materials to assist him in preparing that interview. Luy Decl. Ex. B1. Attached to this email were a cover letter; a letter from ACS releasing the promissory note Vidal had signed in 2019; and an amended employment contract for him to review and sign ("the 2022 Contract"). *Id.*

4

The cover letter stated that this new contract "was developed after consulting industry best practices and feedback from our team members." Luy Decl. Ex. B2, ECF No. 30-3. The letter explained that the differences between the 2019 Contract and the 2022 Contract included "greater clarity," and highlighted, among the changes, the following:

> **No "Liquidated Damages" or Promissory Note.** The older version specified a sum of money to be paid in the event of a breach and included a promissory note. We received feedback that this was viewed as a "buy out", which was never our intention. . . . This new version eliminates a specified sum of damages and allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version). Attached to this letter is a separate letter waiving/cancelling any promissory note that you might have signed.

*Id.* The cover letter further stated: "If you have any questions before signing, please contact me as soon as possible," via provided contact information, or "[i]f you have no questions, please returned a signed copy of the new Employment Agreement . . . via email." *Id.*

Also attached to the email was a short letter stating in its entirety: "[ACS] hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to [ACS], dated May 8, 2019." Luy Decl. Ex. B3, ECF No. 30-4. This letter provided Vidal with no explanation as to whether that cancelation had any impact on either party's rights or obligations under the 2019 Contract that he had signed in conjunction with the note. *See id.*

Like the 2019 Contract, the 2022 Contract provided that ACS would pay Vidal in accordance with prevailing wage requirements and would cover Vidal's relocation expenses, specifying one-way airfare, a rent subsidy for two months, $400 in gift cards for groceries, and one monthly MTA card, as well as licensing and immigration expenses. Seligman Decl. Ex. 4 ("2022 Contract") at 4, ECF No. 23-6.[3]

---

[3] Page numbers for the 2022 Contract, ECF No. 23-6, refer to the ECF page numbering.

However, the 2022 Contract deviated in several significant ways from the 2019 Contract. First, the 2022 Contract eliminated the liquidated damages clause and substituted a provision outlining the damages ACS would suffer if Vidal left his employment before the end of the term. The provision first noted that ACS would be harmed to the extent that it fronted "expenses and costs" related to immigration and relocation expenses.  2022 Contract at 7.  The clause further stated: "In addition, Employee recognizes that Employer will suffer significant loss of profits . . . in the event Employee fails to fulfill Employee's obligations under this Agreement," and provided that, in the event Vidal resigned before the contract term expired, "Employer shall be entitled to all damages and other relief to redress the harm caused by the failure of Employee to fulfill Employee's obligations under this Agreement."  2022 Contract at 7.  The contract also contained a statement that it superseded the previous agreement, as well as a severability clause. 2022 Contract at 8.

The 2022 Contract contained an expanded arbitration agreement, set forth in a separate Schedule B, which provided:

> I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision").  This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds.
>
> ***
>
> I agree that arbitration will be administered by the American Arbitration Association ("AAA") and that the AAA's Commercial Arbitration Rules in effect at the time of the dispute will govern, except as modified by this Provision.  I understand that the AAA's Commercial Arbitration Rules are available online at www.adr.org.

\*\*\*

I agree that at the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator.

\*\*\*

I agree that in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or "blue pencil" such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible.

2022 Contract at 12–13.  In this proceeding, Vidal refers to the clause providing that the prevailing party in the arbitration is entitled to recover all fees and costs from the non-prevailing party as the "loser pays" provision.  Pl.'s Mem. at 4.

Vidal considered himself bound by the terms of the 2019 Contract when he was presented with the 2022 Contract; he believed that if he did not sign the 2022 Contract, he would be in breach of the 2019 Contract he had already signed.  Vidal Decl. ¶ 25.  Vidal was never informed whether he could have opted to refuse to sign the 2022 Contract and choose, instead, to continue to work for ACS under the terms of the 2019 Contract.

At oral argument before me on February 21, 2023, I asked counsel for ACS whether, at the time he was presented with the 2022 Contract, Vidal could have declined to sign the 2022 Contract without forfeiting his long-awaited opportunity to pursue employment through ACS in the United States.  That is, could Vidal have held ACS to its contractual agreement to sponsor his visa application and secure him employment in the United States under the terms of the 2019 Contract, and would ACS have been bound by that contract's original terms had he chosen to do so?  Counsel for ACS answered both questions in the affirmative.  Thus, in January 2022, Vidal could have chosen to avail himself of all of the benefits of the 2019 Contract, but with one significant change.  In the event of an alleged breach on Vidal's part, ACS would no longer be

able to seek to collect on the $20,000 promissory note against him, since ACS had unilaterally cancelled the note in January 2022. On the present record, however, it is undisputed that no one from ACS informed Vidal of this option at the time he was presented with the 2022 Contract for his signature.

Vidal did speak with an ACS staff member when he received the proposed new contract, who told him that he "should sign the revised contract and send it back to [ACS] quickly." Supp. Vidal Decl. ¶ 7, ECF No. 35-1. Accordingly, Vidal signed the 2022 Contract the same day he received it—January 4, 2022. 2022 Contract at 9.

### D. Vidal's work in the United States

Vidal came to the United States and began working at ACS's client facility, Downtown Brooklyn Nursing & Rehabilitation Center, on March 8, 2022. Vidal Del. ¶ 26; Compl. ¶ 44. Almost immediately, Vidal contends, he began to work under conditions that he believed were unsafe. Vidal Decl. ¶ 27. Although ACS had previously told him he would be responsible for twenty to thirty patients, Vidal bore a caseload of forty to fifty patients at a time. *Id.* ¶ 26. Vidal experienced patients buzzing his call button repeatedly because they needed urgent help, but he was unable to reach them in time. *Id.* ¶ 28. He regularly heard patients screaming out in pain. *Id.* Vidal was provided with insufficient breaks and suffered repeated illnesses during this time. *Id.* ¶¶ 29–30. Given the number of patients for whom Vidal was responsible—and the conditions under which he was working—Vidal grew increasingly "terrified" that he could not provide his patients with adequate care and was "putting [his] personal health, the health of [his] patients, and [his] professional license at risk." *Id.* ¶¶ 33–34.

Ultimately, three months after he began working for ACS, Vidal wrote to ACS to resign on June 15, 2022.  Vidal Decl. ¶ 35; Luy Decl. Ex. G at 2, ECF No. 30-13.[4]

Subsequently, ACS wrote to Vidal on June 22, 2022, in response to his resignation. Asaad Decl. Ex. 1, ECF No. 31-1.  In this letter, ACS wrote:

> Although [ACS]'s damages would ultimately be determined by an arbitrator pursuant to the Agreement, [ACS] will present evidence demonstrating that *its damages are at least $20,000 (not counting attorney's fees and costs that would be incurred in the arbitration).* As mentioned already, [ACS] would seek the thousands of dollars of lost investment made in helping you get to this point. Also, although [ACS] is seeking to reduce its losses by seeking a replacement, given the current market conditions, recruiting and hiring a replacement nurse(s) *is expected to cost over $9,000 dollars per year* over the remainder of your three-year term.

*Id.* at 1–2 (emphasis added).  Although he feared the financial consequences of leaving his position with ACS, Vidal ultimately followed through with his resignation out of concerns that he would lose his license—his sole tool to obtain sufficient income to support himself and his family—if he remained.  Vidal Decl. ¶¶ 54, 56.

### E. Arbitration proceedings and the instant litigation

On July 8, 2022, ACS initiated arbitration proceedings against Vidal with the American Arbitration Association ("AAA").  ACS alleged that Vidal had breached his contract and demanded "all available damages" including ACS's "costs and lost profits," "reasonable attorney's fees," and the "cost of arbitration."  Seligman Decl. Ex. 6 at 6, ECF No. 23-8.

Proceeding without counsel in the arbitration proceedings, Vidal requested extensions to respond to the demand throughout the summer.  *See* Asaad Decl. Ex. 5, ECF No. 31-5; Ex. 6,

---

[4] Vidal maintains that prior to his resignation, he raised his concerns about his working conditions with ACS directly.  ACS denies that he did so, *see* Def.'s Opp'n at 8, but has offered no declaration or other direct evidence to refute Vidal's affidavit on this point; ACS instead relies on the absence of any reference to earlier communications with ACS in Vidal's resignation email. Def.'s Opp'n at 8 (citing Luy Decl. Ex. G).  In light of this factual dispute, I do not rely on this allegation by Vidal in considering the grounds for the requested injunction, which is in any event immaterial to the claims presented in this motion for a preliminary injunction.

ECF No. 31-6.[5]  AAA informed Vidal an arbitrator was selected on September 7, 2022.

Seligman Decl. Ex. 11, ECF No. 23-13.  This arbitrator's rate was $450 per hour, *id.*, and AAA

charged a filing fee of $1,900 and a case management fee of $750.  Compl. ¶ 76.

      Vidal filed the instant action in the Eastern District of New York on September 16, 2022.

He asserted that the arbitration was invalid under the Trafficking Victims Protection Act

("TVPA"), 18 U.S.C. § 1589; New York's prohibition on labor trafficking, N.Y. Pen. Law §

135.35; and federal and state minimum wage laws.  He further alleged that the contractual

provisions mandating arbitration were unconscionable under New York law.  Vidal sought

declaratory and injunctive relief enjoining the arbitration.

      After filing the complaint in this Court, Vidal continued to request that the arbitration be

paused while a court considered his challenge to its terms.  Seligman Decl. Ex. 12, ECF No. 23-

14; Ex. 13, ECF No. 23-15.  ACS opposed these requests.  *See* Seligman Decl. Ex. 14, ECF No.

23-16.

      Vidal also submitted arguments to the arbitrator that the purported delegation clause was

invalid.  Seligman Decl. Ex. 15, ECF No. 23-17; Ex. 16, ECF No. 23-18.  On October 24, 2022,

the arbitrator issued an order stating, "Pursuant to the Parties' Dispute Resolution Provision and

AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction,

including with respect to the validity of the arbitration agreement or the arbitrability of any

claim." Asaad Decl. Ex 11, ECF No. 31-11.  The Arbitrator also noted that many of Vidal's

arguments "are premature and do not support the issuance of a stay," and that he would "have the

---

[5] Attorneys from Towards Justice, Kakalec Law PLLC, and Nichols Kaster PLLP represent Vidal in the instant lawsuit in this Court challenging the enforceability of the arbitration provisions in his 2022 contract; they represent Vidal before the arbitrator for the limited purpose of seeking a stay of the arbitration.  *See* Seligman Decl. Ex. 13, ECF No. 23-15.

opportunity during the course of arbitration to argue that the contract at issue is unenforceable." *Id.* Vidal continued to seek stays from the arbitrator, but instead she set a schedule for discovery on the merits, originally set to be completed in mid-March. Seligman Decl. Ex. 19, ECF No. 23-21. The arbitrator later agreed on January 23, 2023, to extend discovery deadlines by 30 days, but stated that she would only stay the matter "upon party agreement or by court order." Pl.'s Letter dated Jan. 23, 2023, ECF No. 24. ACS would not consent to a stay. *See id.*; Def.'s Mot. for Extension, ECF No. 25.

This case was originally assigned to the Hon. Carol Bagley Amon. ACS filed a letter seeking a pre-motion conference on anticipated motions to dismiss Vidal's complaint and compel arbitration on October 20, 2022. Def.'s Mot. for Pre-Mot. Conf., ECF No. 11. Vidal opposed this request on October 27, 2022. Pl.'s Resp. to Def.'s Mot. for Pre-Mot. Conf., ECF No. 13. This case was transferred to me as a routine matter of court administration while ACS's request was pending.

On January 23, 2023, Plaintiff filed a motion for a preliminary injunction seeking to enjoin the ongoing arbitration. Following expedited briefing and oral argument, I entered a short written order granting the preliminary injunction on February 24, 2023. Mem. & Order, ECF No. 39. This written opinion follows to more fully explain the reasons why Vidal is entitled to preliminary injunctive relief.

## II. Discussion

"[A] party seeking a preliminary injunction [must] show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special*

*Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted).[6] Where a district court applies the "serious questions" standard to grant an injunction, the requirement that the balance of hardships tip decidedly in favor of the moving party is an "additional[]" requirement that ensures that the movant's "overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Glob. Mkts.*, 598 F.3d at 35. Additionally, courts also consider whether "the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

District courts have jurisdiction to enjoin or stay pending arbitrations. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 139–41 (2d Cir 2011); *CRT Cap. Grp. v. SLS Cap., S.A.*, 63 F. Supp. 3d 367, 375 (S.D.N.Y. 2014) ("The [Second Circuit] Court of Appeals has made it clear that federal courts do have the power to enjoin domestic arbitrations . . . ."); *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) ("Federal courts generally have remedial power to stay arbitration." (citation omitted)).

### A. Likelihood of success on the merits

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

---

[6] Contrary to ACS's assertions, Def.'s Opp'n at 26–27, the serious question standard is not limited to cases with the potential for particularly widespread impact or particularly complex litigation, but is applied regularly to cases that vary in terms of scope and complexity. This standard exists in recognition that "preliminary injunctions should not be mechanically confined to cases that are simple or easy." *Citigroup Glob. Mkts.*, 598 F.3d at 35. Here, further discovery may reveal additional facts and circumstances surrounding Vidal's signing of the 2022 Contract or his financial circumstances relevant to the unconscionability and TVPA analyses. Further litigation may be warranted on a more complete record for other issues of first impression in this case, such as the validity of delegation language that is contradicted by other language in the arbitration agreement or the invalidity of a delegation clause paired with a loser pays provision under the TVPA. Although it is not necessary to rely on the serious questions standard in light of my determination that Plaintiff is likely to succeed on the merits of the claims detailed in this opinion, the serious questions standard is also appropriate here.

revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). However, this policy seeks to make "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12 (1967). "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218–221 (1985)).

Generally speaking, when addressing whether a dispute is properly subject to arbitration, courts first consider "whether the parties have entered into a valid agreement to arbitrate," and then "whether the dispute at issue is subject to the arbitration agreement" *In re Am. Exp. Fin. Advisors Sec. Litig.,* 672 F.3d at 128. This second inquiry is often referred to as "arbitrability" and encompasses "threshold questions such as whether the arbitration clause applies to a particular dispute, or whether it is enforceable." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019).

However, "before addressing the second inquiry, [a court] must also determine *who*, the court or the arbitrator, [should] decide[]" such threshold questions of arbitrability. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128 (emphasis added); *Alemayehu*, 934 F.3d at 250. "In general, what is determinative for deciding whether the arbitrability of a dispute is to be resolved by the court or by the arbitrator is the arbitration agreement. Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a

particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189–90 (2d Cir. 2019).

Issues of arbitrability are at the core of the parties' dispute here. Vidal claims this dispute is not properly subject to arbitration because the arbitration agreement is unenforceable: he argues it is unconscionable under New York state contract law, and it violates federal statutes that protect the rights of workers like him to be free from forced labor. [7] He argues that a court, rather than the arbitrator, should resolve these legal challenges because the parties did not properly and validly delegate issues of arbitrability to the arbitrator. For its part, ACS contends that the arbitration agreement is enforceable and, in any event, contains a valid delegation clause that properly delegates any legal challenges regarding enforceability to the arbitrator.

Therefore, the threshold question here is whether the purported delegation clause in the 2022 Contract allows this Court to consider Vidal's challenge to the contract's enforceability at all, or whether all disputes about the enforceability of the agreement's terms must go to the arbitrator in the first instance. This question directly informs the relief Vidal seeks at the preliminary injunction stage. If the delegation clause is valid, then the preliminary injunction should be denied and the arbitration should proceed, because Vidal's arguments on enforceability must go to the arbitrator. But if the delegation clause either (a) does not clearly and unmistakably reserve those questions for the arbitrator, or (b) is otherwise invalid, then a district

---

[7] Vidal also argues (1) that the delegation clause and arbitration agreement violate federal and state labor laws and (2) that the entire 2022 Contract is invalid because he signed the agreement under economic duress. *See* Compl. (Counts III–VI ); Pl.'s Mem. at 21–22. However, the Court need not address these other claims and reserves decision on these claims for the merits stage. *See Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022) ("To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all their claims for relief. Rather, Plaintiffs must show a likelihood of success on the merits of at least one of their claims." (citation omitted)).

court may (if plaintiff meets his burden under the preliminary injunction standard) proceed to grant Vidal's request for a preliminary injunction.  The injunction Vidal requests would have the effect of pausing the arbitration while a court decides these issues of arbitrability—specifically whether the arbitration agreement violates state or federal law.

Vidal argues that the purported delegation language is not a sufficiently "clear and unmistakable" delegation clause to permit these questions to be resolved by the arbitrator under Supreme Court and Second Circuit precedent.  He further argues that, even if it were, the delegation clause is nonetheless invalid because (a) it violates the TVPA and (b) is unconscionable under New York state law.  For the following reasons, I find that Vidal is likely to succeed on the merits—or, at the very least, raises serious questions as to the merits—of each of these claims.

### 1.  The contract's delegation language

The parties dispute whether the arbitration agreement properly delegates questions of arbitrability to the arbitrator.  It is well-settled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021).  Importantly, this test reflects a marked departure from the "presumption of arbitrability" that applies to courts' analysis of "whether a given dispute falls within the scope of the arbitration agreement." *DDK*, 6 F.4th at 317.  Instead, when parties raise the question of "who should decide arbitrability, there is a presumption that the question should be resolved by the court." *Id.*; *see First Options of Chi.*, 514 U.S. at 944–45.

Accordingly, while courts generally resolve ambiguities in arbitration agreements in favor of arbitration, they resolve ambiguities as to the *delegation of arbitrability* in favor of court adjudication. *See First Options of Chi.*, 514 U.S. at 944–45 ("[C]ourts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability point' as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide."); *DDK*, 6 F.4th at 317 ("This 'clear and unmistakable evidence' requirement reflects a departure from the manner in which we treat silence or ambiguity when interpreting whether a particular merits-related dispute falls within the scope of an arbitration agreement."); *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (finding that the presence of certain clauses "creates an ambiguity which, under *First Options*, requires us to assign questions of arbitrability to the district court, not the arbitrator").

The "clear and unmistakable" requirement exists in recognition that, generally, "persons involved in a dispute are ordinarily entitled to have access to a court for the resolution of [their] dispute, [and i]t is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender [this] right." *Bucsek*, 919 F.3d at 190. Accordingly, the clear and unmistakable requirement

> is designed to guard against 'the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.' Were the courts to cede to arbitrators resolution of the arbitrability of the dispute (absent the clear and unmistakable agreement of the parties to that effect), this would incur an unacceptable risk that parties might be compelled to surrender their right to court adjudication, without their having consented.

*Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

I find that the arbitration agreement here contains significant ambiguity such that its purported delegation language cannot be considered clear and unmistakable. In arguing otherwise, ACS points to (1) language in the arbitration agreement that "any dispute, controversy

16

or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination *or validity* hereof) shall be resolved by arbitration," and (2) the agreement's incorporation of the AAA Commercial Rules.  2022 Contract at 12.

But these two provisions must be read in context.  And taken as a whole, the agreement contains significant ambiguity regarding whether the parties intended that result.  On the very next page, the agreement provides that "in the event that *any court of competent jurisdiction* shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion *so as to render it enforceable* while maintaining the parties' original intent to the maximum extent possible."  2022 Contract at 13 (emphasis added).  Rather than "clearly and unmistakably" delegating the question of arbitrability to the arbitrator, *DDK*, 6 F.4th at 317, Schedule B not only repeatedly contemplates that "a court" might someday rule upon, *inter alia,* "any portion" of the contract's "scope" and "enforce[ability]," but does so without referencing any role for the arbitrator in this determination.

At oral argument, counsel for ACS contended that this provision was a "savings clause" that would allow courts to modify the agreement in the event that Congress declared that a particular type of case or legal claim could not be arbitrated.  ACS pointed, by way of example, to a law passed by Congress in 2021 that precludes defendants from compelling plaintiffs to arbitrate sexual harassment or sexual assault claims even if their contracts so provide.  *See* Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117–90, 136 Stat. 26 (codified at 9 U.S.C. §§ 401, 402) (establishing that, where a plaintiff "alleg[es] conduct constituting a sexual harassment dispute or sexual assault dispute" he or she

17

may elect to render a "predispute arbitration agreement" invalid or unenforceable). Perhaps that is what ACS intended the clause to mean—but that is not what the clause says. Instead, the clause expressly contemplates that "a court of competent jurisdiction" may review this particular contract between ACS and Vidal and determine whether its provisions are "enforceable," without any limitation or caveats as to what that enforceability review may encompass. 2022 Contract at 13.

ACS has failed to point to any other case where a court has found an arbitration agreement to contain a clear and unmistakable delegation clause notwithstanding specific contractual language—as is present here—contemplating judicial resolution of enforceability issues. At least one federal district court has held that a provision anticipating a court *or an arbitrator* may declare any provision to be void or unenforceable does not render an otherwise clear and unmistakable clause ambiguous. *See Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 607 (S.D.N.Y. 2020). However, a clause that contemplates either a court or an arbitrator's intervention is distinct from the provision here, which refers *only* to "a court of competent jurisdiction." 2022 Contract at 13. A provision referring to "a court or an arbitrator" is not inconsistent with the purported delegation clause because it still contemplates an arbitrator's ability to rule on enforceability. But a provision referring only to "a court" injects significant ambiguity into the question of whether the contract actually authorizes an arbitrator *alone* to address arbitrability. From the perspective of someone signing the contract, the latter provision might certainly indicate that a court—and, perhaps, *only* a court—could determine whether the agreement was enforceable. And here, the provision twice contemplates judicial intervention: not only does it expressly state that a court may rule on the question of enforceability, but also

that a court may actively preside over modification (*i.e.*, "blue-penciling") of this specific contract to ensure that its provisions are legal and enforceable. 2022 Contract at 13.

Indeed, courts have recognized that provisions similar to the "savings clause" at issue here are enough to negate even an otherwise clear and unambiguous delegation clause. *See, e.g.*, *Vargas v. Delivery Outsourcing, LLC*, No. 15-CV-03408-JST, 2016 WL 946112, at *6 (N.D. Cal. Mar. 14, 2016) (declining to enforce "an unambiguous delegation clause contradicted by another provision of the contract" that "indicates that the *court* might also find provisions in the contract unenforceable," as "not clear and unmistakable" (citations omitted)); *Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*, No. 15-CV-04718-WHO, 2016 WL 1365946, at *7 (N.D. Cal. Apr. 6, 2016) (noting that "[v]iewed holistically" the arbitration agreement was ambiguous even if one provision "[v]iewed in a vacuum" might constitute clear and unmistakable delegation where another provision allowed the "Agreement [to] be declared invalid or unenforceable by a court of competent jurisdiction"); *cf. Peni v. Daily Harvest, Inc.*, No. 22CV5443 (DLC), 2022 WL 16849451, at *7 (S.D.N.Y. Nov. 10, 2022) ("Nowhere does this provision empower a *court* to rule on the validity or enforceability of the agreement.").

ACS further argues that the test articulated by the Second Circuit in *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308 (2d Cir. 2021), applies here, and that under that framework the arbitration agreement clearly and unmistakably delegates questions of arbitrability to the arbitrator. In *DDK*, the Second Circuit held that an "arbitration agreement [that] is broad and expresses the intent to arbitrate all aspects of all disputes . . . coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability[,] constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the

arbitrator." 6 F.4th at 318–19. The *DDK* Court concluded that the incorporation of the AAA Commercial Rules satisfies this second requirement. *Id.*

As an initial matter, the dispute in *DDK* was over a contract between two sophisticated commercial parties that were involved in a long-running business venture that ultimately dissolved. *See DDK*, 6 F.4th at 312–14. While one district court in this Circuit has applied this case to an unsophisticated individual party, "the Second Circuit has not addressed whether the import of rule incorporation differs based on the parties' sophistication." *Daily Harvest*, 2022 WL 16849451, at *7 (applying *DDK* to a form contract in a consumer rights case). Sophisticated commercial actors may be aware, following *DDK*, that the incorporation of the AAA Commercial Rules signals the existence of a delegation clause. But it is highly unlikely that a foreign nurse unfamiliar with United States law, let alone caselaw surrounding the interpretation of arbitration agreements, would see a reference to the AAA Commercial Rules in the contract and reach that same conclusion, *i.e.,* understand that such incorporation would in any way reflect an actual "intent to delegate the question of arbitrability to the arbitrator." *DDK,* 6 F.4th at 318. Indeed, even if Vidal had followed the link in the 2022 Contract and reviewed the AAA Commercial rules, he still may not be aware of or understand that those rules might impact who would someday decide any challenges to arbitrability.[8]

---

[8] It bears noting that the AAA rules are not particularly clear themselves, especially for a party encountering them for the first time. The AAA Commercial rules span roughly forty pages and contain more than 60 rules setting forth filing requirements, the structure of duties under the AAA, procedures for communicating with arbitrators, disqualifying arbitrators, and oaths required at hearings, to name just a few. Tucked within these broad-spanning rules is Rule 7, entitled "Jurisdiction," which states that an "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." Seligman Decl. Ex. 24 at 15, ECF No. 23-26. It is highly improbable that an unsophisticated party would even register this provision in a set of rules

Even assuming *DDK* required a court to consider the delegation language here to constitute a clear and unmistakable delegation clause, regardless of the parties' status, important factual distinctions remain. *DDK* says nothing about whether an arbitration agreement with a broad arbitration provision and that incorporates the AAA Commercial Rules would still clearly and unmistakably delegate arbitrability to the arbitrator *even if* it also had language explicitly providing for judicial intervention on issues of enforceability. Certainly, *DDK* does not disturb the longstanding rule that, if contracts are to delegate issues of arbitrability to an arbitrator, they must do so "clearly and unmistakably"—in fact, *DDK* restates and relies on that very principle. *DDK*, 6 F.4th at 317 (quoting *First Options of Chi.*, 514 U.S. at 944 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986))).

Accordingly, I find that Vidal is likely to succeed on the merits of his claim that the contract does not clearly and unmistakably delegate issues of arbitrability to the arbitrator, or, at the very least, has raised serious questions as to the merits of that claim.

### 2. The validity of the delegation clause

Even if the contract here does, as ACS alleges, contain an unambiguous delegation clause, a federal court may still consider whether the clause itself violates state or federal laws protecting the rights of persons like Vidal. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

---

intended for an entirely separate purpose, let alone comprehend its implications. *See Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 429 (E.D. Pa. 2016) ("Incorporating forty pages of arbitration rules into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.'" (internal quotation marks and citation omitted)).

In *Rent-A-Center*, the Supreme Court addressed an employee's challenge to an arbitration agreement that contained a delegation clause. 561 U.S. at 66. There, the employee opposed a motion to compel arbitration, arguing that the arbitration agreement was unconscionable and that the delegation clause was therefore invalid. *Id.* at 73. The Supreme Court emphasized that, in the presence of an otherwise clear and unmistakable delegation clause, a challenge to the contract as a whole must go to the arbitrator—but made clear that *specific* challenges to the *validity* of that delegation clause could be heard by a court. *Id.* at 72 ("Unless Jackson challenged the delegation provision specifically, we must treat it as valid . . . Jackson challenged only the validity of a contract as a whole."); *see also Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 603 (S.D.N.Y. 2020). Since the employee in *Rent-A-Center* had only challenged the arbitration agreement as a whole, the Supreme Court declined to address the validity of the delegation clause.

Parties can challenge a delegation clause as invalid because a delegation clause is an agreement to arbitrate a gateway issue. *Rent-A-Center*, 561 U.S. at 70. It is therefore "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce," and as such must be independently evaluated under 9 U.S.C. § 2. *Rent-A-Center*, 561 U.S. at 70. Accordingly, the delegation clause "is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* (quoting 9 U.S.C. § 2).

Since *Rent-A-Center*, courts of appeals have addressed claims where parties to an arbitration agreement have brought challenges to an otherwise "clear and unmistakable" delegation clause, provided those challenges include a specific attack on the validity of the delegation clause. *See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (affirming that a "specific attack on the delegation provision is sufficient to make the issue of arbitrability

22

one for a federal court"); *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021) ("But '[b]ecause a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator,' the court's initial inquiry focuses on whether the agreement to delegate arbitrability—the delegation clause—*is itself* unconscionable." (emphasis added) (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015))).

Here, Vidal repeatedly mounts specific challenges to the validity of the delegation clause under state and federal law, citing the potentially ruinous financial toll of appearing before an arbitrator even to determine questions of arbitrability.  Pl.'s Mem. at 17 ("*[D]elegating questions of arbitrability* to the arbitrator would require Mr. Vidal to submit to an arbitration regarding matters that, by virtue of the 'loser pays' provision, could bury him in extraordinary costs and legal fees."); *id.* at 19 ("These costs—even just those costs flowing from an arbitration over *matters of arbitrability*—amount to a threat of 'serious harm' [under the TVPA].); *id.* at 24 ("Most importantly [for a substantive unconscionability analysis] the requirement includes a loser pays term that provides that the prevailing party 'shall be entitled' to its attorney's fees and the costs of the arbitration, including the arbitrator's fees, even over an arbitration regarding *preliminary matters of arbitrability*."); Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 7, ECF No. 34 ("If Mr. Vidal were required to adjudicate the arbitration provision's *validity and enforceability* in arbitration, he would potentially face tens of thousands of dollars in arbitration costs and Defendant's attorneys' fees."); *id.* at 9–10 ("[S]erious harm exists because of the threat that an arbitration, *even regarding the threshold question of arbitrability*, could force him to bear tens of thousands of dollars in Defendant's attorney's fees and in arbitration costs.").[9]

---

[9] Accordingly, this is unlike cases where courts have held, following *Rent-A-Center*, that a party's general challenge to the validity of a contract does not qualify as a challenge to the

The fact that Vidal emphasizes the impact of other clauses on the delegation clause in his specific challenge to the validity of the delegation clause does not change the analysis. As the Ninth Circuit explained in *Lim*, such arguments are permissible because the existence of other clauses can be what makes the delegation clause unlawful. *See Lim*, 8 F.4th at 1002–03 (concluding that the delegation clause itself was unconscionable because "[v]iewed collectively . . . the cost-splitting, fee-shifting, and . . . venue provisions rendered the delegation clause substantively unconscionable," because the "delegation clause was so 'prohibitively costly' that it deprived Lim of any proceeding to vindicate his rights"). In other words, Vidal need not confine his challenge to the terms of the delegation clause *alone* for him to satisfy *Rent-A-Center*'s specific challenge requirement.

Accordingly, *Rent-A-Center* and its subsequent application permit me to proceed to evaluate Vidal's specific attacks on the validity of the delegation clause. In so doing, I conclude that he is likely to succeed on the merits of at least two of his claims that the delegation clause is legally invalid, or, at the very least, has raised sufficiently serious questions as to the merits of these claims to warrant a pause in the arbitration. Likelihood of success on either of these two independent arguments would satisfy Vidal's burden as to this prong of his motion for a preliminary injunction.

---

validity of an otherwise clear and unmistakable delegation clause. *See, e.g.*, *Ward*, 468 F. Supp. 3d at 604 ("Because the plaintiff's challenge in this Court is clearly directed at the Agreement as a whole, and not at the delegation provision specifically, the plaintiff's . . . challenge to the Agreement . . . must be submitted to the arbitrators under *Rent-A-Center* and the plain language of the delegation provision."); *Greene v. Kabbalah Ctr. Int'l Inc.*, No. 19-CV-4304-ILG-SJB, 2022 WL 4006903, at *1 (E.D.N.Y. Sept. 1, 2022) ("Plaintiffs only make a series of general attacks on the . . . Agreements as a whole. Though they purport to challenge the delegation provision, they do not do so in fact."); *see also Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 482–83 (2d Cir. 2011) (holding that a claim of procedural unconscionability "challenging the validity of the agreement as a whole" was for the arbitrator to decide).

a. **Trafficking Victims Protection Act ("TVPA")**

As an antecedent agreement to arbitrate, a delegation clause is enforceable "save upon

such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Rent-*

*A-Center*, 561 U.S. at 69.  Under New York law, courts will not enforce contracts that are

"illegal, against public policy, or deficient in some other respect." *64th Assocs., L.L.C. v.*

*Manhattan Eye, Ear & Throat Hosp.*, 813 N.E.2d 887, 889 (N.Y. 2004).

Vidal argues that the delegation clause, in conjunction with the "lost profits" and "loser

pays" provisions of the contract, violates the Trafficking Victims Protection Act ("TVPA").  In

the TVPA, Congress made it unlawful to "knowingly provide[] or obtain[] the labor or services

of a person . . . by means of serious harm or threats of serious harm to that person or another

person," or "by means of the abuse or threatened abuse of law or legal process."  18 U.S.C. §

1589(a).  "The term 'serious harm' means any harm, whether physical or nonphysical, including"

as relevant here, "financial . . . harm, that is sufficiently serious, under all the surrounding

circumstances, to compel a reasonable person of the same background and in the same

circumstances to perform *or continue performing labor or services* in order to avoid incurring

that harm."  *Id.* § 1589(c)(2) (emphasis supplied).[10]

Prior to the TVPA's enactment, a plaintiff who claimed to have been subjected to

"involuntary servitude" was required to show that he or she was being forced to work "by the use

or threat of physical restraint or physical injury, or by the use or threat of coercion through law or

the legal process."  *United States v. Kozminski*, 487 U.S. 931, 952 (1988); *see Paguirigan v.*

---

[10] Vidal also challenges ACS's actions as a "threatened abuse of legal process" under the
TVPA, *see* 18 U.S.C. § 1589(c)(1), and a violation of New York's prohibition on labor
trafficking.  *See* N.Y. Pen. Law § 135.5.  I decline to reach these argument at the preliminary
injunction stage.  *See Upsolve, Inc.*, 604 F. Supp. 3d at 109.

*Prompt Nursing Emp. Agency LLC* ("*Paguirigan I*"), 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017)
(collecting cases). Following the Supreme Court's decision in *Kozminski*, Congress passed the
TVPA, which "expanded the scope of cases that could be prosecuted to include those involving
non-violent coercion," *Paguirigan I*, 286 F. Supp. 3d at 437, including "physiological, financial,
or reputational" harm. 18 U.S.C. § 1589(a); *see also* H.R. Conf. Rep. No. 106–939, at 101 (Oct.
5, 2000) ("[P]rosecutors will not have to demonstrate physical harm or threats of force against
victims [under § 1589(a).]").[11]

The TVPA's purpose is thus to "combat severe forms of worker exploitation that do not
amount to actual involuntary servitude." *Paguirigan v. Prompt Nursing Emp. Agency LLC*
("*Paguirigan II*"), No. 17-CV-1302 (NG) (JO), 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 24,
2019) (internal quotation marks and citation omitted), *aff'd in part, appeal dismissed in
part*, 827 F. App'x 116 (2d Cir. 2020). As its plain terms indicate, one objective of the TVPA is
to ensure that workers will not be coerced into remaining in their jobs because they reasonably
fear a threat of serious harm—including "financial" harm—if they leave.

Accordingly, "the relevant question under § 1589(a)(2) is whether defendants' conduct
constituted a threat of harm serious enough to compel a reasonable person of the same
background and in the same circumstances to perform or to continue performing labor or
services in order to avoid incurring that harm." *Paguirigan II*, 2019 WL 4647648, at *16
(internal quotation marks and citation omitted); *see Aguirre v. Best Care Agency, Inc.*, 961 F.
Supp. 2d 427, 433 (E.D.N.Y. 2013) ("Serious harm includes threats of any consequences,
whether physical or non-physical, that are sufficient under all of the surrounding circumstances

---

[11] The TVPA also contains a provision granting a plaintiff a private right of action to
allege substantive violations of the TVPA. *See* 18 U.S.C. § 1595; *Paguirigan I*, 286 F. Supp. 3d
at 436 n.4.

to compel or coerce a reasonable person in the same situation to provide or continue providing labor or services." (internal quotation marks and citation omitted)).  This "standard is a hybrid one. The factfinder is permitted to consider the 'particular vulnerabilities of a person in the victim's position,' but is required to find that 'her acquiescence be objectively reasonable under the circumstances.'"  *Paguirigan II*, 2019 WL 4647648, at *16 (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015)); *see also Baldia v. RN Express Staffing Registry LLC*, 19 Civ. 11268 (PGG), 2022 WL 477836, at *6 (S.D.N.Y. Oct. 3, 2022).

Courts around the country, including many in this Circuit, have held that contracts such as this—in which immigrant workers are threatened with severe financial penalties if they leave their employment before the end of their contract term—can violate the TVPA. *See Paguirigan II*, 2019 WL 4647648, at *18 (holding that liquidated damages provision of $25,000 violated the TVPA), *Magtoles v. United Staffing Registry*, 21-CV-1850 (KAM) (PL), 2021 WL 6197063, at *4 (E.D.N.Y. Dec. 30, 2021) (denying motion to dismiss claim that liquidated damages provisions between $90,000 and $30,000 violated the TVPA),[12] *Javier v. Beck*, No. 13CV2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (same for a $15,000 confession of judgment), *Baldia*, 2022 WL 4777836, at *7 (same, for a $33,320 liquidated damages provision); *see also Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) (same, for a $20,000 liquidated damages provision ); *cf. United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (holding that an employer's threat that a foreign domestic

---

[12] On March 30, 2023, Judge Matsumoto granted summary judgment for the plaintiffs in *Magtoles* on, *inter alia*, their claim that the liquidated damages provision in their contracts violated the TVPA.  *See Magtoles v. United Staffing Registry*, 21-cv-1850 (KAM) (PK), 2023 WL 2710178, at *23–27 (E.D.N.Y. March 30, 2023).

worker would owe $8,000 if she left her employment constituted a threat of "serious harm" under the TVPA).

These decisions have not set a numerical floor for what financial penalty can give rise to serious harm; the focus is instead on the effect that these financial penalties may have on a worker deciding whether or not to leave his or her job. *See Baldia*, 2022 WL 4777836, at \*7 ("When assessing serious harm under the TVPA, it is not the amount of liquidated damages, *per se*, that controls the analysis.  Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances . . . ." (quoting *Magtoles*, 2021 WL 6197063, at \*4)).

ACS asserts the foregoing cases are distinguishable because they addressed liquidated damages clauses—which ACS no longer includes in their contracts, and which it specifically omitted from its superseding contract with Vidal in 2022.  It is true that, under the 2022 Contract, Vidal was subject to an uncapped damages provision, rather than a liquidated damages provision, stating that ACS may recover both expenses and lost profits.  2022 Contract at 7.  The 2022 Contract also contained (1) an attorneys' fee-shifting provision, and (2) a requirement that he pay arbitration costs and arbitrator's fees—all of which would come due if he were to leave his ACS employment and ACS were to prevail in arbitration.  2022 Contract at 6–7, 12.  However, the fact that these provisions were uncapped does not make the potential penalties any less coercive than the liquidated damages provisions at issue in the foregoing cases.  The relevant analysis is whether a reasonable person in Vidal's position would have found all of ACS's threatened financial penalties serious enough to compel him or her into remaining on the job, even in the face of unsafe or intolerable working conditions.  *Paguirigan II*, 2019 WL 4647648, at \*16; *Rivera*, 799 F.3d at 186.

28

Any reasonable person in Vidal's position and of similar financial circumstances would reasonably believe that these enormous potential damages, fees, and costs—even if not labeled with a specific dollar amount in the contract—would be seriously harmful.  The contract specified that, if Vidal stopped working for ACS before his employment term concluded, he could be liable for ACS's lost profits for the duration of the contract term; expenses ACS expended in his relocation, licensing, and visa acquisition; arbitration costs and fees; and attorneys' fees expended in arbitration.  *See* 2022 Contract at 7, 12.  It is not difficult to see why any nurse in Vidal's position would reasonably believe that this provision could easily lead to an enormous judgment against him.  Although ultimately an arbitrator would decide the precise amount of damages (as distinct from the ordering enforcement of a pre-set liquidated damages clause), the impact on Vidal at the moment he faced the decision of whether to leave his position with ACS was the same: he faced the threat of incurring a judgment well in excess of anything he could afford to pay.  And, in any event, one need not speculate about what Vidal anticipated the liability would be based on the contract alone.  ACS expressly told him in a demand letter that it would immediately initiate an arbitration where he would face "*at least* $20,000 in damages, in addition to attorney's fees."  Asaad Decl. Ex. 1 (emphasis in original).  Thus, from ACS's own letter, Vidal faced a clear threat of incurring (1) "at least" $20,000 in damages, *as well as* (2) what any person with even basic familiarity with the American legal system would have realized might quickly add up to thousands (if not tens of thousands) of dollars in ACS's attorneys' fees.

ACS makes much of the "additional factors" at play in *Paguirigan* beyond the $25,000 liquidated damages clause in the contract.  But the court's conclusion of whether the liquidated damages clause violated the TVPA turned on factors similar to those present here: the nurse there was "threatened with the prospect of paying a $25,000 contract termination fee" and was

"actually *sued* for recovery both of the $25,000 fee and $250,000 in tort damages." *Paguirigan I*, 286 F. Supp. 3d at 438 (emphasis in original). The court reasoned that "[a]llegations of such a severe financial burden" as a $25,000 liquidated damages clause combined with a threat to enforce it were "more than enough to rise to the level of harm necessary to state a TVPA claim." *Id.*; *see also Paguirigan II*, 2019 WL 4647648, at *18 ("This [$25,000 liquidated damages] provision constitutes a threat of sufficiently serious harm to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." (internal quotation marks and citation omitted)). In so concluding, the court there cited to other cases where threats of enforcement of a $15,000 confession of judgment or to collect a payment of $10,000, standing alone, constituted serious harm under the TVPA. *Id.* (citing *Javier*, 2014 WL 3058456, at *6, and *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011)). Here, as in *Paguirigan*, ACS made good on its threats to collect a significant amount of money from Vidal: it promptly initiated an arbitration against him for that very purpose. Furthermore, in *Paguirigan*, the court did not rely on the employer's attempts to have workers criminally prosecuted in its legal analysis of whether the liquidated damages clause constituted a threat of serious financial harm. *Paguirigan I*, 286 F. Supp. 3d at 437–39; *Paguirigan II*, 2019 WL 4647648, at *16–19.

Since *Paguirigan* was decided, courts in this circuit have repeatedly held that liquidated damages clauses can constitute a threat of serious harm on their own terms. In *Baldia*, a worker who was told she would be liable for a liquidated damages provision of over $33,000 sufficiently alleged a threat of serious harm under the TVPA. 2022 WL 4777836, at *9. And in *Magtoles*, the court emphasized that the specified liquidated damages amount can rise to a level of serious

harm considering the surrounding circumstances, including the employee's pay rate and the enforceability of the contractual term.  2021 WL 6197063, at *4.

Whether the amount is fixed or projected, employers' threats to collect tens of thousands of dollars in contractual damages from hourly workers certainly can violate the TVPA's prohibitions on forced labor.  Under either circumstance, the question is whether the employer's conduct would "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring" serious financial harm.  18 U.S.C. § 1589(c)(2); *Paguirigan II*, 2019 WL 4647648, at *16.  And in either circumstance, the effect on a worker of limited means who cannot afford the anticipated cost of leaving his job is the same.

Attacking the delegation clause specifically, Vidal argues that even an assessment of costs and fees he may incur contesting issues of arbitrability would have a sufficiently coercive effect on him to constitute a threat of serious harm.  The question thus is whether a reasonable person in Vidal's position considering whether to leave his employment would have considered himself compelled to continue performing that labor in order to avoid the cost of challenging the arbitration agreement.  In other words, would such an employee—even one who believed he had valid arguments that the dispute was not arbitrable or that the agreement was unenforceable— have reasonably concluded that the risk of incurring potentially thousands of dollars in fees and costs just to litigate these threshold questions was too great, such that he felt compelled to remain in that job for the remainder of the contract term?

Here, even if Vidal did not know the precise rate that an attorney or arbitrator charged, any reasonable person in his position (or who did a cursory online search for attorney fee rates) would rightly assume that these rates would likely be hundreds of dollars per hour, and that even

31

25 hours of attorneys' fees and 10 hours of arbitrator's fees could amount to several thousand dollars. *See* Vidal Decl ¶¶ 38-40 ("I don't know how much money arbitration costs exactly, and I don't know how much lawyers cost . . . [b]ut based on what I've heard, arbitration and attorney's charges for [ACS] could cost many thousands of dollars. I knew that much right away."). And at the time he was considering leaving his position, Vidal was making about $3,500 per month after taxes, and had at least $2,850 per month in expenses, while working to send as much money home to his father and disabled brother as possible. Vidal Decl. ¶¶ 48–52. Even the arbitration initiation fees totaling over $2,000 were beyond Vidal's means. *See id.* ¶ 44; Compl. ¶ 76.

Given his financial circumstances and the contract's term, Vidal is likely to succeed on the merits of his claim that the threat of uncapped arbitration costs and attorneys' fees associated with adjudicating even threshold issues of arbitrability constitute threats of "serious harm" in violation of the TVPA. At the very least, given the highly analogous caselaw invalidating liquidated damages clauses in high-dollar amounts similar to what Vidal would have faced if he did not prevail in arbitration, he has raised serious questions as to the merits of this argument.

### b. Unconscionability

Vidal also argues that the arbitration agreement—and specifically, the delegation clause contained in that agreement—is unconscionable. Under New York law, as in other states, the "doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *United States v. Martinez*, 151 F.3d 68, 74

(2d Cir. 1998)).[13] A contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (N.Y. 1988); *see Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010).

A showing of unconscionability requires a demonstration that "a contract is both procedurally and substantially unconscionable." *Ragone*, 595 F.3d at 121 (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)). "In other words, [a] contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Spinelli*, 903 F.3d at 208 (internal quotation marks and citation omitted). Generally, "procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Master Lease Corp. v. Manhattan Limousine, Ltd.*, 580 N.Y.S.2d 952, 954 (N.Y. App. Div. 1992) (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983)).

### i.   Procedural unconscionability

Vidal is likely to succeed on the merits of his argument that the circumstances surrounding his signing of the 2022 Contract were procedurally unconscionable; at the very least, he has raised serious questions on the merits of that claim. "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice." *Wolowitz*, 468 N.Y.S.2d at 145. "While inequality in bargaining power between

---

[13] The parties do not dispute that New York law applies here. *See* 2022 Contract at 7; Pl.'s Mem. at 22; Def.'s Opp'n at 18.

employers and employees is not alone sufficient to hold arbitration agreements unenforceable, such inequality, when coupled with high pressure tactics that coerce an employee's acceptance of onerous terms, may be sufficient to show that an employee lacked a meaningful choice." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citations omitted); *see Brower v. Gateway 2000*, 676 N.Y.S.2d 569, 573 (N.Y. App. Div. 1998) (describing disparity in bargaining power as informed by the "experience and education of the party claiming unconscionability"). As part of this inquiry, "a court should focus on evidence of high pressure or deceptive tactics," in addition to the disparity of bargaining power between the parties. *Brennan*, 198 F. Supp. 2d at 382; *Gillman*, 73 N.Y.2d at 11 ("The focus is on such matters as [*inter alia*] whether deceptive or high-pressured tactics were employed.").

The power disparity between the parties here goes beyond the typical employer-employee relationship. At the moment he signed the 2022 Contract, Vidal was in a particularly vulnerable position. He was living in London, away from home and without a job, having spent over two-and-a-half years waiting for his U.S. visa application to be processed. He had already signed and remained bound by the 2019 Contract, which forbade him from working with any employer in the United States other than ACS. 2019 Contract ¶ 5. And he had quit his job in London in reliance on the 2019 Contract—assuming, once he was notified in December 2021 that his visa interview was scheduled, that he would need to move to the United States and begin his employment right away. Vidal Decl. ¶ 20. Indeed, when he quit his job in London, Vidal had no reason to think that he would be asked to sign a second contract, when he was suddenly presented with the 2022 Contract and told by an ACS representative to "sign quickly." Supp. Vidal Decl. ¶ 7.

In addition to the clear power disparity between the parties here, Vidal identifies many coercive circumstances surrounding his signing of 2022 Contract. Vidal believed when he was presented with the 2022 Contract that he was still bound by the terms of the 2019 Contract—that is, if he walked away from his early contractual agreement to be placed in U.S.-based employment with ACS at that point or refused to sign the 2022 Contract, he would owe $20,000 in liquidated damages. Vidal Decl. ¶ 25; 2019 Contract ¶ 19. Vidal's fear was neither unreasonable nor unfounded. ACS makes much of the fact that its accompanying letter released the promissory note Vidal had previously signed. *See* Def.'s Opp'n at 7, 24. Yet, the 2019 Contract also included other methods outside the promissory note by which ACS could seek to recover the liquidated damages, including by "legal action." 2019 Contract ¶ 19. And no portion of the 2022 Contract nor anything in ACS's written communications advised Vidal that ACS could not and would not seek to collect $20,000 by other means, either immediately if he failed to sign the 2022 Contract or later if he was alleged to violate its terms.

Moreover, ACS employed what I conclude are both "high pressure" and "deceptive" tactics in January 2022 when presenting Vidal with his contract. *See Brennan*, 198 F. Supp. 2d at 382. ACS's letter explaining the changes reflected in the 2022 Contract was misleading at best. ACS told Vidal that the contract was revised because of "feedback" the company had received that the liquidated damages clause—followed by what can charitably be described as a cryptic explanation that ACS was concerned this clause "was viewed as a buy-out, which was not our intent." Luy Decl. Ex. B2. Yet as ACS was no doubt well aware, as of January 2022, a number of courts in this circuit and elsewhere had held that liquidated damages clauses in contracts between staffing agencies and immigrant healthcare workers specifically were unenforceable, because they threatened workers with serious harm in violation of the TVPA. *See, e.g.*,

35

*Paguirigan I*, 286 F. Supp. 3d at 437; *Paguirigan II*, 2019 WL 4647648 (holding in September 2019 that Plaintiffs' TVPA claims survived Defendant's summary judgment motion); *Magtoles*, 2021 WL 6197063, at *5; *Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) (denying motion to dismiss TVPA claim where a $20,000 liquidated damages clause was at issue); *see also In re Attorney General Investigation*, https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058_-_fully_executed_9.13.22.pdf (settlement agreement executed in September 2022 in case where immigrant nurses had been subject to liquidated damages clause in amounts between $10,000 and $20,000 that was challenged as a violation of TVPA, and in which employer agreed to pay financial restitution to impacted nurses); *cf. Javier*, 2014 WL 3058456 (denying a motion to dismiss complaint in 2014 that threats to enforce a $15,000 confession of judgment against an immigrant physical therapist violated the TVPA).

To be sure, ACS was not under any obligation to provide Vidal a legal opinion as to the all-but-certain unenforceability of the liquidated damages clause in the 2019 Contract he had already signed. But ACS's affirmative statement that it revised this clause due to "feedback" was highly misleading, and, in conjunction with the other circumstances, adds to the likelihood that Vidal will succeed on the procedural prong of the unconscionability analysis.

In addition, ACS now concedes that in January 2022, its decision to present Vidal with a revised contract did not automatically render the 2019 Contract invalid. It acknowledges that Vidal could have chosen to hold ACS to its end of the bargain the parties made in 2019 and come to work in the United States under the terms of the 2019 Contract. Had he done so, of course, those terms would have tilted significantly in Vidal's favor, since if he left his position before the end of the contract term, ACS would no longer have had the ability to collect on the $20,000

promissory note that Vidal signed in 2019 (as ACS had already cancelled that note). But no one at ACS informed Vidal that he had the option to work in the United States under the 2019 contract when they presented him with a revised contract to "quickly" sign.

Finally, ACS makes much of the fact that Vidal was invited to ask questions about the new contract, but that he instead signed the contract that same day. Def.'s Opp'n at 19–20. However, Vidal notes (in a statement that, at this time, is undisputed by ACS) that he did call an ACS representative when he received the 2022 Contract and was told to "sign the revised contract and send it back to [ACS] quickly." Supp. Vidal Decl. ¶ 7. Indeed, in the record provided by ACS, the company advised Vidal should "let us know too should you have any questions or clarification," in its original email attaching the 2022 Contract, Luy Decl. Ex. B1, and followed up with him to invite him to ask further questions *after* he had signed the contract. Luy Decl. Ex. E, ECF No. 30-11. ACS may dispute these circumstances or plead additional facts at a later stage in this litigation. But on the present record, these circumstances taken together demonstrate that Vidal lacked meaningful choice when presented with the 2022 Contract. *Wolowitz*, 468 N.Y.S.2d at 145.

Vidal is likely to succeed on the merits of his claim that the circumstances surrounding the execution of the 2022 Contract were procedurally unconscionable, satisfying the first prong of the unconscionability analysis. At the very least, he has raised serious questions as to the merits of that claim that warrant a pause in arbitration while the merits are fully litigated.

### ii.    Substantive Unconscionability

The substantive unconscionability analysis looks to the terms of the contract itself to analyze "the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12.

"Unconscionability is determined by reference to the relative benefit of the bargain to the parties *at the time of its making*." *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 113 (2d Cir. 1996) (emphasis in original) (quoting *United States v. Bedford Assocs.*, 657 F.2d 1300, 1312–13 (2d Cir. 1981)).

Here, the agreement shifts costs of arbitration, the arbitrator's fees, and attorneys' fees to Vidal if ACS prevails at arbitration, 2022 Contract at 12, in what courts have referred to as a "loser pays" provision. Vidal argues that this provision is unconscionable, and that, specifically, the delegation clause is unconscionable when paired with the "loser pays" provision. This is because, Vidal argues, the portion of these fees and costs that he would face just to contest arbitrability would be in the thousands of dollars—a prohibitively high amount for someone in his financial circumstances that could prevent him from being able to vindicate his rights to make legal arguments regarding the enforceability of the arbitration agreement.[14]

Courts applying New York law have held that similar "loser pays" provisions in arbitration agreements are substantively unconscionable where a party makes a "showing of individualized prohibitive expense that considers factors including the financial means of plaintiff and the cost differential between arbitration and litigation in court." *Valle v. ATM Nat.,*

---

[14] ACS argues that this Court should not consider whether the provision requiring Vidal to pay the costs of arbitration (including case initiating costs and the arbitrator's fees) is unconscionable since, once the arbitration began, ACS stipulated that it would agree to bear these costs notwithstanding the contract's language to the contrary, and the arbitrator ratified that agreement. *See* Def.'s Opp'n at 11; Asaad Decl. Ex. 20. ACS argues that, since the parties have already agreed that this provision will not apply, I should not consider it in my analysis of unconscionability because ACS has already declined to enforce the provision. Def.'s Opp'n at 20; *see Ragone*, 595 F.3d at 124 (noting that "unconscionability is an equitable defense to the *enforcement* of harsh or unreasonable contract terms"). But here, Vidal is asking the Court to determine the validity of the *delegation clause* in conjunction with other contractual provisions, and at this stage of the litigation, is not seeking a final ruling as to the unconscionability of the "loser pays" provision as it applies to the arbitrator's fees. As such, ACS's arguments are premature.

*LLC*, 14-CV-7993 KBF, 2015 WL 413449, at *6–7 (S.D.N.Y. Jan. 30, 2015); *Brady v. Williams*

*Capital Grp., L.P.*, 878 N.Y.S.2d 693, 698–700 (N.Y. App. Div. 2009), *aff'd as modified* 14 N.Y.

3d 459 (N.Y. 2010) (holding that a fee-splitting provision of an employment arbitration

agreement was substantively unconscionable given the cost of $21,150 to a plaintiff who

previously was earning between $100,000 and $405,000 in the previous five years but was then

unemployed); *cf. Schreiber v. K-Sea Transp. Corp.*, 9 N.Y.3d 331, 341 (N.Y. 2007) ("Schreiber

should not be compelled to bear costs which would effectively preclude him from pursuing his

claim.").

      Here, not only is the "loser pays" provision likely unconscionable on its own terms, but

the delegation clause itself is likely unconscionable when paired with the "loser pays" provision.

Courts in this district, in conducting similar analyses, have looked to whether the "fee splitting

arrangement . . . for the arbitration of *enforceability*" is "substantively unconscionable," "rather

than for arbitration of more complex and fact-related aspects of the claim." *Saizhang Guan v.*

*Uber Techs.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017) (emphasis added) (quoting *Rent-A-*

*Center*, 561 U.S. at 74); *cf. Lim*, 8 F.4th at 1002 (concluding that under California law the cost

splitting, fee shifting and venue provisions rendered the delegation clause substantively

unconscionable in light of the employee's financial circumstances).  It is true that it may be

"more difficult to establish" the unconscionability of fees relating only to arbitrability, rather

than to the entire arbitration.  *Id.*  However here, the issues of enforceability are complex, multi-

faceted, and, as this litigation has already indicated, likely to result in many hours of work for

both parties' attorneys and the decisionmaker.

      Vidal has made a sufficient showing for this preliminary stage in the litigation that to

even challenge the threshold issues of arbitrability before the arbitrator could cause him financial

ruin.  As Vidal's counsel explained at oral argument, if an attorney with fifteen years of experience has a prevailing rate of $475/hour, twenty-five hours of work on this case would amount to over $11,000 in fees.  *See No Limit Auto Enters., Inc. v. No Limit Auto Body, Inc.*, No. 21-cv-04577 (AMD) (JMW), 2022 WL 18399477, at *15 (E.D.N.Y. 2022) (awarding an hourly rate of $475 for a motion that "involved more than say a straightforward default motion for breach of contract" to a partner with fifteen years of experience).  Vidal has demonstrated that he cannot afford even the arbitration initiation fees of over $2,000 in this case.  Vidal Decl. ¶ 44.  In his current position after leaving ACS, he earns around $4,500 per month after taxes, incurs at least $2,850 worth of basic living expenses, and sends $1,000 per month to his family in the Philippines who rely on him for support.  Vidal Decl. ¶¶ 47–52.  Accordingly, even during the best month, Vidal would have only $650 left over, which does not account for any unexpected expenses, such as his own medical needs or unexpected emergency expenses his family may incur.  Thus, even the $1,900 filing fee and $750 case management fee to initiate arbitration would be well beyond Vidal's means, let alone $10,000 or more in attorneys' fees just to resolve a dispute over arbitrability—and more still in arbitrator's fees.  Seligman Decl. Ex. 11 (noting that the arbitrator's rate is "$450 per hour").  And in this case, the arbitrator's choice to reserve decision on enforceability until after discovery on the merits, *see* Asaad Decl. Ex. 11, further increases the cost Vidal may have to bear even were he to contest issues of arbitrability, since attorneys' fees on the merits of ACS's breach of contract claim issues continue to mount.

For all these reasons, the Court concludes that Vidal is likely to succeed on the argument that the terms of this contract are substantively unfair.  Under the delegation clause, to even contest the arbitrator's jurisdiction, whether the dispute is properly for arbitration, or even whether the arbitration agreement is unconscionable or illegal, Vidal is vulnerable to owing

potentially thousands of dollars of legal fees simply to resolve these threshold legal questions. This would "effectively preclude" Vidal from pursuing his claim. *Schreiber v. K–Sea Transp. Corp.*, 9 N.Y.3d at 341; *Ragone*, 595 F.3d at 124. For even if Vidal believed that he had a valid argument that the arbitration agreement or contract as a whole was unenforceable, to contest the arbitrator's jurisdiction would risk potentially thousands of dollars in attorneys' fees and arbitration costs if he failed to convince the arbitrator of the merits of his legal position. *See Brady v. Williams Cap. Grp., L.P.*, 14 N.Y.3d 459, 466–67 (N.Y. 2010) (underscoring that under New York law, courts look to whether the cost of arbitration would "preclude a litigant from effectively vindicating his or her statutory rights in the arbitral forum" (citing, *inter alia*, *Green Tree Financial Corp.–Ala. v. Randolph*, 531 U.S. 79 (2000))). Faced with nearly identical arguments, the Ninth Circuit has held that, where a delegation clause and a "loser pays" provision are taken together, the presence of a "loser pays" provision "creates a chilling effect on [an employee] enforcing his rights because it exposes him to the possibility of paying attorney's fees to [the employer] if he lost at arbitration, including fees associated with the threshold issue of arbitrability." *Lim*, 8 F.4th at 1003.

Thus, although it may be "difficult" in many cases to show that a delegation clause coupled with fee-shifting arrangement is unconscionable as to issues of enforceability, *see Rent-A-Center*, 561 U.S. at 74, Vidal has made such a showing here. Conversely, district courts that have rejected employees' challenges to the validity of delegation clauses in arbitration agreements with "loser pays" provisions have done so because plaintiffs have "not made a particularized showing of their inability to pay for arbitration"—which Vidal has demonstrated here. *See Saizhang Guan*, 236 F. Supp. 3d at 732–33. In *Saizhang Guan* the court also highlighted a contractual provision not present here, which specified that an employee would

"not be required to bear any type of fee or expense that [he] would not be required to bear if [he] had filed the action in a court of law." *Saizhang Guan*, 236 F. Supp. 3d at 732–33.  By contrast, this is precisely the type of penalty the 2022 Contract would impose on Vidal.  Although the arbitration provision states that "in the event that the AAA's *initial filing fee* is higher than the filing fee for a court action . . . [the employee] will only be required to contribute the cost of what [he] would have paid to file an action in Court," it imposes no such limit on other costs and fees.  2022 Contract at 12 ("[A]t the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as *all costs and fees charged by the AAA and the Arbitrator*.").  Accordingly, the delegation clause itself, viewed collectively in conjunction with the "loser pays" provision, is so prohibitively costly as to deprive Vidal of his right to contest its validity.  Vidal is likely to succeed on the merits of—or has, at the very least, raised serious questions on the merits of—his argument that the delegation clause is unconscionable.

### c.  Severability of the "loser pays" provision

In evaluating the merits of the parties' claims, I have considered whether Vidal's objections to the arbitration agreement—and the delegation clause specifically—could be addressed if the "loser pays" provision were severed from the rest of the contract.  *See* 2022 Contract at 8.  The Second Circuit has previously held that severance is the appropriate remedy where a particular provision in an arbitration agreement is deemed unconscionable and the agreement contains a severability provision, as the agreement here does.  *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 124–25 (2d Cir. 2010).[15]  As explained below, however, a

---

[15] *Ragone* emphasized that this conclusion was based on the "federal policy favoring the arbitration as an alternative means of dispute resolution," under which courts "are charged with

severability analysis would be premature at this stage, where the only relief sought by Vidal is a preliminary injunction pausing the arbitration.

The parties dispute whether severance would be required if I were to find that the "loser pays" provision is unenforceable. Vidal raises several arguments as to why the "loser pays" provision is so integral to the arbitration agreement that it cannot be severed. ACS argues that the fee shifting provision is not essential to the bargain—the purpose of which is to set arbitration as the mechanism for the resolution of employment disputes—and if the "loser pays" provision cannot be enforced, the appropriate remedy is severance.

However, at this preliminary stage in the litigation, I have not made a final determination as to whether the "loser pays" provision is unconscionable or a violation of the TVPA. I have only determined that Vidal is likely to succeed on the merits (or at least raised serious questions as to the merits) of his claim that the *delegation clause*, viewed in conjunction with the "loser pays" provision, is invalid under state and federal law. It is certainly appropriate and necessary for a court to consider severability when it makes a final determination that a particular provision is unlawful or cannot be enforced. But as I have not made any such determination (nor could I, at the preliminary injunction stage), then neither the delegation clause nor any other provision in

---

'encouraging and supporting arbitration.'" 595 F.3d at 121, 124 (citations omitted). However, there are at least serious questions as to the viability of this direction following the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022), where the Supreme Court emphasized that the FAA's "policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules," and that instead of adopting a rule that "favor[s] arbitration," courts should "place [arbitration] agreements upon the same footing as other contracts." 142 S. Ct. at 1713 (citations omitted). General contract law is far more flexible in the face of an unconscionable provision than what the Second Circuit instructed in *Ragone*. *See Oneida Indian Nation of New York v. County of Oneida*, 617 F.3d 114, 138 (2d Cir. 2010) ("[A] court generally is allowed substantial flexibility in its choice of remedy when it determines that a contract or term thereof is unconscionable, [but] the traditional remedy for a claim of unconscionability is to deny enforcement of the relevant contract." (citing Restatement (Second) of Contracts § 208)).

this contract has yet been deemed unenforceable—and thus, there is no offending clause to "sever" from the rest of the contract. The question at this stage is simply whether Vidal has made a sufficient showing that the delegation clause, read in conjunction with the "loser pays" provisions of the contract, is *likely* unlawful, such that the arbitration should be paused while his challenges to the contract are fully litigated. Notably, neither party has pointed to any other case—and I have found none—in which a district court has ordered a similar provision severed in the context of a motion for a preliminary injunction that turns on the validity of a delegation clause.

Moreover, the effect of the ruling that ACS seeks would be unproductive and confusing. If I were to hold that the delegation clause is valid only if the (likely-invalid) "loser-pays" provision were severed, such a holding would be essentially advisory. The result would be to deny the preliminary injunction and allow the arbitration to proceed. That would leave the arbitrator free to make her own *de novo* assessment of the merits of Vidal's arguments and determine for herself the enforceability of the agreement (including the "loser pays" provision)—all while ACS continues to accumulate substantial legal fees potentially recoverable against Vidal. Such an advisory ruling should be avoided. *See County of Suffolk v. Sebelius*, 605 F.3d 135, 138 (2d Cir. 2010) ("Obliged, as we are, to avoid issuing advisory opinions, our authority is limited to 'live' cases in which there remains a possibility that the court can grant some form of effectual relief.'"); *Long Island Lighting Co. v. County of Suffolk*, 604 F. Supp. 759, 761–62 (E.D.N.Y. 1985) ("It is fundamental that a United States District Court may not render advisory opinions." (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

44

Therefore, in light of my determination that Vidal is likely to succeed on the merits of (or at least has raised serious questions as to the merits of) his arguments that the delegation clause is invalid, I decline to address the parties' severance arguments at this stage. ACS remains free to argue at a later stage in the litigation that Vidal's challenges to the fee-shifting provisions of the arbitration agreement could be cured by severance, and Vidal remains free to argue the contrary. At this juncture, the appropriate remedy is simply to pause the arbitration proceeding while discovery and merits litigation continues in this Court.

### B. Irreparable harm

As to the remaining injunction factors, irreparable harm is the "most important." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Vidal has demonstrated that he will suffer irreparable harm if the arbitration is allowed to proceed before his legal challenges to the 2022 Contract can be adjudicated on the merits in this Court.

First, as explained *supra,* Vidal has shown a likelihood of success on the merits of his claim that threshold issues of arbitrability should be decided by the courts and not the arbitrator. Courts in this circuit have held that "[c]ompelling arbitration of a matter not properly subject to arbitration constitutes '*per se* irreparable harm.'" *Citigroup Glob. Mkts. Inc. v. VCG Special Opportunities Master Fund*, No. 08-cv-5520 (BSJ), 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008) (quoting *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004)); *Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union, Loc. 365*, 975 F. Supp. 445, 446–47 (E.D.N.Y. 1997) ("[Plaintiff] may be presumed to suffer irreparable harm if forced to arbitrate a dispute it did not intend to be subject to arbitration . . . .").

Here, prior to the injunction, discovery was progressing in arbitration, and the arbitrator had (1) determined that she had jurisdiction over issues of arbitrability and (2) decided she would not even consider Vidal's arguments that the arbitration agreement was unenforceable or unconscionable until she reached the merits of ACS's breach of contract claim. Asaad Decl. Ex. 11. The unauthorized arbitration of arbitrability issues is particularly harmful, given that the "right of access to courts is of such importance that courts will retain authority over the question of arbitrability in the particular dispute unless the parties clearly and unmistakably provide[d] that the question should go to arbitrators." *Bucsek*, 919 F.3d at 190 (internal quotation marks and citation omitted) ("It is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to arbitration."). In the absence of an injunction, Vidal would be unable to vindicate his rights to access the courts and present his claims that the arbitration agreement is unenforceable to a judge. Accordingly, because Vidal is likely to succeed on the merits that the arbitration of his enforceability arguments is unauthorized and that, instead, a court should determine these threshold issues of enforceability, Vidal has made a showing of *per se* irreparable harm.

Second, Vidal has demonstrated a likelihood of specific irreparable harm in the form of time, energy, and expense in defending himself before the arbitrator. While as a general matter, the risk of ultimately being responsible for money damages and attorneys' fees may not amount to irreparable harm, for Vidal, the financial costs of participating in arbitration could constitute irreparable harm. Vidal has limited financial means and is living nearly paycheck to paycheck to provide his family in the Philippines with subsistence income. For him, taking shifts off work to attend arbitration proceedings or responding to discovery requests may have outsized consequences. Vidal may risk losing out on money that is essential for his family's well-being—

and his own.  ACS argues that any potential loss of wages is not irreparable because it can be remedied—arguing that money, by definition, can be paid back.  But ACS fails to acknowledge that, for workers with as slim a financial margin as Vidal has in a given month, missing out on income because of missed shifts could have an irreparable impact.  For example, even a small amount of lost income in one month could mean the difference between Vidal's ability to pay for an unexpected medical expense, or not—and suffering more serious symptoms, pain, or a prolonged illness as a result.  While ACS may argue that loss of income can never constitute irreparable harm, it is simply not the case that for a worker in Vidal's financial position, the harm from lost income can always be remedied in full through retroactive compensation.

Thus, because of the *per se* irreparable harm of participating in an unauthorized arbitration, coupled with Vidal's specific expenditures of time and resources in defending himself against this arbitration, Vidal has demonstrated irreparable harm.

### C.  Balance of the hardships

The balance of the hardships also tips decidedly in Vidal's favor.  *See Citigroup Glob. Mkts.*, 598 F.3d at 35; *see Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (instructing courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief" (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008))).  In addition to the irreparable harm outlined above, Vidal also has demonstrated that participating in the arbitration is harmful to him given the serious risk of financial ruin if ACS were to prevail, the time and energy spent representing himself in the arbitration pro se, the opportunity costs inherent in that representation, and the mental toll that the ongoing proceedings and the threat of a ruinous damages award have had on him.  Vidal Decl. ¶¶ 43–45, 54–56; Pl.'s Mem. at 27–28.

By contrast, ACS has pointed to no specific harm that it will suffer if the arbitration is temporarily paused while the Court adjudicates the merits of Vidal's claims. ACS makes much of the financial hardships it claims it has suffered due to Vidal's purported breach of his employment contract. Def.'s Opp'n at 27–28. But the relevant analysis at this stage is the harm that the party opposing an injunction "might suffer as a result of a preliminary injunction issuing against it," *Reuters, Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 909 (2d Cir. 1990), not of an adverse final judgment on the merits or harm caused by the events giving rise to the lawsuit. Accordingly, even if ACS can point to lost profits or other short-term losses resulting from Vidal's resignation, they are immaterial to the analysis of the balance of the hardships when considering the impact of Vidal's requested relief.

ACS argues that it has an interest in a swift and efficient resolution of the issues—an interest indeed shared by both parties. But this interest can just as easily be vindicated in this Court. At oral argument, ACS expressed that a preliminary injunction would cause a hardship because it would lead to a "snowball effect" in other cases, allegedly preventing ACS from being able to seek damages from other employees who quit before the end of their employment terms, citing two other arbitrations that the AAA indicated would be paused if this Court granted a preliminary injunction. *See* Pl.'s Feb. 14, 2023 Letter, ECF No. 33. However, I fail to see how addressing the legality of the delegation clause, whether for Vidal or other workers, harms ACS. Preventing the enforcement of an illegal arbitration provision does not constitute harm. And, of course, ACS is still free to pursue breach of contract claims on the merits in Vidal's case, and to make its intention to do so known to Vidal and others. This preliminary injunction means only that ACS must wait to resolve those claims until after litigation on the validity of the delegation

clause and the enforceability of various provisions of the contract has concluded.  The balance of hardships at this stage of the litigation thus tips decidedly in Vidal's favor.

### D.  Public interest

Finally, a party seeking an injunction must demonstrate that an injunction is "in the public interest."  *Winter*, 555 U.S. at 20.  Vidal has done so here.  It is in the public interest for a potentially unauthorized arbitration to be paused while a court evaluates whether the arbitration is unconscionable or runs contrary to Congressional prohibitions on forced labor.  That is especially so where ACS is seeking to enforce analogous agreements against at least two other employees who also terminated their contracts and who now face the prospect of a costly loser-pays arbitration initiated by ACS.  *See* Pl.'s Feb. 14, 2023 Letter.  It is in the public interest to identify and remedy any unlawful provisions in these contracts.  And it is in the public interest to ensure that arbitration threats are not improperly leveraged to prevent nurses and other essential workers from leaving unsafe or unlawful employment conditions if the circumstances so warrant.

ACS argues that the injunction Vidal seeks is not in the public interest because it runs counter to the national policy in favor of arbitration.  The Supreme Court has referred to the FAA as announcing a federal policy in favor of arbitration.  *See Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).  It has also repeatedly emphasized, however, that this policy does not place arbitration agreements at a higher level than other contracts, but merely on equal footing with any other contract.  *Morgan*, 142 S. Ct. at 1713 ("[T]he FAA's policy favoring arbitration . . . is merely an acknowledgment of the FAA's commitment to . . . place such agreements upon the same footing as other contracts" (quoting *Moses H. Cone*, 460 U.S. at 24; *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)) (internal quotation marks omitted)).  Accordingly, where, as here, a court's application of New York or federal law leads to the conclusion that a

preliminary injunction is warranted, granting an injunction is wholly consistent with the FAA's mandate.

## III.    Additional considerations

Two final points bear mentioning.  First, ACS took the curious step of requesting that any order granting a preliminary injunction also state that ACS's request for a pre-motion conference in anticipation of a motion to compel arbitration or dismiss the complaint is denied.  *See* Def.'s Letter with Supp. Authority, ECF No. 38.  ACS's pre-motion conference request is denied as moot.  The pre-motion conference letter indicated the anticipated motion would raise the very same arguments ACS raised at greater length here: that the agreement contains a valid delegation clause, and as such that threshold issues of arbitrability must be decided by the arbitrator rather than a court; and that Vidal was in fact challenging the arbitration agreement as a whole as unconscionable, rather than the delegation clause specifically.  Def.'s Mot. for Pre-Mot. Conf., ECF No. 11 at 2–3.  Because I considered and rejected each of the foregoing contentions in concluding that Vidal is likely to succeed on the merits of his legal challenge to the delegation clause, and the arbitration is paused pending further litigation, ACS's anticipated motion to compel is clearly moot.  *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 141 ("[T]o enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present." (citation omitted)).  ACS may be suggesting that it was somehow prejudiced by the delay in addressing these legal issues until the parties fully briefed and argued them at the preliminary injunction stage.  But if anything, ACS benefitted from this delay, since it allowed arbitration to continue for several more months—and ACS to attempt to accumulate fees it hopes to shift to Vidal in the process.

Second, I feel compelled to note my dismay at ACS's suggestion—with which it opened its brief opposing Vidal's motion for a preliminary injunction, and which it invoked again at oral argument—that Vidal should not be considered a trafficked worker covered by the protections of the TVPA since he was not "working in a back alley sweat shop, a remote lettuce field, or a massage parlor for substandard wages." Def.'s Opp'n at 1. The TVPA was enacted with the understanding that worker exploitation can take myriad forms. *See* 18 U.S.C. § 1589(a) (establishing that threats of, *inter alia*, psychological, financial, and reputational harm can give rise to forced labor). Courts have time and again found that employers can be held liable for violations of the TVPA in legal actions brought by immigrant nurses like Vidal. *See, e.g.*, *Paguirigan II*, 2019 WL 4647648, at *18; *Magtoles*, 2021 WL 6197063, at *6; *Baldia*, 2022 WL 4777836, at *8–9; *Dale Carmen*, 2021 WL 2476882, at *9. And with good reason. Nurses and other healthcare workers toil long hours under demanding conditions to care for our nation's ill and infirm. They are no less entitled to protection against forced labor than those who sew our clothes or harvest our food. For ACS to suggest otherwise—despite its familiarity with the TVPA and the courts' prior application of that law to healthcare workers—is both troubling and highly disingenuous.

## IV.    Conclusion

For the foregoing reasons, Vidal's motion for a preliminary injunction is granted. The arbitration shall be paused while the parties litigate the merits of Vidal's claims in this Court.

SO ORDERED.

*/s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated: Brooklyn, New York
    April 4, 2023